FILED
2020 Nov-16  AM 10:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

**Page 1**

```
 1          UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ALABAMA
 2                 SOUTHER DIVISION
 3
 4    JAMES JOHNSON, JR., and
      ERICKA JOHNSON,
 5
          Plaintiffs,
 6
      vs.                      2:18-CV-01835-MHH
 7
      ABF FREIGHT SYSTEM, INC.,
 8    and MARK MASSINGILL,
 9    Defendants.
10
11
12
13        DEPOSITION OF MARK MASSINGILL
14
15
16
17        The deposition of MARK MASSINGILL was
18    taken before Kayla Wilson, CCR, as
19    Commissioner, on September 11, 2019, by
20    the Plaintiffs, commencing at 9:00 a.m.,
21    in the office of Carr Allison, in
22    Birmingham, Alabama, pursuant to the
23    stipulations set forth herein.
```

**Page 2**

```
 1          A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFFS:
 4        Jason M. Baer, Attorney at Law
          Baer Law, LLC
 5        3000 Kingman Street, Suite 200
          Metairie, LA 70006
 6
 7    FOR THE DEFENDANTS:
 8        Tom Oliver, Attorney at Law
          Carr Allison
 9        100 Vestavia Parkway
          Birmingham, Alabama 35216
10
11
12                 --oOo--
13
14
15
16                  INDEX
17
18                                    PAGE
19    Examination by MR. BAER.................5
20    Examination by MR. OLIVER.............172
21    Further Examination by MR. BAER.......195
22    Further Examination by MR. OLIVER.....202
23
```

**Page 3**

```
 1                  EXHIBITS
 2                                    PAGE
 3    Plaintiff's Exhibit No. 1.............12
 4    Plaintiff's exhibit No. 2.............12
 5    Plaintiff's Exhibit No. 3.............44
 6    Plaintiff's Exhibit No. 4.............73
 7    Plaintiff's Exhibit No. 5.............73
 8    Plaintiff's Exhibit No. 6............109
 9    Plaintiff's Exhibit No. 7............135
10    Plaintiff's Exhibit No. 8............151
11    Plaintiff's Exhibit No. 9............158
12    Plaintiff's Exhibit No. 10...........165
13    Plaintiff's Exhibit No. 11...........172
14
15    Defendant's Exhibit No. 1............180
16
17
18                 --oOo--
19
20
21
22
23
```

**Page 4**

```
 1          S T I P U L A T I O N S
 2        It is hereby stipulated by and between
 3    counsel that the deposition of MARK
 4    MASSINGILL may be taken on the date of
 5    time specified and in the action
 6    denominated herein before Kayla Wilson, as
 7    Commissioner.
 8        It is further stipulated that all
 9    objections are assignment of grounds,
10    except as to the form of the question, are
11    reserved until the time of the trial.
12        It is further stipulated that the
13    signature to and reading of the deposition
14    by the witness are waived, the deposition
15    to have the same force and effect as
16    though full compliance is had with all
17    laws and rules for court relating to
18    taking depositions.
19        It is further stipulated that notice of
20    filing this deposition is hereby waived.
21                 --oOo--
22
23
```



1      D E P O S I T I O N
2         MARK MASSINGILL
3   was sworn (affirmed) and testified as follows:
4            EXAMINATION
5   BY MR. BAER:
6      Q    My name is Jason Baer.  I represent
7   James and Ericka Johnson in a motor vehicle
8   collision that happened on October 26, 2016.
9   I'm here today to take your deposition.  Your
10  lawyers are present.  The court reporter is
11  present.  I'm essentially just going to be
12  asking you questions.  You're under oath to
13  tell the truth, okay?
14     A    Okay.
15     Q    You understand that?
16     A    Yes.
17     Q    Okay.  When I say tell the truth,
18  that's the truth under the penalty of perjury
19  as if you're before a judge and jury, you
20  understand that?
21     A    Yes.
22     Q    One of the most important things about
23  this deposition that I cannot stress enough is

1   that if you do not understand one of my
2   questions, it's very important that you tell
3   me you don't understand the question, okay?
4      A    Okay.
5      Q    The reason for that is if you answer
6   the question, you're bound by that testimony,
7   okay?
8      A    Okay.
9      Q    Okay.  You're doing a great job right
10  now, but try and verbalize your responses.  At
11  points in this deposition it's going to become
12  very conversational.  I need you to verbalize
13  yes and no and answer as opposed to shaking
14  your head or nodding.
15     The court reporter needs to take everything
16  that we say down in a question and answer
17  format; do you understand that?
18     A    Yes.
19     Q    Okay.  Are you taking any medications
20  that would prevent you from being able to
21  understand my questions and answer them
22  truthfully today?
23     A    No.

1      Q    Okay.  Let's get started.  Please
2   state your full name for the record.
3      A    Mark Eugene Massingill.
4      Q    Where did you grow up?
5      A    In Georgia.
6      Q    All right.  What's your current
7   address?
8      A    ████████████████ , Lafayette,
9   Georgia, █████
10     Q    All right.  Have you ever lived in
11  Alabama?
12     A    Yes.
13     Q    Okay.  When did you live in Alabama?
14     A    From '92 to I believe 2010.
15     Q    All right.  Just because Tom is in
16  here; are you an Auburn fan too?
17     A    No.
18     Q    Okay.  I like you already.  And give
19  me your social security number.  I only want
20  to publish the last four on the record.
21     A    XXX-X█████ .
22     Q    All right, my man.  Do you own the
23  house you live in now?

1      A    Yes.
2      Q    Are you aware of any tax liens against
3   you?
4      A    No.
5      Q    All right.  How long have you lived in
6   Georgia where you currently live?
7      Q    Where I currently live?
8      Q    Yeah.  How long have you lived in the
9   state of Georgia?  Let's start there.
10     A    Nine, ten years.
11     Q    All right.  And tell me a little bit
12  about your education.  Last grade you
13  completed in school, backwards.
14     A    I got a degree at Jacksonville State
15  University.
16     Q    All right.  What's your degree in?
17     A    Computer information systems.
18     Q    All right.  So I know already that
19  you're smarter than me.  Computer information
20  systems.  What made you want to be a truck
21  driver?
22     A    Well, it paid more than where I was
23  working at before.



1    Q    Okay.  And when did you start being a
2  truck driver; when did you get a CDL -- strike
3  that.
4    Let's be clear.  When did you get your CDL?
5    A    Let's see, I believe it was
6  February 18, 2015.
7    Q    Do you have a copy of it on you?  Or
8  I'm sorry, do you have it on you, your CDL?
9    A    Yes.
10    Q    Can I see it?  I've just been handed a
11  copy of a Georgia commercial driver's license
12  of Mark Eugene Massingill, issue date is
13  February 6, 2015.  Driver's license number
14  ████████████
15    MR. OLIVER:  For the record, we
16  produced a copy of it for production.
17    Q    (By Mr. Baer) I see you have
18  restriction for corrective lenses; is that
19  correct?
20    A    Yes.
21    Q    Okay.  I see you have glasses on right
22  now.  When you drive, do you use glasses or do
23  you use contact lenses?

1    A    Contact lenses.
2    Q    Were you wearing contact lenses on
3  October 26, 2016?
4    A    Yes.
5    Q    Okay.  You have a Class A commercial
6  driver's license, correct?
7    A    Yes.
8    Q    Okay.  There's going to be some times
9  during this deposition where I ask you to
10  explain to me like you're going to explain to
11  the jury.  You understand that this case is
12  going to trial sometime around April of 2020.
13  Have you been advised of that?
14    A    No.
15    Q    Okay.  Well, you'll be testifying in
16  front of a jury.  So if you hear me say that,
17  I know there's no jury in this room, but if
18  you say something different at trial than you
19  say today, I'm going to be able to read what
20  you said in your deposition, okay?
21    So I don't want to confuse you.  Everyone
22  in this room can tell there's no jury in here;
23  you understand that?

1    A    Yes.
2    Q    I want you to explain to the jury,
3  what is a Class A driver's license; what does
4  that mean?
5    A    I don't know exactly what it means.
6    Q    Okay.  And I see another endorsement
7  for a double or triple trailer.
8    A    Yes.
9    Q    That means you can pull a double
10  trailer?
11    A    Yes.
12    Q    Or a triple trailer; yes?
13    A    Well, we don't pull triples.
14    Q    Okay.  You can also pull an X tanker;
15  is that right?
16    A    Yes.
17    Q    Okay.  With hazardous materials; yeah?
18    A    Yes.
19    Q    Okay.  On October 26, 2016, were you
20  pulling a single trailer or a double trailer?
21    A    Single.
22    Q    Okay.  I'm going to get a copy of that
23  driver's license and attach it as Exhibit 1.

1  I'm going attach the deposition notice as
2  Exhibit 2.
3    (Plaintiff's Exhibit Nos 1 and 2 were
4    marked for identification.)
5    MR. OLIVER:  We'll make a copy on the
6  break.
7    Q    (By Mr. Baer) Have you ever served in
8  the military?
9    A    Yes.
10    Q    All right.  Thank you for your
11  service.  Which branch?
12    A    United States Coast Guard.
13    Q    Okay.  When did you get out of the
14  Coast Guard?
15    A    I don't remember the exact date.  It
16  was --
17    Q    Ballpark it for me.
18    A    August of '92.
19    Q    All right.  What type of discharge did
20  you have?
21    A    Honorable.
22    Q    Again, thank you.  Kind of crazy we're
23  all here on 9/11 too.



Page 13

1    MR. OLIVER:  Right.
2    Q    (By Mr. Baer) I know.  I've got to
3  fly.  Let's talk a little bit about your
4  driving history.  I want to start with since
5  you've been a commercial driver, which is
6  since February 18th of 2015, right, that
7  that's when you received your CDL and were
8  able to drive commercial vehicles, correct?
9    A    That's when I got hired, yes.
10    Q    That's when you got your driver's
11  license, right?
12    A    I believe you said it was.
13    Q    Right.  Is that the same day you got
14  hired or is that the same day you got your
15  driver's license?
16    A    I believe it got issued on --
17    Q    On February 6?
18    A    -- February 6.
19    Q    2015?
20    A    And I got hired the 18th.
21    Q    And when you got hired, you got hired
22  by ABF?
23    A    Yes.

Page 14

1    Q    Okay.  Just want to make sure.  And
2  what was the date of that, you said, when you
3  got hired?
4    A    February 18th --
5    Q    Okay.
6    A    -- 2015.
7    Q    All right.  When you went to ABF --
8  how did you get placed at ABF or how did you
9  find that job?
10    A    My brother worked there.
11    Q    Okay.  And before you went to ABF, I
12  assume you went to driving school; is that
13  right?
14    A    I was on the dock, yes.  They sent me
15  to will driving school.
16    Q    Yeah, that's what I'm asking you.  You
17  went to driving school; where did you go to
18  driving school?
19    A    Fort Smith, Arkansas.
20    Q    All right.  What's the name of the
21  school?
22    A    I'm not sure.  I believe it's ABF
23  driving school.

Page 15

1    Q    Okay.  So it's an internal driving
2  school.  It wasn't a driving school and then
3  you got placed at ABF or applied for a job at
4  ABF?
5    MR. OLIVER:  Object to the form.  You
6  can answer.
7    Q    (By Mr. Baer) Let me back up.  So
8  before February 6, 2015, when you got your
9  commercial driver's license, is it your
10  testimony that your brother or brother-in-law
11  worked there at ABF?
12    A    Yes.
13    Q    Okay.
14    A    My brother.
15    Q    And did your brother-in-law approach
16  you -- your brother or brother-in-law?
17    A    My brother.
18    Q    Okay.  So your brother worked for ABF,
19  correct?
20    A    Correct.
21    Q    Okay.  Did your brother approach you
22  about going to work for ABF or did you say, I
23  want to go to work for ABF; how did it work?

Page 16

1    MR. OLIVER:  Object to the form.
2    Q    (By Mr. Baer) All right.  Tell me how
3  you came to work at ABF.  I am just trying to
4  streamline, buddy.  My flight don't leave
5  until 4:00 o'clock.  I will sit here until
6  then.  Go ahead.
7    MR. OLIVER:  He worked on the docks
8  for them before he became a driver.  So that's
9  what has got him confused.
10    Q    (By Mr. Baer) Okay.  Let's back up.
11  Let's start from scratch, my man.
12    When did you started working for ABF
13  whether or not you were a janitor or any other
14  type of job?  You tell me.  When did you start
15  working for ABF?
16    A    I believe it was September of '14.
17    Q    All right.  September of 2014.  How
18  did you come to work for ABF initially?
19    A    My brother said, hey, if you need a
20  part-time job, there's an opening on the dock.
21    Q    All right.  So September 2014, you
22  start working on the dock, right?  What does
23  that mean?



Page 17

1    A    Taking freights off the trailers,
2  loading it onto other trailers.
3    Q    All right.  What type of freight?
4    A  It varies.
5    Q    All right.  Give me examples.
6    A    It could have been a pallet of coffee,
7  could be a pallet of lodge.  It could be a
8  roll of carpet.
9    Q    So ABF delivered a variety of cargo,
10  right?
11    A    Correct.
12    Q    And it didn't matter to you what the
13  cargo was.  They said, Mark, load this cargo
14  on this truck, take the cargo off of this
15  truck, right?
16    A    Yes.
17    Q    Okay.  What made you want to go get
18  your CDL?
19    A    Increase in pay.
20    Q    Okay.  So from September of 2014 until
21  February of 2015, did you work on the dock?
22    A    Yes.
23    Q    Okay.  And then February of 2015, you

Page 18

1  decide you want to get your commercial
2  driver's license because you want to make more
3  money?
4    A    Yes.
5    Q    Okay.  How -- when you approached --
6  did you approach ABF about becoming a
7  commercial driver or did they approach you?
8    A    I believe they approached me.
9    Q    Okay.  And I want you to explain to
10  the jury how did ABF train you to become a
11  commercial driver for its company.
12    A    They sent me to a driving school.
13    Q    And that was the one in Arkansas?
14    A    Yes.  Fort Smith, Arkansas.
15    Q    Do you remember the name of the
16  driving school?
17    A    I do not.  I believe it was under the
18  University of Arkansas.
19    Q    How long was that driving school?
20    A    Four weeks.
21    Q    What type of training did you receive
22  at that driving school?
23    A    Inspection --

Page 19

1    Q    Okay.
2    A    -- of truck.  Hooking up of the
3  tractor and trailer.  Hooking up doubles.
4  Backing up, moving gears, and then road
5  driving.
6    Q    Before February of 2015, did you ever
7  have any experience as a professional truck
8  driver?
9    A    No.
10    Q    Would you consider yourself to be a
11  professional truck driver as we sit here
12  today?
13    A    Yes.
14    Q    Would you have considered yourself to
15  be a professional truck driver in October of
16  2016?
17    A    Yes.
18    Q    Okay.  So most people sitting on this
19  jury have driver's license, right?  So explain
20  to them what is different about truck driving
21  school versus going to the DMV to get a
22  driver's license?
23    A    I guess the stuff I listed.  The

Page 20

1  hooking up of trailers.  You know, the driving
2  through turns, signals, changing of lanes,
3  getting off of the interstate, getting on the
4  interstate, doing this with the truck, speeds.
5    Q    Of the four weeks at the driving
6  school that ABF sent you to, how much of that
7  four weeks was sent in the classroom actually
8  learning as opposed to the practical things
9  you just discussed?
10    A    I don't remember.
11    Q    Okay.  Am I correct in saying that
12  there was, in fact, a classroom portion of
13  that four weeks where there was an instructor
14  that explained to you things that would be
15  needed --
16    A    Yes.
17    Q    -- in order for you to get a
18  commercial driver's license and be a
19  professional truck driver?
20    A    Yes.
21    Q    Were there training videos or was it
22  just you got a book, you had to read it, and
23  you took a test?



MARK MASSINGILL
JAMES JOHNSON vs ABF FREIGHT SYSTEM

September 11, 2019
21–24

Page 21

1   A   I believe both.
2   Q   Okay.  And did you do that part --
3   that instructional part with that instructor
4   at the school before you did any of the
5   practical driving test?
6   A   Yes.
7   Q   Okay.  When you did the driving test,
8   did somebody ride around with you?
9   A   Yes.
10  Q   And we're still at driving school,
11  just so we're clear, okay?  So when you were
12  at driving school, did somebody ride around
13  with you?
14  A   Yes.
15  Q   Were you graded, scored?
16  A   Not that I know of.
17  Q   Okay.
18  A   It was -- give me a second.  I think
19  they call it counseled after every time you
20  drive, the person riding with you, you go into
21  a room, they say this is what you did right.
22  This is something you need to work on.
23  Q   So after each time, you did -- would

Page 22

1   you call it a test; would you agree with me?
2   Can you and I get on the same term with when
3   you go out and you're with a supervisor, what
4   would you call that?  I would call it a
5   driving test; what would you call it?
6   A   I wouldn't call it a test.
7   Q   Okay.
8   A   A ride along.
9   Q   Okay.  Let's call it a ride along.  I
10  just want to get on the same page with you.
11  So when a supervisor at the driving school ABF
12  sent you to is in the tractor with you, we
13  call that a ride along?
14  A   Okay.
15  Q   Is that right?
16  A   Yes.
17  Q   Okay.  So during the ride alongs, the
18  supervisor sits in the front seat with you in
19  the tractor?
20  A   Yes.  He seats in the passenger seat,
21  yes.
22  Q   The passenger seat.  You're driving,
23  right?

Page 23

1   A   Yes.
2   Q   The tractors that you learned on, were
3   they standard or automatic transmission?
4   A   Standard.
5   Q   Had you ever driven a standard
6   transmission before you went to commercial
7   driving school?
8   A   Yes.
9   Q   When did you learn standard
10  transmission?
11  A   Probably 1979 or 1980.
12  Q   All right.  And what did you learn on;
13  how many gears was it?
14  A   It was three.
15  Q   Three gears, huh?  All right.  What
16  was different about the standard transmission
17  of a tractor-trailer; how many speeds did it
18  have?
19  A   10.
20  Q   10?  Did every tractor-trailer that
21  you drove since 2015 have a 10 speed
22  transmission?
23  A   Yes.

Page 24

1   Q   When you went to driving school, did
2   they -- let's see here -- strike that.
3   So driving school would have been the four
4   weeks before you got your commercial driver's
5   license in February of 2015 or is there a gap?
6   A   That's a gap.
7   Q   Okay.  Let's talk about driving
8   school -- the dates you went to driving school
9   in Arkansas; what were those?
10  A   I don't recall.
11  Q   Okay.  How much time passed from the
12  time you finished driving school until the
13  time you got your CDL?
14  A   A couple of months.
15  Q   Okay.  What did you do during that
16  time?
17  A   Worked on the dock.
18  Q   Okay.  So you were still working on
19  the dock?
20  A   Yes.
21  Q   Why was that?
22  A   I had to setup to take the test with
23  the State of Georgia.

Page 25

1   Q   Okay.  When you say the test, are you
2   talking about the CDL test?
3   A   Yes.
4   Q   Okay.  Did you have to fill out an
5   application for that; what goes into that?
6   A   You have to go online and then they'll
7   give you a test date.  And then show up with
8   your -- you have like a -- for better word, a
9   learner's permit -- CDL learner's permit, but
10  you got to go take a test with them.
11  Q   You get the CDL learner's permit after
12  you graduate truck school?
13  A   No.  You get it before.
14  Q   Okay.  So you get the CDL permit,
15  which enables you to drive a tractor-trailer
16  while you're in driving school?
17  A   Yes.
18  Q   Okay.  And that enables you, the
19  person who is trying to get a CDL, to drive a
20  tractor-trailer with a supervisor in the cab
21  with you, right?
22  A   Yes.
23  Q   Okay.  After you graduate truck

Page 26

1   school, does that CDL permit allow you to
2   drive a commercial vehicle such as a
3   tractor-trailer without a supervisor?
4   A   Not on the road, no.
5   Q   Okay.  So you can drive it in a
6   parking lot, but you can't go out on the road?
7   A   Correct.
8   Q   Okay.  When you took the CDL test, was
9   that in February of 2015, the first time you
10  took it, I'm sorry?
11  A   No.
12  Q   Okay.  When is the first time you took
13  the CDL test?
14  A   I'm not sure.
15  Q   Okay.
16  A   I believe it was December.
17  Q   Okay.  So December of 2014; yes?
18  A   Yes.
19  Q   Okay.  December of 2014, the first
20  time you take the CDL test.  Did you pass or
21  fail?
22  A   Failed.
23  Q   Okay.  How many parts is the CDL test?

Page 27

1   A   Three parts.
2   Q   All right.  Explain to me, what are
3   those three parts?
4   A   Inspection.
5   Q   Second?
6   A   The second part is a -- how do I
7   explain it?  Task in a parking lot.  Like,
8   maybe backing up or parallel parking the
9   trailer -- the tractor and trailer, you know.
10  They have different tests.
11  Q   Okay.  So all those would be in a
12  parking lot, like park within these lines?
13  A   Yes.
14  Q   Okay.  Make sure your blinker works
15  when you're parallel parking?
16  A   Yes.
17  Q   Check your mirrors?
18  A   Yes.
19  Q   Okay.  Did you work on turns?
20  A   That could be one of them.
21  Q   Okay.  Is it tests that wouldn't be
22  necessarily on a highway; they would be when
23  you were trying to park or get the truck into

Page 28

1   first gear to be able to leave a parking lot;
2   is that --
3   A   There's six tests.  I don't know if I
4   can recall them all.
5   Q   Six tests under the task part of the
6   test or is it --
7   A   They pick two out of the six.
8   Q   Okay.  You don't know what those two
9   are when you go take the test?
10  A   Right, you don't know what they are.
11  Q   All right.  So you got the first part
12  of the CDL test is the inspection.  The second
13  part is task test.  There's six of them.  You
14  have to take two.  You don't know what those
15  two are when you go take the test; yes?
16  A   Right.
17  Q   Okay.  What's the third part of the
18  CDL test?
19  A   Road test.
20  Q   Explain to me, what's a road test?
21  A   You go out driving on the road.
22  Q   All right.  Which of these three parts
23  did you fail to pass the first time you took

MARK MASSINGILL
JAMES JOHNSON vs ABF FREIGHT SYSTEM

September 11, 2019
29–32

Page 29

1   the CDL test?
2       A   Inspection.
3       Q   All right.  Explain to me what the
4   inspection portion of the CDL test is.
5       A   That's where you -- for the test, you
6   show them different parts, like where the air
7   compressor is, the alternator, the engine,
8   check the lights, tires, pressures, stickers.
9   If you have fire extinguishers, different
10  parts of the truck.
11      Q   Is this inspection portion of the CDL
12  test, is it similar to the pre-trip inspection
13  that all professional truck drivers are
14  required to do out on the road in a commercial
15  vehicle?
16      A   Similar, yes.
17      Q   Okay.  What's different about it?
18      A   Touching stuff and you know, just more
19  verbal.
20      Q   Okay.  But I mean, do you run through
21  the same things in the CDL portion of the test
22  that you do in the pre-trip inspection before
23  you get out on a highway now?

Page 30

1       A   Yeah.  Pretty much, yes.
2       Q   Okay.  All right.  What -- what was
3   the process to get your CDL after you failed
4   the inspection portion of the initial CDL
5   test?
6       A   I had to reschedule.
7       Q   Did have you to undergo any other
8   training?
9       A   No.
10      Q   Okay.  So you didn't go back to truck
11  school and learn the stuff; you just learned
12  it on your own and retook the test?
13      A   Right.
14      Q   Okay.  Did you only have to take the
15  inspection portion or did you have to take all
16  three parts again?
17      A   No.  Once you miss the inspection
18  part, you don't take the other part.
19      Q   Okay.  All right.  Let's briefly talk
20  about just your driving record before you went
21  to driving school -- truck driving school.
22  Any citations for moving violations?  Let's do
23  in the 10 years beforehand.

Page 31

1       A   I don't believe so, no.
2       Q   Okay.  Look, if you don't remember
3   something, tell me you don't remember, you
4   don't recall.  That's a perfectly fine answer,
5   okay?
6       A   Okay.
7       Q   I'm not trying to trick you, I
8   promise, all right?
9       A   All right.
10      Q   You don't remember if you had any
11  moving violations before you got your CDL in
12  the 10 years prior; is that fair?
13      A   Yes.
14      Q   Okay.  What about any motor vehicle
15  accidents in the 10 years before you got your
16  CDL?
17      A   I don't remember.
18      Q   All right.  Had your driver's license
19  ever been suspended or revoked --
20      A   No.
21      Q   Hold on.  Let me finish.  Had your
22  driver's license ever been suspended or
23  revoked before you got your commercial

Page 32

1   driver's license?
2       A   No.
3       Q   Okay.  All right.  So no accidents, no
4   citations in the 10 years before you got your
5   CDL, correct?
6       A   Not that I remember.
7       Q   Okay.  All right.  Did your vision
8   change in any way from the time that you were
9   issued this Class A commercial driver's
10  license in February of 2015 until October 26
11  of 2016?
12      A   I don't remember.
13      Q   Okay.  You understand my question?
14      A   Yes.
15      Q   Okay.  Who's your -- you see an
16  ophthalmologist, an optometrist?  Just call it
17  an eye doctor, right?
18      A   Yeah.
19      Q   Make it easy, man.
20      A   I don't -- yes, I see one.
21      Q   All right.  Let's just call him the
22  eye doctor.  Who's your eye doctor?
23      A   I can't remember his name.



MARK MASSINGILL                                           September 11, 2019
JAMES JOHNSON vs ABF FREIGHT SYSTEM                             33—36

Page 33

1   Q   All right.  Where's he at?
2   A   North Georgia Eye Clinic.
3   Q   And he's a doctor that would tell you
4   whether or not you need a different type of
5   contact lenses that enables you to see better,
6   correct?
7   A   Yes.
8   Q   Okay.  Do you recall the last time you
9   received a new contact prescription before
10  October 26, 2016?
11  A   No.  No.
12  Q   Okay.  Look, I've read some answers to
13  questions that you submitted and swore to,
14  okay?
15  A   Yeah.
16  Q   You didn't not see Mr. Johnson's
17  tractor-trailer when you made that left turn
18  on October 6, 2016, did you?
19      MR. OLIVER:  Object to the form.
20  Q   (By Mr. Baer) Let me ask you this:  On
21  October 6, 2016, did you see Mr. Johnson's
22  tractor-trailer before you made the left turn
23  striking the rear of his trailer?

Page 34

1   A   Yes.
2   Q   Okay.  Your vision wasn't impaired to
3   any way to where you didn't see it, correct?
4   A   Yes.
5   Q   You saw the tractor-trailer, you made
6   the left turn, and you struck the rear of the
7   trailer, correct?
8   A   Yes.
9   Q   Okay.  There's certain parts of this
10  I'm going to try and streamline, okay?  If you
11  don't agree with me, tell me.  We can do baby
12  steps and I will lay all the foundation like
13  Tom wants and we can move real slow, okay?
14  A   Okay.
15  Q   All right.  Just so the record is
16  clear, ABF is the only company before
17  October 26, 2016, in which you operated a
18  commercial -- professional commercial truck
19  driver, correct?
20  A   Yes.
21  Q   Okay.  And that was in Georgia or was
22  it in Alabama when you began being a -- strike
23  that.

Page 35

1   When you were first hired by ABF to be a
2   professional commercial truck driver, what
3   state were you in?
4   A   That I lived in?
5   Q   No.  When ABF hired you, where were
6   you going to work out of as a professional
7   commercial truck driver; what state?
8   A   Tennessee.
9   Q   Okay.  So they were going to move you
10  to Tennessee so you could be a professional
11  commercial truck driver?
12      MR. OLIVER:  Object to the form.
13  Q   (By Mr. Baer) Okay.  Why did you move
14  to Tennessee?
15      MR. OLIVER:  Object to the form.
16  Q   (By Mr. Baer) Did you move to
17  Tennessee?
18  A   No.
19  Q   Okay.  So explain to me and this jury
20  how you lived in Georgia, but you were going
21  to operate out of ABF's terminal in Tennessee?
22  Because that don't make any sense to anybody,
23  so please explain that to me.

Page 36

1   A   It's like an hour drive there.
2   Q   Okay.  So every morning, you would get
3   up and you would drive an hour to Tennessee?
4   A   Yes.
5   Q   All right.  Now we're cooking with
6   gas.  All right.  Does ABF have a terminal in
7   Georgia?
8   A   Yes.
9   Q   Okay.  Why did they want you to
10  operate or start your day every day out of
11  Tennessee?
12  A   That's the terminal that hired me.
13  Q   Okay.  Did you have an option or
14  that's where they put you?
15      MR. OLIVER:  Object to the form.
16  Q   (By Mr. Baer) You can answer.  It was
17  a perfectly fine question.  Go ahead.  Don't
18  worry, Tom and I are going to jar back and
19  forth all day.  You want to clear it up, go
20  ahead.
21      MR. OLIVER:  Just tell him why you
22  drove out of the Chattanooga terminal.
23      THE WITNESS:  That's the terminal



Page 37

1  where I got hired.  That's the terminal that
2  sent me to school to come drive there.
3       MR. OLIVER:  Is that where you worked
4  on the dock?
5       THE WITNESS:  That's where I worked on
6  the dock.
7    Q    (By Mr. Baer)  Okay.  So the entire
8  time when you worked for ABF, whether you were
9  on the dock or you were driving a commercial
10  tractor-trailers, you operated out of the
11  Chattanooga, Tennessee terminal, fair?
12    A    Yes.
13    Q    All right.  I believe you told me that
14  from your house in Georgia to Tennessee, the
15  ABF terminal in Tennessee, that's about an
16  hour drive?
17    A    Yes.
18    Q    Okay.  And if it's an hour drive
19  there, can we agree that it's an hour drive
20  back?
21    A    Yes.
22    Q    All right.  We can agree on some
23  things.  All right.  When you began working

Page 38

1  for ABF terminal as a professional truck
2  driver out of its Chattanooga terminal, did
3  ABF send you to a doctor for a physical
4  examination?
5    A    Yes.
6    Q    Okay.  Did ABF pick that doctor or did
7  you pick that doctor?
8    A    They give you a choice of a couple of
9  places you can go.
10    Q    When you went to that doctor, he
11  physically examined you?
12    A    Yes.
13    Q    Okay.  You filled out an application
14  or some type of -- strike that.
15    You filled out some type of questionnaire
16  about prior medical history when you went and
17  got that examination?
18    A    Yes.
19    Q    At the time you had that examination,
20  did you tell him that your CDL required you to
21  wear corrective lenses?
22    A    I don't remember.
23    Q    Okay.  Did he ask to see a copy of

Page 39

1  your CDL?
2    A    Yes.
3    Q    Okay.  And you showed it to him?
4    A    Yes.
5    Q    Okay.  The same CDL that we've
6  attached today as Exhibit 1?
7    A    Yes.
8    Q    Okay.  Did you have any type of
9  medical conditions when you went to see the
10  doctor that was ABF approved that would have
11  affected your ability to drive a commercial
12  vehicle in any way in your opinion?
13    A    No.
14    Q    Okay.  Were you prescribed any
15  medications from the time that you obtained
16  your CDL in February of 2015 through October
17  of 2016?
18    A    Yes.
19    Q    Okay.  What medications were you
20  prescribed?  And look, just so we're clear,
21  I'm only talking about February of 2015 until
22  October 26 of 2016.
23    A    I was prescribed -- I'm trying to

Page 40

1  remember.  I believe it was
2  hyrdochlorthiazide.
3    Q    What was that for?
4    A    Blood pressure.
5    Q    Okay.  So you were taking blood
6  pressure medication?
7    A    Yes.
8    Q    Okay.  So you were taking blood
9  pressure medication?
10    A    Yes.
11    Q    What else?
12    A    Amlodipine besylate, something like
13  that, blood pressure.
14    Q    Okay.  So you took another blood
15  pressure medicine, right?
16    A    Levothyroxine.
17    Q    What's that for?
18    A    Thyroid.
19    Q    All right.  Were you taking these two
20  blood pressure medications and thyroid
21  medications at the time of October 26, 2016?
22    A    I don't know.
23    Q    Okay.



Page 41

1    A   I did some -- I got back in the gym at
2  some point during that time and I had a blood
3  pressure thing at home.  They said keep track
4  of it, see how it goes.  So at some point
5  during that time, I stopped taking it.
6    Q   Did you get back on it?
7    A   This year.
8    Q   Okay.  So at some point between
9  February of 2015 and October 26, 2016, if I
10  understand your testimony correctly, you got
11  off all three of the medications you just
12  testified to?
13   A   Yes.
14   Q   Okay.  If I'm understanding your
15  testimony correctly, that means you would not
16  have been taking any prescription medications
17  as of October 26, 2016?
18   A   Right.
19   Q   Okay.  Your blood pressure medication,
20  was it prescribed to you for any type of blood
21  flow issues in your legs?
22   A   No.
23   Q   Okay.  Have you ever had diabetes?

Page 42

1    A   No.
2    Q   Okay.  When you went to work for ABF
3  before you became a truck driver in February
4  of 2015, you filled out an employment
5  application, correct?
6    A   Yes.
7    Q   Okay.  All right.  I assume everything
8  you wrote in on that employment application
9  was true, right?
10   A   Yes.
11   Q   You didn't lie to ABF, in other words,
12  when you filled out the application?
13   A   No.
14   Q   Okay.  So is it safe to assume that
15  everything you put in your employment
16  application with ABF is true and accurate?
17   A   Yes.
18   Q   Okay.  When you switched from working
19  on a dock -- working on the dock in the
20  Chattanooga terminal and wanted to become a
21  professional commercial truck driver for ABF,
22  did you have to fill out another job
23  application?

Page 43

1    A   Yes, I believe so.
2    Q   Okay.  What type of documentation did
3  you have to submit to ABF, if any, when you
4  filled out its application for -- or to become
5  a professional commercial truck driver?
6    A   I don't remember.
7    Q   Okay.  I'm going to show you a copy of
8  new ABF application for employment.  And take
9  a look at it.  I'm not going to ask you many
10  questions about it.  The question I have is
11  just is this the new ABF application for
12  employment that you filled out applying to be
13  a professional commercial truck driver?
14   A   Yes.
15   Q   Okay.  All right.  I'm going to attach
16  that as 3.  Let me just identify the Bates
17  pages.
18       MR. OLIVER:  Let me see that when you
19  get through with it.  I got a different one,
20  so I think you handed me a different set.
21       MR. BAER:  Okay.
22       MR. OLIVER:  This one is DT city, the
23  one you handed me.  This one is dock work.

Page 44

1  These are two different applications just for
2  whatever it is worth.  Which one did you want
3  him to look at?
4       MR. BAER:  The one for commercial
5  truck driving.  Do we have that one?
6       MR. OLIVER:  This is dock work.  It
7  says up here what the interest is he is
8  applying for.
9    Q   (By Mr. Baer) I'm glad I didn't
10  mention the Bates numbers yet.  That would
11  have been confusing.  So flip through this and
12  tell me if this is a complete copy of the
13  application, to the best of your knowledge,
14  that you filled out to become a commercial
15  truck driver for ABF.
16       (Plaintiff's Exhibit No. 3 was marked
17       for identification.)
18   A   Yes.
19   Q   All right.  When you went to work for
20  ABF, did ABF require you to do any on-the-job
21  training before it allowed to go out on the
22  road as a professional commercial truck driver
23  on its behalf?



MARK MASSINGILL
JAMES JOHNSON vs ABF FREIGHT SYSTEM

September 11, 2019
45–48

Page 45

1    A    I'm not sure what you're asking.
2    Q    Okay.  So you remember how you told me
3  that when you went to truck driving school,
4  you did some training in the classroom, and a
5  practical test; do you remember that?
6    A    Yes.
7    Q    Okay.  And then you remember you told
8  me when you went to get your CDL, you did the
9  same thing, right?  You had a written test and
10  then you had a practical driving test; do you
11  recall that?
12    A    Right.
13    Q    All right.  So when you went to work
14  at ABF as a professional truck driver on its
15  behalf, did ABF do any training with you
16  before you operated on the highways as a
17  professional truck driver on its behalf?
18    A    Yes.
19    Q    Okay.  So let's talk about the ABF
20  training.  We on the same page?
21    A    Maybe.
22    Q    Okay.  So February -- go ahead.  I
23  mean, explain it to me.

Page 46

1    A    I'm not -- they sent me to the driving
2  school.
3    Q    Okay.  So right --
4        MR. OLIVER:  I think his question is
5  once you get out of driving school and before
6  you start driving their trucks, did they put
7  you through any kind of other training?
8        THE WITNESS:  Yes.
9    Q    (By Mr. Baer) Okay.  Explain to me
10  what ABF did to train you before you went out
11  and drove a commercial vehicle on its behalf,
12  whether that be in the classroom or a
13  practical driving test or training.
14    A    What they did -- Chattanooga, for the
15  first couple of weeks is they put me in the
16  truck with somebody to show me around
17  Chattanooga.  There are several roads where
18  bridges are too low and you wouldn't know it
19  before you went down it to kind of --
20    Q    Okay.  So let's just back up.  I just
21  want to recap for right now, okay, so you --
22  on the dock at the Chattanooga terminal for
23  ABF, right?

Page 47

1    A    Yes.
2    Q    You decide you want to become a
3  professional truck driver for ABF, right?
4    A    Yes.
5    Q    ABF sends you to truck driving school
6  in Arkansas, correct?
7    A    Yes.
8    Q    During that time period, you get a
9  driving permit to operate a commercial
10  vehicle, correct?
11    A    Yes.
12    Q    Okay.  And then in February of --
13  well, in May of 2014, you fill out an
14  application to become a commercial truck
15  driver?
16    A    Yes.
17    Q    And that's what we've attached as
18  Exhibit 3?
19    A    Yes.
20    Q    Okay.  And then ABF hires you at its
21  Chattanooga terminal to become a professional
22  truck driver on its behalf when?
23    A    February 18th.

Page 48

1    Q    Of 2015?
2    A    2015.
3    Q    Okay.
4    A    Right.
5    Q    So the job application that's in front
6  of you attached as Plaintiff's Exhibit 3 and
7  Bates ABF154 to 160, the application was dated
8  May 2nd, 2014; you see?
9    A    Yes.
10    Q    Okay.  What took so long from May of
11  2014 when you filled out the application to
12  become a professional truck driver at ABF
13  until you began being a commercial truck
14  driver for ABF in February of 2015?
15    A    One, you have to wait on school to
16  open up.
17    Q    Okay.  There are certain times in
18  which the Arkansas trucking driving school
19  enables new students?
20    A    Yes.
21    Q    Okay.  So now we're going back to
22  February of 2015 at ABF.  So the first thing
23  ABF does is you ride around with someone from



Page 49

1   ABF to become familiar with Chattanooga,
2   correct?
3       A    Yes.
4       Q    Okay.  When you ride around to become
5   familiar with Chattanooga, are you in a
6   tractor-trailer, a tractor?
7       A    Tractor-trailer.
8       Q    Okay.  Are you driving it?
9       A    Yes.
10      Q    Okay.  And how many times did you
11  drive around Chattanooga to become familiar
12  with it in a tractor-trailer with somebody
13  from ABF showing you the city?
14      A    I believe it was -- if I remember
15  correctly, about two weeks.
16      Q    Okay.  So that would put us sometime
17  around beginning of March, correct?
18      A    Yes.
19      Q    Okay.  Did you do any other driving of
20  a commercial tractor-trailer for ABF out of
21  their Chattanooga terminal from February 18th
22  to roughly two weeks, beginning of March; did
23  you do anything else other than drive around

Page 50

1   the city and become familiar with it?
2       A    Yes.
3       Q    Okay.  What did you do?
4       A    Worked the dock.
5       Q    Okay.  So when it comes to driving a
6   commercial tractor-trailer for ABF, the first
7   two weeks you were employed there, part of the
8   time, you were riding around the city of
9   Chattanooga in a commercial tractor-trailer
10  with somebody from the ABF terminal, correct?
11      A    Yes.
12      Q    Okay.  After those two weeks of the
13  ride around with somebody from ABF, then
14  what's the next step on training that ABF
15  provided to you before you went out on the
16  highways as a professional commercial truck
17  driver?
18      A    That was it.
19      Q    Okay.  So two weeks, you're familiar
20  with Chattanooga, and you're out on the road
21  delivering cargo, correct?
22      A    Yes.
23      Q    All right.  Is it safe to say that you

Page 51

1   began delivering cargo in a tractor-trailer
2   for ABF sometime around the beginning of March
3   of 2015?
4       A    Yes.
5       Q    Okay.  So when you began delivering
6   cargo out of ABF out of its Chattanooga
7   terminal in March of 2015, did you only drive
8   commercial tractor-trailers on behalf of ABF
9   inside of Tennessee?
10      A    I don't know.  I don't remember.
11      Q    Okay.  All right.  When is the first
12  time -- and I don't need an exact date, okay?
13  I need a time frame from March of 2015 to
14  October 26 of 2016 that you believe ABF had
15  you driving a commercial tractor-trailer
16  outside of the state of Tennessee.
17      A    I don't know.  It's -- I worked the
18  dock and then after you work the dock,
19  sometimes they would send you out.  So with it
20  being at the corner of the Tennessee, Georgia,
21  Alabama, I could have -- you know, it could
22  have been the very next week or it might have
23  been two weeks.

Page 52

1       Q    Okay.
2       A    So I don't know when.  They just send
3   you out and around.
4       Q    So when you began driving a commercial
5   tractor-trailer for ABF after you did the ride
6   around to become familiar with the city of
7   Chattanooga, you were free to deliver freight
8   and cargo in a tractor-trailer wherever ABF
9   told you they needed you to do that?
10      A    Yes.
11      Q    Because of the location of
12  Chattanooga, you believe it may have been to
13  locations outside of the state of Tennessee,
14  correct?
15      A    Yes.
16      Q    Okay.  So in March of 2015, were you
17  still working on the dock; was your sole job
18  at ABF to be a professional commercial truck
19  driver?
20      A    No.  My bid was on the dock then.
21      Q    Okay.  What does that mean, a bid?
22      A    They put up jobs and the person with
23  the most seniority picks and they go down.



```
1    Q    When they pull up jobs -- I am not --
2   is that for operating a commercial vehicle for
3   ABF or is that part of the dock?
4    A   Both.
5    Q   Okay.  All right.  So I need to break
6   this down, all right?  Bear with me.  So March
7   of 2015 during your employment at ABF, part of
8   the time that you were working on any given
9   day would have been spent working on the dock
10  and the other part would have been driving a
11  commercial vehicle; is that correct?
12   A   Yes.
13   Q   Okay.  What percentage of your time in
14  the beginning of March of 2015 when ABF
15  allowed you to drive one of its commercial
16  tractor-trailers on its behalf was spent
17  between doing that and working on the dock?
18   A   I don't know.
19   Q   All right.  How many jobs a week or
20  assignments a week would you get from ABF to
21  deliver cargo from its terminal in Chattanooga
22  to another location around the tame of March
23  of 2015; you do one a week, one every other
```

```
1   day, it varied?
2    A   It varied.
3    Q   Okay.  It varied between what; you
4   might get one a week?
5    A   I might get one a week, I might get
6   five a week.
7    Q   Okay.  When you get more than one a
8   week, would it be more than one trip in one
9   day or would it be one trip over one day and
10  then one trip over another day that week?
11   A   It'd be one per day.
12   Q   Okay.  And you're saying it could have
13  been one to five trips driving a commercial
14  vehicle on behalf of ABF?
15   A   Yes.
16   Q   At any time between -- well, how long
17  did this -- strike that.
18      When you would make trips for ABF around
19  the time of March of 2015, how far would they
20  let you deliver the cargo that it wanted you
21  to deliver to other terminals or vendors s?
22   A   I don't know.
23   Q   Okay.  So when you first started
```

```
1   driving a commercial tractor-trailer, we agree
2   that's around March of 2015, correct?
3    A   Correct.
4    Q   And during that time, you were also
5   working on the dock, correct?
6    A   Correct.
7    Q   Okay.  So you were working on the dock
8   and you're driving commercial tractor-trailers
9   at the directive of ABF, correct?
10   A   Correct.
11   Q   Okay.  You don't remember what
12  percentage you were working on the dock and
13  what percentage you were driving the
14  commercial tractor-trailers on behalf of ABF,
15  correct?
16   A   Correct.
17   Q   Okay.  It varied by week, correct?
18   A   Yes.
19   Q   Okay.  I should be able to get that
20  information from ABF, correct?
21   A   Yes.
22   Q   Okay.  Did that change at any time
23  between March of 2015 and October 26 of 2016?
```

```
1    A   Yes.
2    Q   Okay.  When did you stop working on
3   the dock at ABF?
4    A   I don't know.
5    Q   Okay.
6    A   You'd have to pull that.
7    Q   Christmas of 2015, were you still
8   working on the dock at ABF?
9    A   I don't know.
10   Q   Okay.  When is your birthday?
11   A   ███████████.
12   Q   Okay.  September 7th of 2015, were you
13  still working on the dock or were you just
14  driving a commercial vehicle for ABF?
15   A   I don't know.
16   Q   All right.  You can't give me an idea
17  of how many months before ABF turned you loose
18  and said all you're going to do is drive a
19  commercial vehicle for us?
20      MR. OLIVER:  Object to the form.
21   Q   (By Mr. Baer) Is that safe?  Either
22  you can or can't.  Can you tell me when --
23  give me a ballpark of when you solely became a
```



MARK MASSINGILL
JAMES JOHNSON vs ABF FREIGHT SYSTEM

September 11, 2019
57—60

Page 57
1  professional truck driver for ABF and did not
2  work on the dock anymore?
3     A   I can't.
4        MR. BAER:  Okay.  Do you need an
5  interrogatory or you need me to shoot you an
6  email with that?  I will do whatever you want.
7        MR. OLIVER:  What do you mean?
8        MR. BAER:  I want to know when he
9  became a full-time professional commercial
10  truck driver for ABF and did not work on the
11  dock anymore.
12       MR. OLIVER:  We'll have to get that
13  from ABF.
14       MR. BAER:  Right.  Do you want -- what
15  I'm saying is I'm asking you I can do it
16  formally or you can just get it to me.
17       MR. OLIVER:  I'll get it to you.
18       MR. BAER:  Okay.
19       THE WITNESS:  Can we take a minute?
20       MR. OLIVER:  Yeah, sur.
21       (A recess was taken.)
22    Q   (By Mr. Baer) You ready,
23  Mr. Massingill?

Page 58
1     A   Yes.
2     Q   You know you're still under oath,
3  correct?
4     A   Right.
5     Q   The last question I asked you was a
6  time breakdown from how much time you spent
7  being a commercial truck driver for ABF versus
8  working on the dock.  Do you recall that?
9     A   Yes.
10    Q   And the answer is you can't, correct?
11    A   Right.
12    Q   Okay.  Is there a time when you did,
13  in fact, become a full-time commercial truck
14  driver for ABF and no longer worked on the
15  dock?
16    A   Yes.
17    Q   Okay.  When I say worked on the dock,
18  I'm talking about in any capacity; do you
19  understand that?
20    A   Yes.
21    Q   Okay.  When you started driving
22  commercial vehicles at the direction of ABF
23  and on its behalf until the time of this

Page 59
1  collision on October 26, 2016, had you ever
2  been involved in any other type of collision
3  while operating a commercial vehicle for ABF?
4     A   Could repeat that for me?
5     Q   Okay.  Let me back up for a second.
6  Between March of 2015 and the day of this
7  collision on October 26, 2016, the only
8  company that you operated a commercial vehicle
9  for was ABF, correct?
10    A   Yes.
11    Q   Okay.  During that time and while you
12  were operating a commercial vehicle such as a
13  tractor-trailer at the direction and on behalf
14  of ABF, had you been involved in any other
15  type of motor vehicle collision before
16  October 26, 2016?
17    A   You mean like out on the road?
18    Q   Could be out on the road, could be in
19  a parking lot, anywhere.
20    A   Yes.
21    Q   Okay.  Where was it; on the road, on a
22  highway, or in a parking lot?
23    A   Parking lot.

Page 60
1     Q   Okay.  Tell me what happened -- well,
2  strike that.
3        When was that?
4     A   I'm not sure of the date.
5     Q   That's okay.  How long before
6  October 26, 2016?
7     A   Probably a year and a half.
8     Q   Okay.  So sometime in 2015, correct?
9     A   Yes.
10    Q   Okay.  And I believe I have the date,
11  so I just wanted to know what happened.
12    A   I was pulling a trailer around from
13  beside the building.
14    Q   What building?
15    A   Our terminal building.
16    Q   In Chattanooga?
17    A   In Chattanooga.
18    Q   Okay.  And what happened?
19    A   I clipped the grill of a truck that
20  was beside -- sitting in front of the
21  maintenance shop.
22    Q   Another ABF vehicle?
23    A   Yes.

Page 61

1   Q   Was it a tractor-trailer?
2   A   Yes.
3   Q   Was anybody in it?
4   A   No.
5   Q   Were you backing up or going forward?
6   A   Forward.
7   Q   Were you making a turn?
8   A   Yes.
9   Q   A right or left?
10  A   Left.
11  Q   So sometime in 2015 at the ABF
12  terminal -- strike that.
13  At the time of this prior collision in 2015
14  at the ABF terminal, were you operating a
15  tractor-trailer?
16  A   I'm sorry, repeat that.
17  Q   In other words, you weren't driving a
18  forklift; you weren't driving a personal
19  vehicle?  The question is were you operating a
20  commercial tractor-trailer at the time of the
21  collision at the ABF terminal in 2015?
22  A   Yes.
23  Q   Yes?

Page 62

1   A   Yes.
2   Q   Okay.  And you struck another ABF
3   commercial tractor-trailer while making a left
4   turn?
5   A   Yes.
6   Q   Okay.  Was the tractor-trailer in
7   front of you -- the tractor-trailer that yo
8   struck, was it in front of you and you were
9   trying to go around it making the left turn?
10  A   Yes.
11  Q   Okay.  What part of the ABF
12  tractor-trailer did you strike in this 2015
13  collision?
14  A   The front grill.
15  Q   Of the tractor?
16  A   Yes.
17  Q   Okay.  And just so we're clear and the
18  jury is clear, the tractor is part of the
19  18-wheeler that you sit in and drive, correct?
20  A   Yes.
21  Q   And the trailer is what you hook onto
22  the tractor and pull, correct?
23  A   Yes.

Page 63

1   Q   Did you have to report that 2015
2   collision to your supervisor at ABF?
3   A   Yes.
4   Q   Who was your supervisor?
5   A   Anthony O'Neal.
6   Q   Anthony who?
7   A   O'Neal.
8   Q   Was Anthony O'Neal your supervisor at
9   the time of the October 26, 2016, collision
10  with Mr. Johnson?
11  A   I'm not sure.
12  Q   Okay.  We'll get to that.  So in the
13  2015 collision at the ABF terminal in
14  Chattanooga, you had to report that to your
15  supervisor, Anthony O'Neal, correct?
16  A   Yes.
17  Q   Okay.  When you reported that to your
18  supervisor, what happened next?
19  A   He took a statement.
20  Q   A written statement?
21  A   I can't remember.  I can't remember.
22  I don't know if it was written or verbal.
23  Q   Okay.  Did you hand write what

Page 64

1   happened?
2   A   I don't remember.
3   MR. BAER:  That's something I'd like
4   produced.
5   MR. OLIVER:  I don't think it exists.
6   MR. BAER:  Okay.  I've got a running
7   tab, buddy.
8   Q   (By Mr. Baer) Was there anybody with a
9   recorder there that recorded that statement?
10  A   Not that I know.
11  Q   Okay.  Would you agree with me that
12  the way in which the 2015 collision you were
13  involved in at the ABF terminal in Chattanooga
14  was similar, outside of the location of the
15  impact, as the October 26, 2016, collision
16  with Mr. Johnson?
17  MR. OLIVER:  Object to the form.  You
18  can answer.
19  THE WITNESS:  Yes.
20  Q   (By Mr. Baer) Would you agree with me
21  at that the 2015 collision at the ABF terminal
22  where you were operating a commercial
23  tractor-trailer and you struck another

Page 65

1  commercial tractor-trailer, you were making a
2  left turn?
3     A   Yes.
4     Q   Okay.  Would you agree with me that
5  the October 26, 2016, collision with
6  Mr. Johnson's tractor-trailer, that you were
7  also making a left turn?
8     A   Yes.
9     Q   Okay.  Can we agree that the collision
10  while operating an ABF commercial
11  tractor-trailer and the collision of
12  October 26, 2016, both involved you making a
13  left turn while operating a commercial vehicle
14  such as a tractor-trailer for ABF?
15     A   Yes.
16     Q   Okay.  After the 2015 collision, you
17  gave a statement to your supervisor, Anthony
18  O'Neal, you just don't recall if it was oral
19  or written, correct?
20     A   Correct.
21     Q   Okay.  After you gave the statement to
22  Mr. O'Neal for the collision involving the
23  left turn in 2015, what did ABF require you to

Page 66

1  do from a training perspective, if anything?
2     A   I don't remember anything.
3     Q   Okay.  So ABF didn't make you go
4  through any additional training about how to
5  make left turns without hitting other
6  commercial tractor-trailers?
7        MR. OLIVER:  Object to the form.
8     Q   (By Mr. Baer) Is that right?
9        MR. OLIVER:  You can answer.
10        THE WITNESS:  Yes.
11     Q   (By Mr. Baer) Okay.  Would you agree
12  with me that ABF, after the collision
13  involving another ABF tractor-trailer in 2015,
14  did not require you to do any additional
15  training; yes or no?
16     A   On --
17     Q   Say it again?
18     A   Repeat that question.
19     Q   Okay.
20     A   So I'm clear.
21     Q   We've established through your
22  testimony that in 2015, you -- at the
23  Chattanooga terminal, you were operating a

Page 67

1  commercial tractor-trailer on behalf of ABF,
2  correct?
3     A   Correct.
4     Q   And sometime in 2015 while you were
5  operating that commercial tractor-trailer for
6  ABF, you made a left turn and struck another
7  ABF commercial tractor-trailer at the
8  terminal, correct?
9     A   Correct.
10     Q   Okay.  After that collision at the ABF
11  terminal in Chattanooga in 2015, you spoke to
12  your supervisor about how that collision
13  happened, correct?
14     A   Correct.
15     Q   And you, sir, gave a statement to your
16  supervisor; you just don't recall if that
17  statement was oral or written, correct?
18     A   Correct.
19     Q   After you gave that statement to your
20  supervisor, which you testified was the first
21  thing you did after the collision in 2015, did
22  your supervisor or anyone from ABF require you
23  to do any additional training; yes or no?

Page 68

1     A   No.
2     Q   No?  Okay.  You didn't have to watch
3  any instructional videos?
4     A   No.
5     Q   Did you report that to the Department
6  of Motor Vehicles?
7     A   No.
8     Q   Did you report that collision in 2015
9  to the DOT?
10     A   No.
11     Q   Okay.  Do you know if ABF reported
12  that collision to the DOT?
13     A   I don't know.
14     Q   Okay.  What is your understanding of
15  your obligation as a truck driver to report
16  any motor vehicle collisions to the DOT that
17  you were involved in?
18     A   My understanding is once we call
19  the -- I don't have an obligation as far as I
20  understand.
21     Q   Okay.  And you believe you don't have
22  an obligation because the police aren't called
23  out because it happened on ABF property?



Page 69

1    A   Correct.

2    Q   ABF didn't require you to complete
3  another road test with a supervisor present
4  after the 2015 collision at its terminal --

5    A   No.

6    Q   -- correct?

7    A   No.

8    Q   I'm going to jump back for a second.
9  When you began your employment as a commercial
10  truck driver with ABF, were you provided any
11  documentation by ABF?

12   A   What do you mean?

13   Q   Okay.  Did ABF provide you -- strike
14  that.

15      When you began operating as a professional
16  truck driver for ABF, were you provided with a
17  copy of the Federal Motor Carrier safety
18  regulations?

19   A   The green book, yes.

20   Q   Say that again?

21   A   Yes.

22   Q   Okay.  What is your understanding of
23  what the Federal Motor Carrier safety

Page 70

1  regulations are?

2    A   My understanding?

3    Q   Yes, sir.

4    A   They're just the regulations of
5  commercial truck driving.

6    Q   Okay.  Did ABF explain to you the
7  significance or the importance of the Federal
8  Motor Carrier safety regulations for
9  professional truck drivers such as yourself?

10   A   We went over it at school.

11   Q   Okay.  Did you go over all of the
12  Federal Motor Carrier safety regulations in
13  school?

14   A   I don't recall.

15   Q   Okay.  Have you ever read the Federal
16  Motor Carrier safety regulations; you,
17  personally?

18   A   No.

19   Q   Okay.  Do you feel that it is
20  important for you as a professional truck
21  driver to be familiar with the Federal Motor
22  Carrier safety regulations?

23   A   Yes, to be familiar.

Page 71

1    Q   All right.  Would you agree with me
2  that the Federal Motor Carrier safety
3  regulations are in place for the safety of the
4  public that's going to be on the highways in
5  the United States with professional truck
6  drivers such as yourself?

7       MR. OLIVER:  Object to the form.  You
8  can answer.

9       THE WITNESS:  Yes.

10   Q   (By Mr. Baer)  Okay.  Do you believe
11  the October 26, 2016, collision that you were
12  involved in with Mr. Johnson could have been
13  prevented by yourself?

14   A   Yes.

15   Q   Okay.  Do you believe that a
16  professional truck driver is expected to meet
17  a higher standard of performance than the
18  average driver.

19      MR. OLIVER:  Object to the form.

20      MR. BAER:  What's the problem with the
21  question?

22      MR. OLIVER:  It doesn't define higher
23  standard.

Page 72

1       MR. BAER:  Take that up with ABF
2  because I'm reading from their handbook.

3       MR. OLIVER:  It's okay.

4    Q   (By Mr. Baer)  Okay.  Did you get a
5  copy of this driver's handbook when you
6  started working for ABF?

7    A   Yes.

8    Q   Did you read it?

9    A   Yes.  We went over it in school.

10   Q   Did you read it cover to cover?

11   A   Yes, at school.

12   Q   Okay.  You read the whole thing?

13   A   As far as I remember, we went through
14  the whole thing.

15   Q   Did you raise any questions with ABF
16  about things in the handbook that you didn't
17  understand?

18   A   I don't remember.

19   Q   Okay.  Do you recall signing an
20  acknowledgment that you read and understood
21  this handbook?

22   A   I don't remember if we signed a paper
23  or not.



MARK MASSINGILL
JAMES JOHNSON vs ABF FREIGHT SYSTEM

September 11, 2019
73–76

Page 73

1    Q    Let me show you a document.
2    A    Okay.
3    Q    First off, I'm going to attach a copy
4  of the handbook which is Bates ABF Freight
5  System 301 through 353 that I was provided
6  with this morning as Plaintiff's Exhibit 4.
7    I'm going to show you a document that is
8  titled Training Receipt and it is Bates
9  labeled ABF Freight System 106.
10    Is that your signature at the bottom of the
11  document I just handed you?
12        (Plaintiff's Exhibit Nos 4 and 5 were
13        marked for identification.)
14    A    Yes.
15    Q    And you signed that document on
16  October 17, 2014, correct?
17    A    Yes.
18    Q    Would you please read for me number
19  one.
20    A    I have received a copy of the Federal
21  Motor Carrier safety regulation pocketbook
22  detailing federal safety regulations as
23  prescribed by the U.S. Department of

Page 74

1  Transportation in Title 49 of the US Code of
2  Federal Regulations, Part 390 through 399.  I
3  understand I am responsible to comply with all
4  Federal Motor Carrier safety regulations.
5    Q    Do you see number four on the training
6  receipt document in front of you?
7    A    Yes.
8    Q    Okay.  Will you please read that part
9  to me.
10    A    I have received a copy of the
11  company's driver's handbook and will become
12  thoroughly familiar with its contents.  This
13  handbook will remain property of the safety
14  and security department, Fort Smith, Arkansas
15  and will be returned if I leave the service of
16  this company.  And I understand that I'm
17  responsible to comply with all company
18  policies.
19    Q    Is it your understanding after reading
20  that document that you represented to ABF that
21  you read and understood the Federal Motor
22  Carrier safety regulations?
23    A    Yes.

Page 75

1    Q    And you signed the bottom of that
2  document attesting to that, correct?
3    A    Yes.
4    Q    Would you agree with me that it was
5  your responsibility to comply with all of the
6  company policies in this driver handbook?
7    A    Yes.
8    Q    Okay.  And that you attested on this
9  document that you were responsible to comply
10  with all these company policies, correct?
11    A    Yes.
12    Q    Okay.  So you're familiar with all the
13  company policies in the handbook, correct?
14  I'm not going to ask you to memorialize and
15  testify to them, but you're familiar with
16  them, right?
17    A    Yes.  I've looked through them.
18    Q    Right.  And that's what you told ABF?
19    A    Correct.  Right.
20    Q    Okay.  So if you didn't understand
21  what was in this handbook, you wouldn't have
22  signed the document I'm going to attach as
23  Exhibit 5 titled Training Receipt and marked

Page 76

1  -- Bates labeled as ABF Freight 106 if you
2  didn't understand the information and policies
3  contained in the ABF employee handbook,
4  certainly you would not have signed and dated
5  saying that you did, correct?
6        MR. OLIVER:  Object to the form.  You
7  can answer.
8    Q    (By Mr. Baer) Okay.  I'll ask it
9  another way.  I'm going to use the wording
10  since we're being like we're being here.  When
11  you signed this document that I have attached
12  as Exhibit 5, Training Receipt -- sir, when
13  you signed the documents that I've attached as
14  Exhibit 5 that is titled training receipt, you
15  understood that it was your duty as a
16  professional truck driver for ABF that you
17  were responsible and understood that you were
18  responsible to comply with all the company
19  policies, correct?
20    A    Yes.
21    Q    Okay.  I'm going to read for you now
22  Page 6 -- a portion of Page 6 of the Driver
23  Handbook for Safety and Security of ABF



Page 77

1  Freight.  I want you to tell me if you agree
2  with it or disagree with it.  I'm assuming
3  y'all have a copy of it.  Y'all provided me
4  with a copy.  You printed this for me today.
5  I'm going through this document.
6      MR. OLIVER:  Let's take a break.  Just
7  so the witness can see it.
8      MR. BAER:  It's fine.
9      (A recess was taken.)
10     Q   (By Mr. Baer) Mr. Massingill, you have
11  a copy of the handbook that is attached to the
12  deposition as Exhibit 4 in front of you,
13  correct?
14     A   Correct.
15     Q   Did you have an opportunity to review
16  this handbook today?  Did you get a chance to
17  look through it while we took a break?
18     A   I haven't looked through the whole
19  book, no.
20     Q   ABF produced this in response to a
21  request as the handbook that you acknowledged
22  that you would comply with as a professional
23  truck driver for ABF, okay?

Page 78

1      A   Okay.
2      Q   Okay.  And you signed a document,
3  correct, attached as Exhibit 5 and Bates 106
4  saying that you agreed and were responsible to
5  comply with the provisions of this handbook,
6  correct?
7      A   Correct.
8      Q   Okay.  In order to comply with the
9  provisions, you would agree with me that you
10  have to be familiar with the provisions of the
11  handbook, correct?
12     A   Correct.
13     Q   Okay.  I'd like you to flip to Page 6
14  of the handbook, which is ABF307.  Are you on
15  that page?
16     A   Yes.
17     MR. OLIVER:  The Bates 307?
18     MR. BAER:  Yes, sir.
19     MR. OLIVER:  You've got it.  You're
20  ahead of me.
21     Q   (By Mr. Baer) Do you see at the top,
22  document says accident review committee?
23     A   Yes.

Page 79

1      Q   Okay.  Are you familiar with the
2  accident review committee -- as a professional
3  truck driver for ABF, are you familiar with
4  the accident committee?
5      A   As the committee itself?
6      Q   Yes, sir.
7      A   No.
8      Q   That it exists?
9      A   Oh, yes.
10     Q   Do you know who makes up the accident
11  review committee for ABF?
12     A   No.
13     Q   Okay.  I'm going to read from you --
14  strike that.
15     I'm going to read for you something from
16  the first paragraph of accident review
17  committee; do you see that at the top?
18     A   Yes.
19     Q   I guess a little bit below the title
20  section three.
21     A   Yes.
22     Q   Okay.  The accident review committee
23  utilizes criteria established by the American

Page 80

1  Trucking Association and the National Safety
2  Council, which asks one simple question when
3  determining preventability -- did the
4  professional driver do everything reasonable
5  to present the accident?  Did I read that
6  correctly?  There's a question mark after
7  that.  Did I read that correctly?
8      A   Yes.
9      Q   Okay.  Next paragraph, the concept of
10  preventability is based on the premise that
11  the professional driver is expected to meet a
12  higher standard of performance than the
13  average motorist; did I read that correctly?
14     A   Yes.
15     Q   Would you agree with me as a
16  professional truck driver for ABF, that you
17  are expected to meet a higher standard of
18  performance than the average motorist?
19     MR. OLIVER:  Object to the form.
20     MR. BAER:  What's the problem with the
21  question, Tom?
22     MR. OLIVER:  It doesn't define higher
23  standard.



Page 81

1    MR. BAER: Okay. That's something
2    we'll take up with ABF.
3    Q    (By Mr. Baer) My question is do you,
4    sir, agree or disagree with ABF's policy from
5    its handbook that you, as a professional truck
6    driver, are expected to meet a higher standard
7    of performance than the average motorist?
8    MR. OLIVER: Same objection. You can
9    answer.
10    THE WITNESS: Yes.
11    Q    (By Mr. Baer) Okay. Would you agree
12    with me that the Federal Motor Carrier
13    regulations also holds professional truck
14    drivers to a higher duty or higher standard of
15    performance than the average motorist?
16    MR. OLIVER: Object to the form.
17    MR. BAER: You can answer.
18    MR. OLIVER: Yeah, you can answer.
19    THE WITNESS: Yes.
20    Q    (By Mr. Baer) Okay. Would you agree
21    with me that the Federal Motor Carrier safety
22    regulations are in place for the safety of
23    motorists?

Page 82

1    A    Yes.
2    Q    Okay. Would you agree with me and
3    ABF, from their handbook, that it is
4    self-evident that a professional truck driver
5    should be able to assess the behavior of
6    pedestrian and other drivers and recognize
7    those actions which may create hazardous
8    conditions and take every reasonable measure
9    to avoid involvement in an accident; do you
10    agree with that?
11    A    Yes.
12    Q    Okay. I'm going to call your
13    attention to the third paragraph, the last
14    sentence. Do you agree with ABF and its
15    employee handbook that a professional truck
16    driver such as yourself must take every
17    reasonable measure to deal safely with the
18    illegal or unsafe acts of other drivers and
19    pedestrians?
20    A    Yes.
21    Q    Okay. Do you believe that Mr. Johnson
22    on October 26, 2016, was performing an illegal
23    or unsafe act at the time of the collision?

Page 83

1    A    No.
2    Q    Do you believe that you, sir, while
3    you were driving an ABF commercial vehicle on
4    October 26, 2016, were at fault for the
5    collision?
6    A    Yes.
7    Q    Do you believe that on October 26,
8    2016, that you, as a professional truck
9    driver, did everything that you could have
10    done to avoid the collision?
11    A    No.
12    Q    In other words, you could have taken
13    action that would have prevented the
14    October 26, 2016, collision, with Mr. Johnson,
15    but you chose to make the left turn, correct?
16    A    Correct.
17    Q    Did you go before an accident review
18    committee for the 2015 collision while you
19    were operating a commercial tractor-trailer
20    for ABF and made the left turn striking the
21    other tractor-trailer owned by ABF?
22    A    No.
23    Q    Did you go before an accident review

Page 84

1    committee for the October 26, 2016, collision
2    when you made the left turn and struck the
3    rear of Mr. Johnson's trailer?
4    A    No.
5    Q    Do you know why not?
6    A    No.
7    Q    Is the accident review committee
8    requested by you as the professional truck
9    driver or is that something ABF would have to
10    ask you to be a part of after a collision?
11    A    I don't know the answer, but it
12    wouldn't be requested by me.
13    Q    Okay. Did ABF make a determination
14    after the 2015 collision at the ABF terminal
15    that that collision was preventable?
16    A    Yes.
17    Q    Okay. Did ABF find that you, as a
18    professional truck driver for ABF, were
19    responsible for the 2015 collision at its
20    Chattanooga terminal?
21    A    Yes.
22    Q    Were you reprimanded in any way by ABF
23    following the 2015 collision at the ABF



MARK MASSINGILL                                    September 11, 2019
JAMES JOHNSON vs ABF FREIGHT SYSTEM                          85–88

Page 85

1  terminal?
2        MR. OLIVER:  Object to the form.
3  Asked and answered.
4     Q    (By Mr. Baer) No.  I asked about
5  training earlier.  So I want to be clear, did
6  ABF reprimand you as one of its professional
7  truck drivers following the 2015 collision
8  while you were making a left turn at the ABF
9  terminal in Chattanooga?
10       MR. OLIVER:  Same objection.
11    Q    (By Mr. Baer) Okay.
12    A    I don't believe they did, no.
13    Q    Okay.  Following the October 26, 2016,
14 collision with Mr. Johnson when you were
15 making a left turn, did you write a letter or
16 send an email and request a review of the
17 collision?
18    A    I don't believe so, no.
19    Q    Okay.  Did you provide a written
20 statement to --
21    A    I don't remember.
22    Q    Let me finish.
23    A    Okay.

Page 86

1     Q    Did you provide a written statement to
2  ABF about how the collision on October 26,
3  2016, occurred?
4     A    No.
5     Q    Okay.  Did you take photographs
6  following the October 26, 2016, collision of
7  either your tractor-trailer or Mr. Johnson's
8  tractor-trailer.
9     A    I don't believe so, no.
10    Q    Okay.  While you were a professional
11 truck driver for ABF up until the time of this
12 collision on October 26, 2016, did you attend
13 monthly safety meetings at ABF?
14    A    Yes.
15    Q    Okay.  What did those safety meetings
16 pertain to?
17    A    I can't -- I can't recall what each
18 one pertained to.
19    Q    Okay.  Do you recall any safety
20 meetings from the time you began driving a
21 commercial vehicle for ABF up until the time
22 of this collision on October 26, 2016, that
23 dealt with the proper and safe way to make a

Page 87

1  left turn while operating a commercial motor
2  vehicle for ABF?
3     A    I don't believe so, no.
4     Q    Okay.  I'm going to ask you some
5  questions.  I just want to know if you agree
6  or disagree.  If you disagree, why, okay?
7     A    Okay.
8     Q    Okay.  Would you agree with me that
9  safety is always a top priority while a
10 professional truck driver is, in fact,
11 operating a commercial vehicle?
12       MR. OLIVER:  Object to the form.  You
13 can answer.
14       THE WITNESS:  Agree.
15       MR. BAER:  Okay.  What's the problem
16 with the question?
17       MR. OLIVER:  Top priority, the
18 definition of it.
19    Q    (By Mr. Baer) Okay.  Would you agree
20 with me that safety is a priority for a
21 professional truck driver such as yourself
22 when you are operating a commercial vehicle
23 such as a tractor-trailer?

Page 88

1     A    Agree.
2     Q    Okay.  Now, I want to know, you,
3  personally, as a professional commercial truck
4  driver, do you feel the safety of others on
5  the road is the most important thing for a
6  professional truck driver to take into account
7  while operating a commercial vehicle?
8        MR. OLIVER:  Object to the form.  You
9  can answer.
10       THE WITNESS:  Yes.
11    Q    (By Mr. Baer) Okay.  Is there anything
12 else that you think is more important for you
13 as a professional commercial truck driver than
14 safety?
15    A    No.
16    Q    Do you believe that the Federal Motor
17 Carrier safety regulations should be enforced?
18    A    They're the law, yes.
19    Q    Okay.  Would you agree with me that if
20 the Federal Motor Carrier safety regulations
21 are not followed by a commercial truck driver
22 such as yourself, that those violations can
23 lead to injuries or even death of other



Page 89

1  motorists on the road?
2      MR. OLIVER: Object to the form. You
3  can answer.
4      THE WITNESS: Yes.
5   Q   (By Mr. Baer) Okay. Would you agree
6  with me that a professional driver that
7  doesn't comply with the Federal Motor Carrier
8  safety regulations exposes other drivers on
9  the road to injury --
10     MR. OLIVER: Object to the form.
11  Q   (By Mr. Baer) -- in the event of a
12 collision?
13     MR. OLIVER: Same objection.
14  Q   (By Mr. Baer) Okay.
15  A   Yes.
16  Q   Okay. Why do you feel it's important
17 for a commercial truck driver not to expose
18 other motorists on the road to injury?
19  A   Don't want to expose anyone to injury.
20  Q   Would you agree with me that if a
21 professional truck driver such as yourself
22 does not comply with the Federal Motor Carrier
23 safety regulations, that you are, in fact,

Page 90

1  exposing other drivers to potential injury?
2      MR. OLIVER: Object to the form.
3      THE WITNESS: Say that again.
4   Q   (By Mr. Baer) It's not a trick
5  question. I just want to know this: If a
6  professional truck driver doesn't follow the
7  rules and standards that it is held to by the
8  Federal Motor Carrier safety regulations and
9  any state that it operates through, do you
10 believe that you are exposing other drivers on
11 the road to incidents where they could be
12 injured?
13     MR. OLIVER: You talking about a
14 particular rule or all rules?
15     MR. BAER: All of them.
16     MR. OLIVER: All right. Same --
17 object to the form.
18     THE WITNESS: Object to the form.
19     MR. OLIVER: No. You've got to answer
20 him.
21     THE WITNESS: Okay. Yes.
22  Q   (By Mr. Baer) Would you agree with me
23 that when a professional truck driver makes a

Page 91

1  left turn in a tractor-trailer, that it's his
2  responsibility to make sure that he is not
3  going to strike another vehicle while making
4  the turn?
5   A   Yes.
6   Q   Okay. Would you agree with me that
7  you did not follow the Federal Motor Carrier
8  safety regulations when you made the left turn
9  on October 26, 2016 and struck the rear of
10 Mr. Johnson's trailer?
11     MR. OLIVER: Object to the form.
12 Which regulation are you asking that he didn't
13 comply with?
14     MR. BAER: I'll ask him. He testified
15 he's familiar with the Federal Motor Carrier
16 safety regulation.
17  Q   (By Mr. Baer) Which of the Federal
18 Motor Carrier safety regulations do you feel
19 you violated on October 26, 2016, when you
20 made the left turn and struck the rear of
21 Mr. Johnson's trailer, if any?
22     MR. OLIVER: Object to the form.
23     THE WITNESS: I'm not sure.

Page 92

1   Q   (By Mr. Baer) Okay. I'm going to show
2  you Exhibit 5 again. Number one, it says you
3  understand that you are responsible to comply
4  with all Federal Motor Carrier safety
5  regulations. Did I read that correct?
6      MR. OLIVER: Object to the form.
7  Asked and answered.
8      MR. BAER: He's telling me he's not
9  familiar with the Federal Motor Carrier safety
10 regulations. He said he has to comply with
11 them.
12     THE WITNESS: Yes.
13  Q   (By Mr. Baer) Say that again.
14  A   Yes.
15  Q   Okay. So yes, it's your duty, as a
16 professional truck driver, to comply with the
17 Federal Motor Carrier safety regulations; yes?
18  A   Yes.
19  Q   Okay. Would you agree with me that
20 making a left turn and cutting that turn too
21 short and striking another vehicle is a
22 violation of the Federal Motor Carrier safety
23 regulations?

Page 93

1        MR. OLIVER: Object to the form.
2        THE WITNESS: Yes.
3     Q   (By Mr. Baer) Okay. Please flip to
4  Page 39 of the employee handbook, which is
5  attached as Exhibit 4, Bates 340. Page 39 of
6  the handbook. Do you see the left column
7  where it says left turn?
8     A   Yes.
9     Q   Do you agree with me on October 26,
10  2016, you were making a left turn at the time
11  of the collision, correct?
12    A   Yes.
13    Q   Okay. See the first bullet?
14    A   Yes.
15    Q   Okay. It says check your mirrors,
16  correct?
17    A   Correct.
18    Q   Did you check your mirrors before you
19  started the left turn on October 26, 2016?
20    A   Before I started the turn? Yes.
21    Q   Okay. Did you keep your eyes moving
22  checking both the roadway ahead as well as the
23  turning radius of your trailer before making

Page 94

1  the left turn on October 26, 2016, when you
2  struck the rear of Mr. Johnson's trailer?
3     A   Before I made the left turn?
4     Q   Yes, sir.
5     A   Yes.
6     Q   Okay. If you checked the turning
7  radius of your tractor-trailer before you made
8  the turn and struck the rear of Mr. Johnson's
9  trailer on October 26, 2016, why did you, in
10  fact, strike the rear of Mr. Johnson's
11  trailer?
12        MR. OLIVER: Object to the form.
13        THE WITNESS: Okay. I might be a --
14    Q   (By Mr. Baer) Let me back up.
15    A   If I'm checking the turning radius
16  before I make the turn, okay, I thought I had
17  the room.
18    Q   Okay. All right. Next sentence.
19  Remember that the trailer will off-track
20  behind the tractor, which means adequate
21  clearance must be allowed for the trailer; do
22  you agree with that?
23    A   Yes.

Page 95

1     Q   Okay. Next bullet. Using your
2  turning indication -- let me back up a second.
3     Did you make sure there was adequate
4  clearance of your trailer on October 26, 2016,
5  before you made the left turn striking the
6  rear of Mr. Johnson's trailer?
7     A   I believe there was adequate clearance
8  when I started to turn.
9     Q   Okay. Did you use your turn
10  indicator -- strike that. It says use your
11  turn indicators at least 100 to 300 feet prior
12  to turning to alert other motorists of your
13  intended actions.
14    A   Yes.
15    Q   Okay. Did you do that on October 26,
16  2016?
17    A   Yes.
18    Q   Okay. Would you agree with me that
19  that would apply when there are vehicles
20  behind you so you can advise them or notify
21  them that you are, in fact, making a left
22  turn?
23    A   Yes.

Page 96

1     Q   That wasn't the case on October 26,
2  2016, correct?
3        MR. OLIVER: Object to the form.
4        THE WITNESS: I'm sorry.
5     Q   (By Mr. Baer) Mr. Johnson's
6  tractor-trailer was not behind you on
7  October 26, 2016, correct?
8     A   Correct.
9     Q   Before you made the left turn on
10  October 26, 2016, did you notice any potential
11  problems that you may have encountered with
12  making the turn before you made the turn?
13    A   Before I started?
14    Q   Yes, sir.
15    A   No. I thought I could make the turn.
16    Q   Okay. Would you agree with me that
17  had you just waited for the train to cross
18  before making the left turn, the October 26,
19  2016, collision as it happened would not have
20  occurred?
21        MR. OLIVER: Object to the form.
22        THE WITNESS: Yes.
23    Q   (By Mr. Baer) Okay. Have you ever had



Page 97

1  an annual review while you were a professional
2  truck driver for ABF from the time you started
3  driving a commercial vehicle until the time of
4  this collision on October 26, 2016?
5      A    I don't recall.
6      Q    Okay.  If you did have an annual
7  review, do you know what that would entail?
8      A    Not right offhand, no.
9          MR. BAER:  Okay.  I'm going to include
10  in the request, if there was, in fact, an
11  annual review and any documentation to support
12  that, please produce it.
13          MR. OLIVER:  You're going to put all
14  this in the request, right?
15          MR. BAER:  I'm going to put all of
16  this in an email.  That's okay, right?
17          MR. OLIVER:  Yep.  What was your time
18  frame?  From the time he became a CDL until
19  the accident?
20          MR. BAER:  Correct.
21      Q    (By Mr. Baer) Do you remember what day
22  of the week October 26, 2016, was?
23      A    No.

Page 98

1      Q    How many days a week were you
2  operating a commercial vehicle for ABF around
3  the time of October 26, 2016?
4      A    I believe it was four days a week.
5      Q    Okay.  And would it be four
6  consecutive days or would there be days in
7  between in which you were off?
8      A    Four consecutive days.
9      Q    Okay.  How many hours a day would you
10  operate a commercial motor vehicle such as a
11  tractor-trailer for ABF over those four days a
12  week?
13      A    On average, probably on average maybe
14  nine.
15      Q    Okay.  And during those nine hours,
16  would you take a break?
17      A    Yes.
18      Q    Okay.  Why would you take a break?
19      A    Had a mandatory lunch.
20      Q    Are you aware of any Federal Motor
21  Carrier safety regulations that require
22  commercial truck drivers to take a break after
23  a certain numbers of hours?

Page 99

1      A    Yes.
2      Q    What is your account on that?
3      A    There's --
4      Q    Say that again.
5      A    I believe you can only work -- you
6  have to take a break before your eight hours
7  and then I believe 14 hours is the longest
8  that you can go.
9      Q    Okay.
10      A    And you have to have a 10-hour period
11  in between.
12      Q    Let's hop to October 26, 2016.  Walk
13  me through your day.  Start with what time you
14  get up that morning.
15          MR. OLIVER:  Let me object to the
16  form, just from the standpoint, this accident
17  happened at 3:00 a.m on the 26th.  That might
18  assume he got up on the 26th.
19      Q    (By Mr. Baer) He might have got up at
20  midnight.  I don't know.  What time did you
21  get up -- you might have got up on the 25th.
22          So between October 25th and October 26th
23  and this collision happened, do you recall

Page 100

1  what time you got up?
2      A    I believe I got up around
3  4:00 o'clock.
4      Q    P.m.?
5      A    Yes.
6      Q    Do you remember what you did when you
7  got up, after the morning rituals, of course?
8      A    Probably started dinner, something.
9      Q    Okay.  Who lived with you at the time
10  of October 25 and 26th?
11      A    My wife and four kids.
12      Q    Okay.  So you would have started
13  dinner; that means you were cooking, right?
14      A    Yes.
15      Q    Okay.  What's your wife's name?
16      A    Alexandria.
17      Q    Last name?
18      A    Massingill.
19      Q    So you start dinner.  I assume you eat
20  dinner?
21      A    Yes.
22      Q    Okay.  Probably eat dinner sometime
23  around 6:00 p.m.?

...

Page 101

1    A    Probably.
2    Q    Okay.  What do you do after you eat
3  dinner?
4    A    Just mess around the house.
5    Q    Okay.  Did you have any drinks at
6  dinner?
7    A  No.
8    Q  Do you drink alcohol?
9    A  Yes.
10   Q  How often?
11   A  Just depends.
12   Q  Okay.
13   A  Football season, I might have a couple
14  every Saturday.  Off of football season, it
15  might be two or three weeks in between.
16   Q  Okay.  What time did you drive from
17  your house in Georgia to Tennessee to start
18  your shift with ABF?
19   A  I believe.  I leave around 8:00, 8:15.
20   Q  So approximately 8:00 p.m., you make
21  the drive from Georgia to Tennessee?
22   A  Yes.
23   Q  Okay.  You drive your own personal

Page 102

1  vehicle from Georgia to Tennessee?
2    A  Yes.
3    Q  In other words, you don't take the
4  tractor home with you to your house in Georgia
5  when you're done?
6    A  No.
7    Q  Okay.  So you get to -- you said it's
8  about an hour from Georgia to Tennessee --
9  your house in Georgia.
10   A  Yes.
11   Q  Okay.  So you get to ABF sometime
12  around 9:00, 9:15?
13   A  Yes.
14   Q  Okay.  What do you do when you get to
15  ABF?
16   A  Clock in.
17   Q  And then what?
18   A  Check on the manifest and see if I've
19  been loaded.
20   Q  You said check on manifest; what do
21  you mean?
22   A  Well, if they have everything that I
23  would be delivering, they'll print a manifest

Page 103

1  and it shows what's on there.
2    Q  Okay.  Did you know what route you
3  were taking on October 26, 2016, before the
4  collision or do you find out that -- when you
5  get to work on that day?
6    A  I knew I was going to Birmingham, yes.
7    Q  Why did you know you were going to
8  Birmingham?
9    A  Because that was the -- Birmingham was
10  the route.
11   Q  How many times have you driven the
12  Birmingham route before October 26, 2016,
13  while you were employed by ABF?
14   A  I'm not sure.
15   Q  Was this the first time?
16   A  No.
17   Q  Okay.  Is this a route you took on
18  each of the four days that you worked a week
19  for ABF?
20   A  Yes.
21   Q  Okay.  You drove the same route every
22  time?
23   A  Yes.

Page 104

1    Q  Okay.  There were no other routes that
2  you drove for ABF while you were employed by
3  ABF as a commercial truck driver from the time
4  of this was March of 2015 to October 26, 2016?
5        MR. OLIVER:  Object to the form.
6        THE WITNESS:  I can't --
7    Q  (By Mr. Baer)  Let me ask you this:
8  How long had you only been driving the route
9  from ABF terminal in Chattanooga, Tennessee,
10  to Birmingham, Alabama?
11   A  Honestly, I can't tell you.
12   Q  Okay.  Were you working four days a
13  week at the time of October 25th and 26th?
14   A  Yes.
15   Q  Okay.  In those two weeks before that,
16  was the route from ABF terminal in
17  Chattanooga, Tennessee to Birmingham, Alabama,
18  was that your only route?
19   A  That was the route I was running.
20   Q  That day, correct.  But how many times
21  in the four days before had you -- your last
22  four shifts, how many times did you drive from
23  Chattanooga, Tennessee, to Birmingham,



Page 105

1  Alabama?
2    A   All four of them.
3    Q   Okay.  And were you bringing the cargo
4  from one place to another?
5    A   It goes from Chattanooga to
6  Birmingham.
7    Q   Okay.
8    A   And then I go back to Chattanooga or I
9  go to Decatur and then Chattanooga.
10   Q   Is there ever an instance where when
11 you go pick up the tractor-trailer at the ABF
12 terminal that the trailer is empty?
13   A   There might knight have -- yeah,
14 sometimes there might have been empty or maybe
15 one pallet.
16   Q   Is that rare?
17   A   Yes.
18   Q   Okay.  Would you agree with me that
19 most of the time or the majority of the time
20 that you went from Chattanooga, Tennessee from
21 ABF's terminal to Birmingham, Alabama, you had
22 a full load?
23   A   Probably half a load.

Page 106

1    Q   Okay.  And depending on what cargo you
2  were carrying, that would determine the weight
3  of your trailer, correct?
4    A   Correct.
5    Q   The load you were carrying on
6  October 26, 2016, had you dropped it off in
7  Birmingham, Alabama before the collision with
8  Mr. Johnson's trailer?
9    A   The load from Chattanooga?
10   Q   Yes, sir.
11   A   Yes.
12   Q   Okay.  Were you empty?
13   A   No.
14   Q   Okay.  What did you have -- what cargo
15 did you still have in your trailer on
16 October 26, 2016, when you struck
17 Mr. Johnson's trailer?
18   A   The cargo I picked up in Birmingham.
19   Q   Okay.  So you picked up cargo from
20 where?
21   A   From Birmingham.
22   Q   From where in Birmingham?
23   A   ABF terminal.

Page 107

1    Q   So you brought it from ABF terminal in
2  Chattanooga to ABF terminal in Birmingham?
3    A   Correct.
4    Q   Did you drop your trailer in
5  Birmingham?
6    A   No.
7    Q   Okay.  They loaded the same trailer
8  that you had --
9    A   Right, gets loaded.
10   Q   Okay.  Okay.  Do you remember what
11 type of cargo was loaded onto your trailer?
12   A   No.
13   Q   Okay.  What type of cargo do you carry
14 from the ABF terminal in Chattanooga,
15 Tennessee, to the ABF terminal in Birmingham,
16 Alabama?
17       MR. OLIVER:  Object to the form.
18   Q   (By Mr. Baer) On any given day.
19   A   It could be a pallet of coffee or
20 maybe some lodge -- pallet of lodge.  Might be
21 a roll of carpet.
22   Q   Okay.  So it could be anything?
23   A   It could be anything.

Page 108

1    Q   Where do you weigh in after you pick
2  up a load -- let's say, in this instance in
3  Birmingham, Alabama after you make the first
4  drop of cargo -- strike that.
5      When you unload the -- when ABF unloads the
6  cargo at the terminal in Birmingham, Alabama,
7  how long does it take for them to reload your
8  trailer with cargo such as they did on
9  October 26, 2016?
10   A   It just depends.
11   Q   Okay.  Do they tell you how much you
12 weigh when you leave the ABF terminal in
13 Birmingham, Alabama?
14   A   You have a manifest with weight.
15   Q   Okay.  When you say a manifest with
16 the weight, what is that called?
17   A   Manifest.
18   Q   All right.  So look, I've never seen a
19 manifest history; neither has the jury, so I'm
20 going to hand you what's been produced to me
21 as manifest history -- ABF's manifest history
22 and that is Bates labeled ABF Freight System 3
23 and 4, which I'm going to attach as 6.



MARK MASSINGILL                                                September 11, 2019
JAMES JOHNSON vs ABF FREIGHT SYSTEM                            109–112

Page 109

1    Have you ever reviewed a manifest history?
2        (Plaintiff's Exhibit No. 6 was marked
3        for identification.)
4    A   I've looked at one before, yes.
5    Q   In other words, when you leave ABF in
6    Birmingham, you get a manifest history, right?
7    A   (Witness nods head.)
8    Q   And that would have been the same
9    procedure in place on October 26, 2016,
10   correct?
11   A   Correct.
12   Q   Okay.  In this two-page document,
13   please tell me how much you weighed when you
14   left the Birmingham ABF terminal on
15   October 26, 2016.
16   A   20,649.
17   Q   Okay.  That's the freight or is that
18   what the trailer weighed?
19   A   That's the freight.
20   Q   Okay.  So in order to determine how
21   much you weighed, total, we need to know the
22   weight of the tractor, correct?
23   A   Yes.

Page 110

1    Q   The weight of the trailer, correct?
2    A   Correct.
3    Q   And the weight of the freight,
4    correct?
5    A   Correct.
6    Q   Okay.  I want you to take a
7    highlighter for me -- give you an orange
8    highlighter and I want you to highlight how
9    much you weighed -- how much the freight in
10   your trailer weighed when you left the
11   Birmingham ABF terminal on October 26, 2016.
12   A   (Witness complies.)
13   Q   Just so the record is clear, the
14   witness has highlighted in orange the weight
15   of the freight he picked up at the ABF
16   terminal in Alabama in orange on the second
17   page, which is Bates ABF Freight 4; is that
18   correct?
19   A   Yes.
20   Q   And that is attached as 6.  What type
21   of tractor were you driving at the time of the
22   collision?
23   A   A Mack truck.

Page 111

1    Q   How much does that weigh?
2    A   I don't know off the top of my head.
3    Q   Okay.  Where would I find that
4    information?
5    A   We can look on the truck.
6    Q   On the truck?
7    A   It should be on the truck.
8    Q   Okay.
9    A   In the door.
10   Q   I'm going to show you a photograph
11   that was produced.  Do you recognize the
12   photograph that I've just shown you?
13   A   I've seen it, yes.
14   Q   Okay.  What is that?
15   A   That's the -- a picture of an ABF
16   truck.
17   Q   Do you recognize that to be the ABF
18   tractor you were driving on October 26, 2016?
19   A   Yes.
20   Q   Okay.  Would you agree with me that
21   not all tractors weigh the same?
22   A   Yes.
23   Q   Okay.  I'm sorry, would you agree with

Page 112

1    me that this photograph is, in fact, a
2    depiction of part of the tractor that you were
3    operating on October 26, 2016?
4    A   Yes.
5    Q   Okay.  Does this indicate -- this
6    photograph indicate to you how much the
7    tractor you were operating on October 26,
8    2016, weighed?
9    A   No.
10   Q   Okay.  Where would that information be
11   on the tractor?
12   A   Inside the door frame, I believe.
13   Q   Okay.  I'm also going to request a
14   photograph of the inside of the tractor -- are
15   you still operating that tractor?
16   A   No.
17   Q   Same one?  No.  Do you know if ABF
18   still has the tractor you were operating on --
19   A   No.
20       MR. BAER:  I'm going to ask for a
21   photograph of inside of the tractor if ABF
22   still has it.
23       MR. OLIVER:  I don't know if they've



MARK MASSINGILL
JAMES JOHNSON vs ABF FREIGHT SYSTEM

September 11, 2019
113–116

Page 113

1   got it.
2        MR. BAER:  Yeah, I'm just going to ask
3   for it.
4        MR. OLIVER:  Do you want the picture
5   of the sticker or you want a weight?
6        MR. BAER:  If you give me an authentic
7   document of the weight, all I want is the
8   weight.  Do y'all know the weight?
9        MR. OLIVER:  I don't, no.
10   Q   (By Mr. Baer) I think that's pretty
11  important.  There's nothing on the manifest
12  that would show us the weight of the tractor,
13  correct?
14   A   No, there's nothing on there.
15   Q   Okay.  Do you go through a weigh
16  station at the ABF terminal or does ABF weigh?
17   A   No.
18   Q   Okay.  So there would be no
19  documentation at ABF that would show how much
20  the tractor-trailer and the freight all
21  weighed together?
22   A   No.
23   Q   Okay.  And you, sir, do not know how

Page 114

1   much the tractor weighed on October 26, 2016,
2   that you were driving?
3   A   No.
4   Q   Okay.  Do you know how much the empty
5   trailer that you were pulling on October 26,
6   2016, weighed?
7   A   No, not off the top of my head.
8   Q   Where would I find that information?
9   A   I'm not sure.  I believe it's on -- I
10  believe there's a tag on the trailer that will
11  have the trailer weight.
12       MR. BAER:  Same request, fellas.
13       MR. OLIVER:  Okay.
14   Q   (By Mr. Baer) Mr. Massingill, at trial
15  when I ask you about the empty weight of the
16  tractor and the empty weight -- strike that.
17       At trial when I ask you about how much your
18  trailer weighed, you don't know, correct?
19   A   (Witness shakes head.)
20   Q   I'd have to get that information from
21  ABF?
22   A   Yes.
23   Q   You don't know the weight of the

Page 115

1   trailer when it's empty that you were pulling
2   on October 26, 2016, correct?
3   A   Correct.
4   Q   Okay.  But now we do know the weight
5   of the freight per the documentation that ABF
6   provided in the manifest record that's
7   attached as Exhibit 6?
8   A   Correct.
9   Q   Okay.  If ABF doesn't have that
10  documentation, is there an educated guess,
11  based upon your knowledge, skill, experience,
12  training as a professional truck driver, that
13  would give us an idea of how much the tractor
14  you were driving weighed at the time of the
15  collision?
16   A   I wouldn't make that guess.
17   Q   Okay.  Same questions.  With respect
18  to the trailer; is there any educated guess
19  based on your knowledge, skill, experience,
20  and training as a professional truck driver
21  that would give us an idea how much that empty
22  trailer weighed?
23   A   No.

Page 116

1   Q   Okay.  You would agree with me that
2   not all empty trailers weigh the same,
3   correct?
4   A   Correct.
5   Q   Depends on the length, correct?
6   A   Correct.
7   Q   Depends what the trailer is made out
8   of, correct?
9   A   Correct.
10   Q   Depends on the type of wheels they
11  have, correct?
12   A   Correct.
13   Q   Depends on the type of rims they have,
14  correct?
15   A   Correct.
16   Q   Depends on how much each axle weighs,
17  correct?
18   A   Correct.
19   Q   Okay.  Does the tractor that you were
20  operating on October 26, 2016, have any type
21  of collision warning system?
22   A   No.
23   Q   Okay.  In other words, there's no



MARK MASSINGILL
JAMES JOHNSON vs ABF FREIGHT SYSTEM

September 11, 2019
117–120

Page 117

1  light that flashes or makes a noise that says,
2  stop, you're about to hit something?
3    A   Correct.
4    Q   Okay.  Do you think that if a tractor
5  did have that type of collision warning
6  system, it would have helped prevent the
7  collision on October 26, 2016, as you were
8  making the left turn?
9       MR. OLIVER:  Object to the form.
10       THE WITNESS:  I can't say for sure.
11    Q   (By Mr. Baer) Okay.  Based on your
12  experience and training as a professional
13  truck driver, do you feel a collision warning
14  system, if it was on your tractor, could
15  prevent a collision?
16       MR. OLIVER:  Object to the form.
17       THE WITNESS:  I don't know.
18    Q   (By Mr. Baer) It's not a trick
19  question.
20    A   I --
21    Q   Right.
22    A   If it's on the tractor, is it going to
23  do anything with the trailer?  That's why I

Page 118

1  don't know.
2    Q   Okay.  That's fair.  That's fair.  How
3  many mirrors do you have on the driver's side
4  of the tractor you were operating on
5  October 26, 2016?
6    A   Two.
7    Q   Two?  Did you check those while you
8  were making the left turn and before the
9  collision with Mr. Johnson's trailer?
10    A   I believe I checked them just about
11  the time I made that collision.
12    Q   Okay.  Like at the time of it -- the
13  impact or before the impact?
14    A   To my recollection, it was pretty much
15  simultaneous.
16    Q   Okay.  Because if you had looked at
17  the mirrors before the impact, you probably
18  would have stopped, right?
19    A   Yes.
20    Q   If the tractor that you were operating
21  on October 26, 2016, is no longer with ABF,
22  how could we determine that -- strike that.
23       If the tractor is no longer -- that you

Page 119

1  were operating on October 26, 2016, is no
2  longer with ABF, how could we determine
3  exactly what it weighed?
4    A   I don't know.  I mean, you'd have to
5  check with ABF.
6    Q   Okay.  If the trailer you were pulling
7  on October 26, 2016, is no longer with ABF,
8  how would we determine the exact weight of
9  that trailer when it's empty?
10    A   I believe you'd have to check with
11  ABF.
12    Q   Okay.  All right.  What type of
13  documents would I have to ask for, if you
14  know?
15    A   I don't know.
16    Q   Who owned the tractor you were driving
17  on October 26, 2016?
18    A   It's an ABF tractor.
19    Q   Who owned the trailer you were pulling
20  on October 26, 2016?
21    A   ABF trailer.
22    Q   Okay.  When you make a left turn --
23  strike that.

Page 120

1       On October 26, 2016, were you pulling out
2  of somewhere when you made the left turn
3  before you struck Mr. Johnson's trailer or
4  were you on a road?
5    A   I was on a road.
6    Q   Okay.  Were you -- did you make the
7  left turn -- strike that.  Did you stop at a
8  red light at -- on the road you were on before
9  you made the left turn?
10    A   No.
11    Q   Okay.
12    A   The light was green.
13    Q   Okay.  So you had a green light and
14  you were going straight, correct?
15    A   Correct.
16    Q   Okay.  Do you know how fast you were
17  going while you were going straight?
18    A   No.
19    Q   Okay.  You said you put on your
20  blinker, correct?
21    A   Correct.
22    Q   And then you began to make the left
23  turn, correct?



MARK MASSINGILL
JAMES JOHNSON vs ABF FREIGHT SYSTEM

September 11, 2019
121–124

Page 121

1    A   Well, not exactly.
2    Q   Okay.  Why don't you walk me and a
3  jury through how you were -- strike that.
4  Walk me and the jury through the moments
5  before the collision with the rear of
6  Mr. Johnson's vehicle on October 26, 2016,
7  while you were going straight down from a time
8  frame of while you were traveling straight
9  through the green light and making the turn.
10    A   Okay.  As I got down there, the light
11  was green and he had already started turning.
12  Of course, he has a tanker truck which has to
13  stop at railroad tracks automatically and then
14  go.  I was going through and about the time I
15  go through and he just stopped, you know.  I'm
16  going through and the railroad light started
17  dinging and then the arm started coming down,
18  so I'm in the middle of the road.  So I was
19  stopped in the middle of the road.
20      There was another truck that had pulled up
21  behind me, so I couldn't back up out of the
22  road, so I felt like I had enough room to go
23  into the right-hand lane, so I swung out and

Page 122

1  went up off the curb and there's power poles,
2  light poles, a couple of poles of some sort.
3      So I was inching my truck around those and
4  that's what I was kind of focused on and then
5  came back down and that's when I looked back
6  in my mirror and I caught the taillight on
7  Mr. Johnson's truck.
8    Q   Okay.  When -- the first time you saw
9  the tractor-trailer being operated by
10  Mr. Johnson, was it moving or was it stopped?
11    A   The first time I saw it?
12    Q   Yeah, when you first noticed
13  Mr. Johnson's tractor-trailer, was it moving
14  or stopped?
15    A   It was moving.
16    Q   Okay.  Was he in front of you?
17    A   Yes.
18    Q   What road were you on?
19    A   I'm not sure the name of the road.
20  It's the road the ABF terminal is on.
21    Q   And how much space was between you and
22  the rear of Mr. Johnson's trailer when you saw
23  it moving for the first time?

Page 123

1    A   I couldn't tell you.
2    Q   Okay.  Was it the length of the truck
3  or the tractor-trailer or was it more?
4    A   Probably a length or two.
5    Q   Was what was the length of the
6  tractor-trailer you were operating?
7    A   I don't know the exact measurement.
8    Q   Where would I get that from?
9    A   Not sure.
10    Q   What do you call the part behind the
11  tractor that enables you -- that you hook onto
12  the trailer to; what do you call that?
13    A   The fifth wheel.
14    Q   So you know, where the tractor
15  connects to the trailer, that's called the
16  fifth wheel?
17    A   Correct.
18    Q   You agree with me that not every fifth
19  wheel weighs the same?
20    A   Correct.
21    Q   You agree with me not every fifth
22  wheel is the same length, correct?
23    A   Correct.

Page 124

1    Q   Do you know as you sit here today the
2  length of the fifth wheel on the
3  tractor-trailer you were operating on
4  October 26, 2016?
5    A   No.
6    Q   Okay.  And I believe you don't know
7  the weight of that either, correct?
8    A   Correct.
9    Q   Okay.  So you, sir, do not know the
10  length or the width of the tractor-trailer you
11  were operating on October 26, 2016, at the
12  time of the collision, correct?
13    A   Correct.
14    Q   And it's your testimony that
15  Mr. Johnson's vehicle when you first saw it
16  was moving, correct?
17    A   Correct.
18    Q   And was one to two tractor-trailer
19  lengths ahead of you?
20    A   Yeah.
21    Q   Okay.  Did you see Mr. Johnson make a
22  left turn and stop before the railroad tracks?
23    A   Yes.



MARK MASSINGILL
JAMES JOHNSON vs ABF FREIGHT SYSTEM

September 11, 2019
125–128

Page 125

1    Q    Okay.  And he was at a complete stop,
2   correct, when you saw him?
3        MR. OLIVER:  Object to the form.
4    Q    (By Mr. Baer) Okay.  Was he at a
5   complete stop before you made the turn?
6    A    Yes.
7    Q    Okay.  In other words, you don't
8   disagree with Mr. Johnson's testimony and the
9   investigating officer's testimony that
10  Mr. Johnson was at a complete stop before the
11  impact, correct?
12   A    Correct.
13   Q    And you testified earlier that you
14  could have stopped instead of making -- and
15  waited before making the left turn, correct?
16   A    I could have, yes.
17   Q    Okay.  But you chose to make the left
18  turn hoping you could make it into the right
19  lane, correct?
20   A    I believe I could, yes.
21   Q    That was your choice, correct?
22   A    Yeah.
23   Q    Okay.  When you did your pre-trip

Page 126

1   inspection -- strike that.
2        Did you do a pre-trip inspection before you
3   left the ABF terminal in Chattanooga?
4    A    Yes.
5    Q    Okay.  Was everything working?
6    A    Yes.
7    Q    Okay.  Mirrors were there?
8    A    Yes.
9    Q    Blinkers were working?
10   A    Yes.
11   Q    Horn was working?
12   A    Yes.
13   Q    Okay.  What was the weather like at
14  3:00 o'clock in the morning on October 26,
15  2016?
16   A    What?
17   Q    What was the weather like?  Was it
18  dark, wet?
19   A    It was clear.
20   Q    Okay.  All right.  I guess I should
21  ask if it's snowing.  Y'all get snow here,
22  right?
23       MR. OLIVER:  Very rarely.  You can

Page 127

1   certainly ask the question.
2    Q    (By Mr. Baer) I just want to ask you,
3   what street were you traveling down before you
4   made the left turn?
5    A    I'm not sure of the name of it.
6    Q    Take a second to think about it.  You
7   told me earlier you take this route all the
8   time, right?
9    A    Right.
10   Q    I don't know, so I'm asking you.  I
11  mean, if it's -- I can tell you how to get to
12  my house or how to get to my work.  I'm asking
13  you, do you know the road you were on before
14  you made the left turn?
15   A    I can't remember the name of it.
16   Q    Okay.  Do you remember the name of the
17  road you were turning on?
18   A    I believe that's Avenue W.
19   Q    Okay.  How many lanes is the road you
20  were traveling on before you made the left
21  turn?
22   A    Two lanes each way.
23   Q    Okay.  So two lanes were traveling in

Page 128

1   the direction you were going in and two lanes
2   were coming the other correction, correct?
3    A    I believe so, yeah.
4    Q    Okay.  Do you know what speed you were
5   traveling at the time you began making the
6   turn?
7    A    Well, I had come to a complete stop,
8   so I'm -- you're looking at around 5 miles an
9   hour.
10   Q    Okay.  That wasn't the question.  The
11  question was do you know how fast you were
12  going when you began the left turn and before
13  the -- when you began the left turn, do you
14  know how fast you were going?
15   A    No.
16   Q    Okay.  How much time passed from the
17  time you began making the left turn until the
18  time of the impact?
19   A    I don't know.
20   Q    You don't know?
21   A    No.
22   Q    All right.  I would imagine it
23  happened pretty fast?

ESQUIRE
DEPOSITION SOLUTIONS

Page 129

1    A    It wasn't fast.
2    Q    No.  I should say, I would imagine
3   from the time you began a left turn until the
4   time of the collision, that it happened
5   quickly?
6        MR. OLIVER:  Object to the form.
7        THE WITNESS:  No.
8    Q    (By Mr. Baer) No?  Okay.  You don't
9   know how fast you were going -- you don't know
10  the name of the road you were traveling down
11  before you started the left turn, correct?
12   A    Correct.
13   Q    You don't know how fast you were going
14  while you were traveling on that road,
15  correct?
16   A    Correct.
17   Q    You don't know how fast you were going
18  when you started making the turn, correct?
19   A    I don't know the exact -- no.
20   Q    Okay.  And you don't know how fast you
21  were going at the time of the impact?
22   A    I don't know the exact, no.
23   Q    Okay.  Any -- speed limit -- any speed

Page 130

1   you believe you were going at the time of the
2   impact would be a guess, correct?  You don't
3   know?
4        MR. OLIVER:  Object to the form.
5    Q    (By Mr. Baer) Okay.  Strike that.
6        You already testified you don't know how
7   fast you were going when you made the left
8   turn, correct?
9        MR. OLIVER:  He said exactly, just for
10  the record.
11   Q    (By Mr. Baer) Well, that's very
12  important.
13   A    I don't know exactly.
14   Q    Okay.  You don't know how fast you
15  were going at the time of the impact, correct?
16       MR. OLIVER:  Same objection.
17   Q    (By Mr. Baer) Okay.  Do you or do you
18  not know how fast you were going at the time
19  of the impact?
20   A    I do not know the exact speed, no.
21   Q    Do you know what gear you were
22  traveling in on the road you were going
23  straight on before you made the left turn; do

Page 131

1   you know?
2    A    Which gear I was in before I made the
3   left turn?
4    Q    Yes, sir.
5    A    I believe I had gotten to sixth gear.
6    Q    Okay.  Do you know for certain if you
7   switched gears before you started to make the
8   left turn?
9    A    Yes.
10   Q    Okay.  How do you know that?
11   A    Because I had already come to a
12  complete stop.
13   Q    Where did you come to a complete stop?
14   A    I was out in the middle of the road.
15   Q    Okay.  So you're traveling in sixth
16  gear; do you know how fast you're going?
17   A    No.
18   Q    Do you know the speed limit of the
19  road you were on?
20   A    Not off the top of my head, no.
21   Q    Okay.  So you're traveling in sixth
22  gear; do you shift down before you come to a
23  complete stop?

Page 132

1    A    Yes.  Well, I brake -- I broke.
2    Q    Did you stay in the sixth gear?
3    A    I started shifting down too.
4    Q    How far were you from the intersection
5   when you began to shift down?
6    A    I couldn't tell you.
7    Q    You had a green light?
8    A    Right.
9    Q    And it's your testimony that you came
10  to a complete stop?
11   A    Right.
12   Q    Okay.  Do you have any witnesses that
13  would testify that you came to a complete stop
14  before you made that left turn?
15   A    No.
16   Q    Why would you come to a complete stop
17  before you made the left turn if you had a
18  green light?
19   A    Because the railroad tracks came
20  down --
21   Q    Okay.
22   A    -- when I was pulling out from the red
23  light.



Page 133

1   Q   Okay.
2   A   So I was trying to figure out what to
3   do.  I came to a complete stop thinking let me
4   back up out of the intersection and another
5   truck came up behind me.
6   Q   You testified earlier that it was a
7   green light.
8   A   Right.
9   Q   Right?  And you just testified now
10  that there was a red light.  Which one is it?
11  Was the light green or red?
12  A   No.  I said another truck pulled up to
13  where the red light -- or the green light.
14  Whatever you want to call it.  We call it a
15  red light.  Do you understand what I'm saying?
16  Q   No.  It's either red -- the light is
17  either red or it's green.
18      MR. OLIVER:  I think he's talking
19  about it's a traffic light.  He's not
20  categorizing.
21      MR. BAER:  Tom, this is important.  I
22  don't need you to help him testify.
23      MR. OLIVER:  I was trying to clear it

Page 134

1   up.
2       MR. BAER:  I know.  Let me clear it
3   up.  This is my turn.
4   Q   (By Mr. Baer) So you're approaching an
5   intersection where you're going to make a left
6   turn, correct?
7   A   Correct.
8   Q   You testified earlier that you had a
9   green light?
10  A   Correct.
11  Q   Are you changing that testimony now?
12  A   No.
13  Q   Okay.  So you have a green light --
14  A   Correct.
15  Q   -- as you're approaching the
16  intersection?
17  A   Right.
18  Q   Why -- well, strike that.
19      Then you just testified that you came to a
20  stop before you negotiated and made the left
21  turn; do you remember that?
22  A   Correct.
23  Q   Why if you had a green light would you

Page 135

1   stop before you made the left turn if -- why?
2   A   Okay.  I went through the traffic
3   light when it was green.
4   Q   Okay.
5   A   The railroad tracks, when I was going
6   through, started dinging because a train was
7   coming, so the things went down so Mr. Johnson
8   couldn't move.  Now, that puts me out in the
9   middle of the intersection.  The truck behind
10  me came up and he stopped behind me at --
11  where the traffic light is.  I'm in the
12  intersection.
13      I noticed that there was a truck coming
14  from the other side, so I was trying to move
15  out of the way.  So that's why I tried to go
16  into the right lane.
17  Q   I'm going to show you a picture I'm
18  going to attach as Exhibit 7.  All right.  Let
19  me show you a picture attached as 7.
20      (Plaintiff's Exhibit No. 7 was marked
21      for identification.)
22  A   Okay.
23  Q   All right.  I want to know, do you

Page 136

1   recognize this photograph?
2   A   Yes.
3   Q   Have you seen this photograph before?
4   A   Yes.
5   Q   Okay.  Would you agree with me that
6   this photograph is an accurate depiction of
7   the tractor -- the tractor and portion of the
8   trailer that you were operating on October 26,
9   2016?
10  A   Yes.
11  Q   Okay.  Would you agree with me that it
12  is an accurate depiction of the tanker, right?
13  Is that the tanker that Mr. Johnson was
14  pulling?
15  A   Yes.
16  Q   Would you agree with me that that's an
17  accurate depiction of the tanker Mr. Johnson
18  was operating on October 26, 2016?
19  A   Yes.
20  Q   Okay.  I'm going to ask you the
21  question again.  I want you to explain to the
22  jury why, if you had a green light and you
23  were making a turn -- a left turn around



MARK MASSINGILL
JAMES JOHNSON vs ABF FREIGHT SYSTEM

September 11, 2019
137–140

Page 137

1   Mr. Johnson's tanker that he was pulling, why
2   would you or why did you come to a complete
3   stop before making the turn?
4      A   Okay.
5      Q   Do you understand the question, first?
6      A   I believe I understand the question,
7   yes.
8      Q   Okay.
9      A   Let me see how I can -- as I'm coming
10  out of the road to -- going through -- okay.
11  So I have a green light -- it might be
12  Washington Street.  I'm not sure.  Let's say
13  the ABF road, okay?
14          MR. OLIVER:  For the record, I think
15  it's Republic Boulevard.  That's what the
16  officer put on the report.
17     Q   (By Mr. Baer) I'm not trying to trick
18  him up on the road, but it doesn't make sense
19  to me that's why I want you to clarify.  I
20  probably made 10,000 -- maybe 100,000 left
21  turns in my life and never have I stopped in
22  an intersection to make a left turn.
23      I think the jury is going to think that as

Page 138

1   well.  I'm giving you an opportunity today
2   under oath to tell me why you would have
3   stopped when you had a green light before
4   making that left turn.  If you don't know, now
5   is the time to say you don't know.
6          MR. OLIVER:  He knows.  He told you
7   once.
8      Q   (By Mr. Baer) We got it was a red
9   light.  It was a green light.  I don't know
10  what truck I was in.  I don't know what street
11  I was on.  That's already locked in.  So I'm
12  giving him an opportunity to try.  If you
13  don't know, you don't know.
14     A   Well, I do know.
15     Q   Let's go.
16     A   I'm going through a green light.
17     Q   Correct.
18     A   Mr. Johnson has already gone through
19  it, correct?  He's --
20     Q   -- stopped?
21     A   -- stopped at the railroad tracks.
22  Okay.  I'm going through to go right behind
23  him because he stops and then he gets to go

Page 139

1   through the railroad track while I'm going --
2      Q   You said the railroad track was down?
3          MR. OLIVER:  Let him finish.
4      Q   (By Mr. Baer) Go ahead.
5      A   As I'm going through the red light --
6          MR. OLIVER:  You mean traffic light?
7          MR. BAER:  No.  No.  The green light,
8   which we've established, Tom.  And he said
9   again.  I'm not getting into this red light,
10  green light, traffic light.  We cleared that
11  up earlier.  You're not going to get him to
12  say it was traffic light now.  He changes that
13  at trial, I've got him.  So go ahead.
14          MR. OLIVER:  He already testified that
15  he calls the light a red light.
16          MR. BAER:  That's not true.  You
17  testified that.
18          MR. OLIVER:  He did.
19          MR. BAER:  Well, we will see how it
20  works and if you want to take the stand and
21  say the green light is a traffic light and a
22  red light is a traffic light, the judge can
23  swear you in.  That's not what this man

Page 140

1   testified to.
2          MR. OLIVER:  It is.  Go ahead.
3          MR. BAER:  Okay, Tom.  Go ahead.
4          THE WITNESS:  Okay.  So that everybody
5   understands, I go through a green light.
6      Q   (By Mr. Baer) Which is not a traffic
7   light, correct?  I need to help Mr. Oliver
8   here understand that.
9      A   It is a traffic light.  It's green.
10     Q   It was green?
11     A   It was green.
12     Q   All right.
13     A   I'm going through that.  He's stopped
14  at the railroad tracks, but the railroad
15  hasn't started through, so the lights aren't
16  flashing, the bars aren't down.
17     As I'm starting go through the green light
18  to turn, then the lights start blinking,
19  everything starts going down.  I'm like,
20  oh, boy.  So I stop because my intention was
21  if nobody is behind me, I'll back up out of
22  the way, but somebody came in behind me.  So I
23  noticed that there was a truck and it was a



MARK MASSINGILL
JAMES JOHNSON vs ABF FREIGHT SYSTEM

September 11, 2019
141–144

Page 141

1   piece down on the right coming down this way.
2   Q   Keep going.
3   A   So I wanted to get out of the middle
4   of the intersection, so that's why I tried to
5   turn into the right lane.
6   Q   Okay.  What gear were you in when you
7   made the turn; do you know?
8   A   Second or third gear.  I don't
9   remember which one.
10  Q   How do you know that?
11  A   Because that's -- from a stop, I go
12  from second into third to make a turn.
13  Q   You told me earlier you can stop in
14  sixth gear, correct?
15  A   Not from a stop.  I was in sixth gear
16  going gown the road.
17  Q   Okay.
18  A   Going towards the traffic light.
19  Q   Okay.
20  A   And then on turns, I usually downshift
21  because I want to make my turns around third
22  or fourth gear because of the speed and I
23  don't want the freight -- you know, you've got

Page 142

1   freight in there.  Some of it is tall.  You
2   want to take it, you know, no more than
3   10 miles an hour or so, so it doesn't fall
4   over.
5   Q   Okay.  The tractor-trailer that you
6   claim was behind you, it could have got over
7   in the right lane.  There was two lanes,
8   right?  It could have got over in the right
9   lane and gone around you, right?
10      MR. OLIVER:  Object to the form.
11  Q   (By Mr. Baer) Is that right?  If he
12  was going past you, he could have gotten in
13  the right lane and gone past you, right?
14  A   I think we have a confusion here.  The
15  one behind me is stopping because the light --
16  I guess because the railroad.  I'm talking
17  about coming down Avenue W.
18  Q   I still need you to explain to me why
19  you stopped before you made the left turn.
20  And why do you think you did that when it's
21  just not customary to do that; why?
22  A   I believe it's customary to do that.
23  Q   Okay.  So every left turn you make,

Page 143

1   you stop?
2   A   Okay.  If you make a left turn and the
3   car that's in that lane isn't moving because
4   of some reason, are you going to keep making
5   the turn?
6   Q   I do it all the time.
7   A   Well, I guess you got a lot of tickets
8   because you are hitting the car.
9   Q   No.  You just go around it.
10  A   That's what I tried to do.
11  Q   All right.  But you want the jury to
12  believe you stopped before you did it?
13  A   That's what I did.
14  Q   That's your story and you're sticking
15  to it?  Okay.  Is that what you still do when
16  you make a left turn?
17  A   When I make a left turn?
18  Q   Yeah.
19  A   If it's blocked, I'm going to have to
20  stop, yes.
21  Q   Okay.  So if I put an investigator on
22  you tomorrow and he follows you every day,
23  you're telling me and you're going to tell

Page 144

1   this jury that that's your protocol and that's
2   how you handle making a left turn?
3      MR. OLIVER:  Object to the form.  You
4   can answer.
5      THE WITNESS:  If I go to turn left and
6   I'm in the middle of the intersection and the
7   car that's in the lane has not moved because
8   of something that happened right when I was
9   starting to turn, yes, I'm going to stop.
10  Q   (By Mr. Baer) Okay.  Do you know for
11  certain how fast you were going at the time of
12  the impact?
13  A   No.
14  Q   Okay.  You don't know how fast you
15  were going before you believe you came to a
16  stop before the impact, correct?
17      MR. OLIVER:  Object to the form.  He
18  testified exactly.
19  Q   (By Mr. Baer) Okay.  What is the exact
20  speed that you were going when you began to
21  make the left turn?  I can have her read it
22  back that you didn't know if you want, but go
23  ahead.



MARK MASSINGILL
JAMES JOHNSON vs ABF FREIGHT SYSTEM

September 11, 2019
145–148

Page 145

1       MR. OLIVER:  I want the record to be
2   clear, he testified he didn't know exactly.
3   That was his testimony.
4       THE WITNESS:  Right.
5    Q   (By Mr. Baer) Correct.  Okay.  So you
6   don't know how fast you were going before you
7   claim you came to a stop before making a left
8   turn, correct?
9       MR. OLIVER:  Object to the form.
10      THE WITNESS:  Correct.
11      MR. BAER:  Okay.
12      THE WITNESS:  We got a couple minutes
13  to take a break?
14      MR. BAER:  Yeah.
15      (A recess was taken.)
16   Q   (By Mr. Baer) Do you know Lars
17  Rhinehart?
18   A   No.
19   Q   Have you ever spoken Lars Rhinehart?
20   A   No.
21   Q   If Lars Rhinehart said he spoke to
22  you, would that not be accurate?
23   A   I don't believe he spoke to me.

Page 146

1    Q   Okay.  So you don't recall telling
2   Lars Rhinehart that you were slowing down as
3   you approached Mr. Johnson's trailer as you
4   attempted to position yourself in the right
5   lane next to Mr. Johnson's trailer; you don't
6   recall telling him that?
7    A   No.
8    Q   Do you recall telling Mr. Rhinehart
9   that you were focused on some poles that were
10  on the right side of the road when you made
11  the left turn?
12   A   I don't believe I have spoken to him.
13   Q   Okay.  So you don't recall telling
14  Mr. Rhinehart that you took yours eyes off of
15  Mr. Johnson's trailer when the collision
16  occurred?
17   A   No.
18   Q   Okay.  You agree with me that you did,
19  in fact, strike Mr. Johnson's trailer,
20  correct?
21   A   Yes.
22   Q   Do you know how many times -- do you
23  know how many impacts there were to

Page 147

1   Mr. Johnson's trailer?
2    A   You mean like how many times?  One
3   time.
4    Q   If Mr. Johnson says he felt two
5   impacts, you would disagree with that?
6    A   Yes.
7    Q   Do you specifically recall feeling one
8   impact or do you just believe there was one
9   impact?
10   A   I just believe there was one impact.
11   Q   You can't say specifically whether or
12  not there was one or two impacts?
13   A   No.
14   Q   Okay.  You don't recall how much time
15  passed from the time you began to make the
16  turn until the time of the impact, correct?
17  The first impact.
18   A   Correct.
19   Q   Okay.  Did you have any damage to your
20  tractor or trailer as a result of the
21  collision on October 26, 2016?
22   A   There might have been a scratch.
23   Q   Okay.  And you did not -- if I believe

Page 148

1   I heard your testimony correct, you did not
2   take any photographs of either your
3   tractor-trailer or Mr. Johnson's
4   tractor-trailer at the scene, correct?
5    A   No.
6    Q   Okay.  Did anybody from ABF come out
7   and take photographs of the scene of the
8   collision?
9    A   Not that I know of.
10   Q   Did anybody from ABF come to the scene
11  of the collision at all on October 26, 2016?
12   A   No.
13   Q   Are you aware of any witnesses that
14  actually saw the collision between your
15  tractor-trailer and Mr. Johnson's
16  tractor-trailer on October 26, 2016?
17   A   No.
18   Q   Okay.  So the only people that would
19  be able to offer any testimony, in your mind,
20  about the collision itself and how it happened
21  are you and Mr. Johnson, correct?
22   A   Correct.
23   Q   Okay.  The investigating officer



Page 149

1  didn't witness the collision, right?
2     A   Correct.
3     Q   Does the tractor you were operating on
4  October 26, 2016, have a black box or an event
5  data recorder?
6     A   Not that I'm aware of, no.
7     Q   Okay.  Are you aware if any data was
8  taken from your vehicle, the tractor
9  specifically, that would show myself, your
10  attorneys, and the members of the jury how
11  fast you were going at the time of the impact?
12    A   Not that I know of.
13    Q   Okay.  Nobody from ABF showed you any
14  data, correct?
15    A   Correct.
16    Q   Did you have a dash cam on your
17  trailer -- strike that.
18  Did you have a dash cam on your tractor?
19    A   No.
20    Q   Do you know what a dash cam is?
21    A   Yes.
22    Q   Would agree with me that a dash cam
23  would have shown what you were doing moments

Page 150

1  before the impact if it was triggered,
2  correct?
3     A   Correct.
4     Q   And that wasn't in the tractor?
5     A   No.
6     Q   Okay.  Did you touch Mr. Johnson's
7  trailer at any time after you exited your
8  tractor and before the police officers got
9  there?
10    A   I don't recall.
11    Q   Okay.  If Mr. Johnson said he observed
12  you touch and alter the condition of the
13  trailer after the impact and before the
14  investigating officer got there, would you
15  have any reason to disagree with Mr. Johnson?
16    A   No.
17    Q   And you don't know who took these
18  photographs, correct?
19    A   Correct.
20    Q   In other words, if I was to show you a
21  photograph that I'm going to attach as Exhibit
22  8, you cannot tell me one way or another if
23  this photograph was taken before or after you

Page 151

1  may have altered the rear of Mr. Johnson's
2  trailer between the time of the impact and the
3  time the investigating officer arrived because
4  you just don't recall, correct?
5        (Plaintiff's Exhibit No. 8 was marked
6        for identification.)
7        MR. OLIVER:  Object to the form.  You
8  can answer.
9        THE WITNESS:  Correct.
10    Q   (By Mr. Baer)  In other words, you just
11  don't know, right?  Mr. Massingill, you don't
12  know, right?
13    A   I don't know if I touched it or not.
14    Q   And because you don't know if you
15  touched it, you don't know if you altered it
16  in any way, correct?
17    A   Correct.
18    Q   Do you have a Qualcomm system in your
19  tractor?  Do you know what Qualcomm is?
20    A   No.
21    Q   Okay.  How do you communicate with
22  ABF?
23    A   Oh, okay.  I see, the --

Page 152

1     Q   It's like a little computer?
2     A   Yeah.  We got the computer in the
3  trucks, yes.
4     Q   Okay.  Do you communicate with ABF
5  through that computer?
6     A   No.
7     Q   Okay.  What do you do with that
8  computer?
9     A   It's usually your -- well, the one I
10  believe we had at that time --
11    Q   Yes, sir.
12    A   -- was a little handheld set and you
13  would take the numbers here -- the pro number
14  and it would have a list of pro numbers and
15  then when stuff was coming off the trailer,
16  you use it to show where it's off and where
17  you put it.  And then what goes on the
18  trailer.
19    Q   Okay.
20    A   And then it does departure times,
21  arrival times.  And you use it for your lunch
22  break.
23    Q   Okay.  So how did you get in touch



MARK MASSINGILL                                      September 11, 2019
JAMES JOHNSON vs ABF FREIGHT SYSTEM                         153–156

Page 153

1   with your supervisor to inform them you had --
2   strike that.
3       Who do you call in the event you are
4   involved in a collision such as the
5   October 26, 2016, collision?
6       A   The safety department.
7       Q   Do you know who you spoke with at the
8   safety department for ABF?
9       A   No.
10      Q   What did the person you spoke with
11  with the safety department at ABF tell you to
12  do after the collision?
13      A   I don't remember.
14      Q   Okay.  Do you remember any
15  conversations with Mr. Johnson following the
16  collision?
17      A   Yes.
18      Q   Okay.  Tell me what those
19  conversations entailed.
20      A   He was saying that it was going to
21  make him late.  He's going to have to go back,
22  I guess, to his terminal and get it fixed
23  before he could make his run.

Page 154

1       Q   Anything else?
2       A   Not that I remember, no.
3       Q   Okay.  Would you agree with me that
4   Mr. Johnson's trailer was not obstructing the
5   intersection before the impact?
6           MR. OLIVER:  Object to the form.
7       Q   (By Mr. Baer) You observed
8   Mr. Johnson's tractor and trailer before the
9   impact, correct?
10      A   Correct.
11      Q   And you observed it before you made a
12  left turn, correct?
13      A   Correct.
14      Q   And you would agree with me that
15  Mr. Johnson's tractor nor his trailer were
16  obstructing -- do you know what obstructing
17  means?
18      A   Yes.
19      Q   Okay.  Were obstructing the lane of
20  travel you were on before you made a left
21  turn, correct?
22      A   Correct.
23      Q   Okay.  Since you didn't talk to

Page 155

1   someone named Mr. Rhinehart, any information
2   that this man claims to have said that you
3   told him about the weight of the tractor or
4   the trailer would be a guess?
5           MR. OLIVER:  Object to the form.
6           THE WITNESS:  I have no idea.
7       Q   (By Mr. Baer) Okay.  You never
8   provided any information to a man named
9   Mr. Rhinehart about anything, correct?
10          MR. OLIVER:  Object to the form.
11      Q   (By Mr. Baer) You never spoke to him,
12  correct?
13          THE WITNESS:  Can I answer?
14          MR. OLIVER:  You can answer that
15  question.
16          THE WITNESS:  Yeah, I never spoke to
17  him.
18      Q   (By Mr. Baer) Did you fill out a form
19  for Mr. Rhinehart?
20      A   Not that I know of.
21      Q   Okay.  So you didn't talk to him; you
22  didn't fill out a form?  Have you ever heard
23  of him?

Page 156

1       A   I've heard that name.
2       Q   Okay.  What's his first name?
3       A   I don't know.
4       Q   Okay.  What does he do for a living?
5       A   I'm not even sure.
6       Q   Okay.  Do you know him from your kid's
7   school?
8       A   I don't know.
9       Q   Or do you just know somebody by the
10  last name Rhinehart?
11      A   I've heard the name.  I don't know who
12  he is.
13      Q   How was your truck removed from the
14  scene?
15      A   I drove it.
16      Q   Did you get a ticket for this
17  collision?  When I say a ticket, I'm talking
18  about a ticket from the investigating officer.
19      A   I don't believe so, no.
20      Q   Okay.  Did he tell you why you weren't
21  getting a ticket?
22      A   No.
23      Q   Okay.  If you don't believe so, do you



Page 157

1  know you didn't get a ticket or you're not
2  sure?
3    A   I'm not sure.
4    Q   Okay.  Are you familiar with the open
5  road program?
6    A   No.
7    Q   Okay.  Did ABF hire an attorney for
8  you to help you with any ticket that may have
9  been pending concerning this collision?
10     MR. OLIVER:  Object to the form.
11     THE WITNESS:  Not that the I know of.
12    Q   (By Mr. Baer) Okay.  I'm not talking
13  about this case.  I'm talking about the
14  ticket.  You understand what I'm talking
15  about?  I know we've got three of them in
16  here.
17    Did ABF hire an attorney for you pertaining
18  to a ticket or going to court for a ticket
19  since you don't recall if you got a ticket?
20     MR. OLIVER:  Object to the form.
21     THE WITNESS:  Could you state that
22  again?
23     MR. BAER:  Could you read that

Page 158

1  question?
2     (Record read.)
3     THE WITNESS:  I don't know.
4    Q   (By Mr. Baer) Okay.  Let me show you a
5  picture, sir, that I'm attaching as Exhibit 9
6  that was produced by your lawyers.  Have you
7  had a chance to look at Exhibit 9?
8     (Plaintiff's Exhibit No. 9 was marked
9     for identification.)
10    A   Yes.
11    Q   Would you agree with me that the
12  damage in Exhibit 9 is of Mr. Johnson's
13  trailer?
14    A   Yes.
15    Q   Would you agree with me that the
16  Exhibit 8 photograph that's attached to this
17  deposition is also the rear of Mr. Johnson's
18  trailer?
19    A   Yes.
20    Q   Would you agree with me that the
21  damage to Mr. Johnson's trailer in Exhibit 8
22  and 9 is not the same?
23    A   Yes.

Page 159

1    Q   Okay.  Did you move your vehicle at
2  any time from the time of the impact to the
3  time the investigating officer arrived at the
4  scene?
5    A   Yes.
6    Q   Why did you move it?
7    A   I backed it up.
8    Q   Okay.  Was Mr. Johnson in his tractor
9  when you backed it up?  If you don't know, you
10  don't know.
11    A   I don't know.
12    Q   Okay.  When you backed it up, were you
13  able to back it up without striking the
14  trailer again?
15    A   Yes, as far as I know.
16    Q   Okay.  If you -- if you -- just
17  explain to me, okay --
18    A   Okay.
19    Q   You would agree with me the
20  photographs that I've shown you, your -- in
21  photograph -- strike that.
22    When you first got out of your
23  tractor-trailer, was your vehicle, either the

Page 160

1  tractor or the trailer, in contact with
2  Mr. Johnson's trailer?
3    A   When I first got out of my truck?
4    Q   Yeah.  And you looked at it and you
5  observed the impact, was your trailer or your
6  tractor still in contact with Mr. Johnson's
7  trailer?
8    A   No.  I had already moved it back.
9    Q   So if I understand you correctly, you
10  struck Mr. Johnson's trailering, correct?
11    A   Yes.
12    Q   And you -- did you stop after you
13  struck it?
14    A   Yes.
15    Q   Okay.  And then before either you or
16  Mr. Johnson got out of the tractor, you backed
17  up your tractor and trailer, correct?
18    A   Yes.
19    Q   Okay.  So there's no photographs or
20  anyone to testify about where the exact point
21  of impact was between your tractor-trailer and
22  Mr. Johnson's tractor-trailer, correct?
23     MR. OLIVER:  Object to the form.  You



MARK MASSINGILL
JAMES JOHNSON vs ABF FREIGHT SYSTEM

September 11, 2019
161–164

Page 161

1  can answer.
2      Q    (By Mr. Baer) Is there anyone that you
3  are aware of as you sit here under oath that
4  observed the actual point of impact between
5  your tractor-trailer and Mr. Johnson's
6  tractor-trailer?
7      A    I don't know of anyone.
8      Q    Okay.  When you did your pre-trip
9  inspection, did you look for any scrapes,
10  scratches, dents on the trailer or you just
11  made sure it was functional?
12      A    Made sure it was functional.
13      Q    Okay.  So you didn't walk around the
14  trailer and note the scrapes and scratches on
15  the trailer like you do if you have -- to rent
16  a car at Enterprise?
17      A    No.
18      Q    Okay.  So in other words, you can't
19  offer any testimony at trial as to the
20  condition of the trailer before the time of
21  the impact, correct, with respect to damage to
22  it?
23      A    With respect to scratches?

Page 162

1      Q    Scratches, dents.
2      A    No.
3      Q    Okay.  So as you sit here today, you
4  can't offer any testimony about the part of
5  your tractor or trailer that actually came
6  into contact with Mr. Johnson's trailer,
7  correct?
8          MR. OLIVER:  Object to the form.  You
9  can answer.
10      Q    (By Mr. Baer) You testified earlier,
11  you didn't see your tractor-trailer contacting
12  Mr. Johnson's trailer at any time, correct?
13          MR. OLIVER:  Object to the form.
14      Q    (By Mr. Baer) Okay.  Let me and you
15  this, sir.  We're going to back up for a
16  second.  After you felt the impact, you didn't
17  get out of the tractor, correct?
18      A    Not right away, no.
19      Q    Okay.  The first thing you did was you
20  backed up, correct?
21      A    Yes.
22      Q    Okay.  So you backed off of
23  Mr. Johnson's trailer, correct?

Page 163

1      A    I backed away from it, yes.
2      Q    Yeah.  You backed away from it?
3      A    Correct.
4      Q    In other words, you were no longer in
5  contact with Mr. Johnson's trailer after you
6  backed up, correct?
7      A    Correct.
8      Q    Okay.  And because you didn't observe
9  the actual point of impact while your
10  tractor-trailer was in contact with
11  Mr. Johnson's tractor-trailer, you can't offer
12  any testimony before the jury about the exact
13  location of the point of impact between the
14  two tractor-trailers, correct?
15      A    Correct.
16      Q    Okay.  Let me just review my notes.  I
17  may be done.
18          We've got a copy of your driver's license
19  as one, correct?  We just need to get a copy
20  of that so she can attach it.
21          I'm sorry, I have to ask this.  Have you
22  ever been convicted of a felony in the last 10
23  years?

Page 164

1      A    No.
2      Q    Any crimes of dishonesty in the last
3  10 years?
4      A    No.
5      Q    Okay.  Ever been charged with tax
6  fraud?
7      A    For what?
8      Q    Tax fraud.
9      A    No.
10      Q    Negotiating a bad check?
11      A    No.
12      Q    Was your tractor-trailer drivable from
13  the scene?
14      A    Yes.
15      Q    Okay.  Are there any cameras
16  whatsoever on your tractor-trailer?
17      A    No, not at that time.
18      Q    Okay.  Are you aware of any cameras
19  around where the collision happened that
20  captured the collision itself?
21      A    I have no way of knowing.
22      Q    Okay.  I'm going to show you another
23  photograph that was produced.  I'm going to



Page 165

1 attach it as 10.  Do you recognize that
2 photograph?
3     (Plaintiff's Exhibit No. 10 was marked
4     for identification.)
5   A   Yes.
6   Q   Okay.  Does that photograph accurately
7 show the vehicles that were involved in this
8 collision on October 26, 2016?
9   A   Yes.
10   Q   Okay.  Have you seen any documents ABF
11 produced or in conjunction with this collision
12 on October 26, 2016?
13   A   Not that I can recall, no.
14   Q   Did you have any in-person
15 conversations or telephone conversations with
16 anybody from ABF following the collision
17 itself outside the one you told me about, the
18 supervisor at the scene?
19   A   I called the supervisor, got the
20 number for the safety, and I called the safety
21 department.
22   Q   Did you talk to your wife about this
23 collision?

Page 166

1   A   I probably did.  I don't remember.  I
2 don't see why I wouldn't.
3   Q   Okay.  Outside of talking with any of
4 the three lawyers that are in this room about
5 this collision or any lawyer representing you
6 in this case, did you speak with anyone about
7 your deposition here today?
8   A   Yes.
9   Q   Who?
10   A   My stepdaughter.  I met her for dinner
11 and told her I was down here taking a
12 deposition.
13   Q   Okay.  Did y'all talk about specifics
14 or you just told you had to go to a deposition
15 about the accident?
16   A   I just told her I had to go to the
17 deposition.
18   Q   Okay.  Let me show you another
19 document that was produced by your attorneys.
20 It's Bates 34 -- ABF Bates 34.  Would you
21 agree with me that the top of that document is
22 titled Certified Road Test for ABF?
23   A   Yes.

Page 167

1   Q   Okay.  And this is done by the safety
2 and security department at ABF?
3   A   By the school, I believe.
4   Q   Okay.
5   A   Yes.
6   Q   If you look at the top of the
7 document, it does say ABF Freight System,
8 Inc., Safety and Security Department, correct?
9   A   Correct.
10   Q   When you say by the school, does ABF
11 have a school?
12   A   Yes.
13   Q   Are you talking about the one in
14 Arkansas?
15   A   The one in Arkansas.
16   Q   Okay.  What about this document makes
17 you believe this is done by the school in
18 Arkansas?
19   A   The address and the instructor.
20   Q   Okay. Okay. Mr. Massingill, this
21 case is going to go before a jury sometime in
22 April or May of 2020.  Is there any reason you
23 feel that you would not be able to attend

Page 168

1 trial and be questioned by me under oath
2 again?
3   A   No.
4   Q   Okay.  Is there anything that you
5 would like to add to your testimony here today
6 about the October 26, 2016, collision?
7     MR. OLIVER:  Object to the form.  You
8 can answer.
9     THE WITNESS:  No.
10     MR. BAER:  I'm just giving him an
11 opportunity.  Okay.  All right.  We're done.
12     MR. OLIVER:  We're going to make a
13 copy of that license and I may have some
14 questions for him.  Let's get that done before
15 we forget about it.
16     (A recess was taken.)
17   Q   (By Mr. Baer) You recall answering a
18 series of questions that are referred to as
19 interrogatories?
20   A   Yes.
21   Q   Okay.  And you did that with your
22 lawyers?
23   A   Yes.



1    Q    Okay.  And you understood that those
2  were verified that they were true and
3  accurate?
4    A    Right.
5    Q    And you reviewed them?
6    A    Right.
7    Q    Did you?
8    A    Yes.
9    Q    Okay.  At the time you were employed
10  by ABF, were you a W-2 employee or a 1099?
11    A    I'm sorry, what?
12    Q    At the time of your employment with
13  ABF at the time of the October 26, 2016, were
14  you a W-2 employee or did you receive a 1099
15  as an independent contractor?
16    A    W-2.
17    Q    Okay.  And were you paid a salary or
18  are you paid by load?
19    A    Paid by the hour.
20    Q    Okay.  And it says you work normal
21  shifts.  I believe you said in the two days
22  before, that would be nine hours a day?
23    A    Right.

1    Q    Okay.  And your cell phone number is
2  ███████████?
3    A    Yes.
4    Q    Did you have a company phone?
5    A    I think it -- well, yeah, it would
6  take a phone call.
7    Q    I mean --
8    A    It was a -- it was built in with the
9  PDA, but not a company --
10    Q    What's a PDA?
11    A    Huh?
12    Q    What's PDA?
13    A    I don't know.  The personal data.
14    Q    Okay.  Was that like a walkie-talkie
15  or was that like a cell phone?
16    A    It's like a walkie-talkie.  Well, it's
17  like a Nextel-type thing.
18    Q    Did you post anything on social media
19  pages or any other social media pages or any
20  other social media outlet about this
21  collision?
22    A    No.
23    Q    Okay.  You said that you didn't know

1  the name of the school that you went -- the
2  driving school that you went to in Arkansas;
3  is that right?
4    A    I'm not sure what it was.
5    Q    Okay.  Was it in Fort Smith, Arkansas?
6    A    Yes.
7    Q    Okay.  And that's where ABF Freight
8  Systems is located.  That's where they're
9  headquarters is?
10    A    Right.  Right.
11    Q    Did you take the driving school or did
12  you attend the driving school at ABF Freight
13  Systems in Fort Smith, Arkansas?
14    A    Yes.
15    Q    Okay.  All right.  I misunderstood
16  that earlier.  At any time from March of 2015
17  when you started driving part time for ABF as
18  a commercial truck driver until October 26,
19  2016, were there any gaps where you just did
20  not drive a commercial vehicle?
21    A    I don't believe so.
22    Q    Okay.  I'm just going to attach
23  discovery responses as 11.  Tom, I will

1  tender.
2        (Plaintiff's Exhibit No. 11 was marked
3        for identification.)
4              EXAMINATION
5    BY MR. OLIVER:
6    Q    Mr. Massingill, I've got a few
7  questions for you.  Are you okay to go?
8    A    Yes, sir.
9    Q    Okay.  At the time of this incident,
10  you were driving a 2015 Mack truck?
11    A    Yes, sir.
12    Q    Pulling a 2007 Great Dane trailer?
13    A    As far as I know.
14    Q    If the ABF records indicate that that
15  was a 53-foot drive-in trailer, would you
16  disagree with that?
17    A    No, I wouldn't.
18    Q    Okay.  If their records indicate that
19  the weight of the trailer was -- unladed
20  weight was 14,400 pounds; would you disagree
21  with that?
22    A    No.
23    Q    If their records indicate that the



MARK MASSINGILL                                September 11, 2019
JAMES JOHNSON vs ABF FREIGHT SYSTEM                      173–176

Page 173

1   tractor's unladed weight was 14,500 pounds,
2   would you disagree with that?
3      A   No.
4      Q   You drove this tractor pretty much
5   every day up until the time of the accident?
6      A   Yes.
7      Q   Okay.  ABS performed the service on
8   the tractor?
9      A   Yes.
10     Q   And the trailer?
11     A   Yes.
12     Q   Was the tractor in good condition on
13  the day this incident occurred?
14        MR. BAER:  Objection to form.
15        THE WITNESS:  Yes.
16     Q   (By Mr. Oliver) Was the trailer in
17  good condition on the day this incident
18  occurred?
19     A   Yes.
20        MR. BAER:  Objection to form.
21     Q   (By Mr. Oliver) You had done a
22  pre-trip inspection on both of those units?
23     A   Yes.

Page 174

1      Q   Did you find anything wrong with
2   either the tractor or trailer when you did
3   your pre-trip inspection prior to this
4   incident occurring?
5         MR. BAER:  Objection to form.
6         THE WITNESS:  No.
7      Q   (By Mr. Oliver) Are you aware of any
8   recent repairs that had been done to your
9   tractor prior to this incident?
10     A   No, sir.
11     Q   Do you recall any issues with the
12  tractor idling too fast or too slow prior to
13  this incident?
14     A   No.
15     Q   Okay.  When you would go to make a
16  turn with this tractor, what gear would you
17  typically be in?
18     A   Third or fourth gear.
19     Q   Okay.  And I know you can't say
20  exactly how fast you were going at the time
21  your truck struck Mr. Johnson's trailer, but
22  do you have a judgment as to the range of
23  speed you would have been going that night?

Page 175

1      A   Probably three to five miles an hour.
2      Q   Okay.  And what's that based on?
3      A   Because as I was trying to get into
4   the right-hand lane, I was having to go up on
5   the curb, so I was down in low gear creeping
6   up watching the poles because I was trying to
7   miss the poles and guide it around.
8      Q   Before attempting to make the
9   left-hand turn and go around the back of
10  Mr. Johnson's trailer, had you brought your
11  tractor and trailer to a stop?
12        MR. BAER:  Objection to form.
13        THE WITNESS:  Yes.
14     Q   (By Mr. Oliver) Where was your tractor
15  located in the roadway there on Avenue W at
16  the point you brought it to a stop?
17     A   It would have been -- let's see, it
18  would have been in the same lane as
19  Mr. Johnson, like, through the road.
20     Q   All right.  For the benefit of the
21  jury, how many lanes were traveling what would
22  be southbound on Avenue W the direction that
23  Mr. Johnson's vehicle was going?

Page 176

1         MR. BAER:  Objection to form.
2         THE WITNESS:  Okay.
3         MR. BAER:  You saying parked or going?
4         MR. OLIVER:  Well, you're right, yeah.
5         MR. BAER:  I just want to make sure
6   there's no issue with going.
7      Q   (By Mr. Oliver) I'll correct it.  How
8   many lanes are there on Avenue W in the
9   direction that Mr. Johnson's truck was in a
10  lane?
11     A   Two.
12     Q   Okay.  And which of those two lanes
13  was Mr. Johnson's truck in?
14     A   The left lane.
15     Q   Okay.  How many lanes are coming the
16  other way on Avenue W?
17     A   Two lanes.
18     Q   Okay.  And the road that intersects
19  Avenue W that you were coming out of, how many
20  lanes are on it?
21     A   I believe it's two lanes.
22     Q   As you approached avenue -- strike
23  that.



MARK MASSINGILL                                   September 11, 2019
JAMES JOHNSON vs ABF FREIGHT SYSTEM                          177–180

Page 177

1    For the record, I'm going to represent to
2  you that road is called Republic Boulevard.
3        MR. BAER:  Tom, just like we talked
4  about -- you talked about the W they were
5  going on first and then you said he was
6  stopped in the left lane.  I think you're
7  talking about Republic where he was stopped in
8  the left lane or your timing is off.  I want
9  you to get a clear record.
10       MR. OLIVER:  I think it's a little
11  confusing.  I want to make sure this is
12  cleared up.
13       MR. BAER:  Okay.  Please, sir.
14    Q   (By Mr. Oliver) When you left the ABF
15  terminal there in Birmingham, you turned out
16  onto Republic Boulevard?
17    A   Correct.
18    Q   And when you did that, how far are you
19  away from the intersection where this event,
20  this incident occurred?
21    A   I'd guess about 200 yards, maybe.
22    Q   All right.  And as you traveled down
23  that section of Republic Boulevard before the

Page 178

1  intersection, now fast were you going?
2        MR. BAER:  Objection to form.  Asked
3  and answered.
4        THE WITNESS:  Not exactly sure.
5    Q   (By Mr. Oliver) Do you have a judgment
6  of the range that you would have been going
7  down Republic Boulevard prior to the
8  intersection.
9        MR. BAER:  Object to the form of the
10  question.  Calls for speculation.  Go ahead.
11       THE WITNESS:  Probably 30 -- 25,
12  30 miles an hour.
13    Q   (By Mr. Oliver) As you approached the
14  intersection of Republic Boulevard and Avenue
15  W, what was the color of the traffic light
16  controlling your direction of travel?
17       MR. BAER:  Object to the form.  Asked
18  and answered.
19       THE WITNESS:  As I was going down
20  through there, it was red and then it turned
21  to green.
22    Q   (By Mr. Oliver) And where was
23  Mr. Johnson's vehicle, if anywhere, in

Page 179

1  relation to you as you approached the
2  intersection of Avenue W?
3    A   He was in front of me.
4    Q   And what movements, if any, did
5  Mr. Johnson make from Republic Boulevard to
6  Avenue W?
7    A   He pulled from Republic Boulevard into
8  the left lane and stopped at the railroad
9  track.
10    Q   Okay.  Where were you at that point in
11  time that he stopped in the left lane of
12  Avenue W for the railroad tracks?
13    A   When he stopped, I was pulling off of
14  Republic onto Avenue W.
15    Q   Okay.  And once Mr. Johnson brought
16  his vehicle to a stop, what did you do with
17  your vehicle?
18       MR. BAER:  Object to the form.
19       THE WITNESS:  Well, I was slowing my
20  vehicle and getting ready to turn when the
21  railroad lights went off.  That's when I
22  stopped in the intersection.
23    Q   (By Mr. Oliver) For the record, when

Page 180

1  you stopped, where was your tractor of your
2  tractor-trailer unit located?
3    A   In the northbound side left lane is
4  where the tractor was.
5    Q   Was it behind Mr. Johnson's trailer?
6    A   It was a little bit from his trailer.
7  I was just getting ready.  So as I was getting
8  ready to turn, but I hadn't turn yet, and then
9  the railroad came down.  It might be easier to
10  draw it.
11    Q   Let me show you what I've now marked
12  as Defendant's Exhibit No. 1, which is the
13  accident report in this case and ask you to
14  turn to the second page of it is which has got
15  a Bates label of 294 on it; do you see that,
16  sir.
17       (Defendant's Exhibit No. 1 was marked
18       for identification.)
19    A   (Witness nods head.)
20    Q   What I want you to do is on this
21  diagram that the officer drew, draw in as best
22  you can where your tractor and trailer were
23  located after you pulled off of Republic



Page 181

1   Boulevard but came to a stop.
2       A   (Witness complies.)
3           MR. BAER:  Can you have him mark
4   tractor and trailer.  I know we know.
5       Q   (By Mr. Oliver) I tell you what to do
6   on where -- what would be your trailer, mark
7   unit one.
8       A   Okay.  So this is unit one.
9       Q   Okay.
10          MR. BAER:  Can you date that, please,
11  and initial.
12          THE WITNESS:  Okay.
13          MR. BAER:  Just for the record, it's
14  blue ink that the witness is drawing in.
15      Q   (By Mr. Oliver) Okay.  So the blue ink
16  diagram or attempted diagram of a
17  tractor-trailer is where your vehicle came to
18  a stop after it left Republic Boulevard?
19      A   Yes.
20      Q   With the tractor being in the
21  left-hand lane of the southbound lanes of
22  Avenue W?
23      A   Right.

Page 182

1       Q   Somewhere to the rear of Mr. Johnson's
2   trailer?
3       A   Yes.
4       Q   Do you have a judgment how far your
5   tractor -- the left side of your tractor was
6   from the rear of Mr. Johnson's trailer when
7   you came to a stop?
8           MR. BAER:  Objection to form.
9           THE WITNESS:  No, sir, I don't know
10  how far away it was.
11      Q   (By Mr. Oliver) At the time you came
12  to a stop with your tractor in the left-hand
13  lane of the southbound lanes of Avenue W, were
14  the crossbars and lights for the railroad
15  crossing going off?
16      A   Yes, when I came to a stop.
17      Q   Did you observe any other traffic out
18  on Avenue W at that time?
19      A   I observed a tractor which would be back
20  down this way just coming down (indicating).
21      Q   And for the record, you're talking
22  about further down the southbound lanes of
23  Avenue W and would be approaching you from

Page 183

1   your right?
2       A   Yes.
3           MR. BAER:  Do you want him to mark
4   that or do you want me to go over that with
5   him?
6           MR. OLIVER:  You can.
7       Q   (By Mr. Oliver) Were there any
8   vehicles behind your trailer on Avenue W at
9   the moment you came to a stop with your
10  tractor in the left-hand lane of the
11  southbound lanes of Avenue W?
12      A   Yes.  There was a trailer behind me.
13      Q   So just go ahead and draw that in.
14          MR. BAER:  You don't want to use a
15  different color?  For the record, he drew
16  another tractor-trailer behind his
17  tractor-trailer which is unit one in blue ink.
18      Q   (By Mr. Oliver) Do you know whose
19  tractor-trailer that was?
20      A   No.
21      Q   Okay.  Why don't you just label it
22  other tractor-trailer so it is clear that it's
23  not yours that you're marking.

Page 184

1       A   (Witness complies.)
2       Q   So for the record, the diagram in
3   Defendant 1 has another
4   tractor-trailer labeled that is behind your
5   tractor which is labeled as unit one, correct?
6       A   Correct.
7       Q   And then Mr. Johnson's tractor and
8   trailer is marked per the original diagram as
9   unit two, correct?
10      A   Correct.
11      Q   And is that the approximate location
12  of all three tractor-trailers at the moment
13  your tractor stopped with it in the left-hand
14  lane of the southbound lanes of Avenue W?
15          MR. BAER:  Object to the form.
16  Diagram is not to scale, but go ahead.
17          THE WITNESS:  Yes.
18      Q   (By Mr. Oliver) Okay.  All right.
19  Once you realized there was a tractor or some
20  vehicle coming further up Avenue W in the
21  southbound direction, what was your original
22  plan?
23      A   To try to move around to the right

Page 185

1  lane.
2     Q   Okay.
3     A   To get out of the intersection.
4     Q   Did you consider backing up before you
5  tried to make the maneuver around
6  Mr. Johnson's trailer?
7     A   I considered it until I saw the
8  tractor-trailer behind me.
9     Q   And for the record, would that be the
10 one you've marked as other traffic trailer on
11 the diagram in Defendant's Exhibit 1?
12    A   Yes.
13    Q   Was there sufficient room for you to
14 back up onto Republic Boulevard without
15 striking the other tractor-trailer?
16    A   No.
17    Q   So what was your plan of action at
18 that moment?
19    A   At that moment, I just tried to swing
20 out a little bit and go up as far as -- as
21 close as I could and come over into the right
22 lane.
23    Q   You mentioned in previous testimony

Page 186

1  that you kind of had to get your tractor up on
2  the curb?
3     A   Yes.
4     Q   Okay.  If you would, take my pen and
5  mark on the diagram of Defendant's Exhibit No.
6  1 what curb you're talking about you had
7  driven your tractor across.
8     A   Something like that there
9  (indicating).
10    Q   And write curb and put an arrow to it
11 so we're clear what you're talking about.
12    A   (Witness complies.)
13    Q   Okay.  You also mentioned there was
14 either power poles or light poles or poles of
15 some sort that you were having to negotiate
16 around; is that correct?
17    A   Yes.
18    Q   Can you indicate generally where those
19 poles were located on the diagram there on
20 Defendant's Exhibit 1.
21    A   Somewhere in that area (indicating).
22    Q   If you would write poles and draw an
23 arrow to those, please.

Page 187

1     A   Okay.
2     Q   As you're making that maneuver to
3  avoid the poles and go around the back of
4  Mr. Johnson's trailer, how fast were you going
5  approximately at that time?
6        MR. BAER:  Object to form.
7        THE WITNESS:  Three to five miles an
8  hour, I guess.
9     Q   (By Mr. Oliver) Do you have a
10 judgment -- an exact speed, but a judgment
11 in range of speed how fast you were going at
12 the time your trailer collided with the rear
13 of Mr. Johnson's trailer?
14       MR. BAER:  Object to the form.
15       THE WITNESS:  Three to five miles an
16 hour.
17    Q   (By Mr. Oliver) After the two trailers
18 came together, what, if anything, did you do
19 at that point?
20       MR. BAER:  Objection.  Asked and
21 answered.
22       THE WITNESS:  Backed up the trailer
23 and called the terminal and got the number to

Page 188

1  the safety department.
2     Q   (By Mr. Oliver) And let me show you
3  what's previously been marked as Plaintiff's
4  Exhibit No. 7.  Does that fairly and
5  accurately depict the location of your two
6  vehicles after you backed up?
7     A   Yes.
8     Q   How much time went by between the time
9  that your trailer and Mr. Johnson's trailer
10 came together before you backed up?
11    A   I don't know, probably 15 to 30
12 seconds.
13    Q   Okay.  And let me show you what's also
14 been marked as Plaintiff's Exhibit No. 10 and
15 ask you if that fairly and accurately
16 represents the location of the vehicles from
17 the other angle as they were after you backed
18 your trailer up?
19    A   Yes.
20    Q   After you brought your truck and
21 trailer to a stop, did you get out of your
22 vehicle?
23    A   After I made the phone calls, yes.



MARK MASSINGILL
JAMES JOHNSON vs ABF FREIGHT SYSTEM

September 11, 2019
189—192

Page 189

1    Q    And did you observe the damage to
2    Mr. Johnson's trailer?
3    A    Yes.
4    Q    Was the damage to that trailer
5    primarily located on the back right corner of
6    his trailer?
7    A    Yes.
8    Q    Or the rear passenger corner of the
9    trailer?
10   A    Correct.
11   Q    Okay.  Was the damage concentrated to
12   the taillight housing on that side as shown in
13   Plaintiff's Exhibits 8 and 9?
14   A    Yes.
15   Q    For the record, if we look at
16   Plaintiff's Exhibit No. 8, tell the ladies and
17   gentlemen of the jury, what's the taillight
18   housing that you noticed was damaged when you
19   got out of your truck?
20   A    It looked like there was some bolts
21   that broke off.
22   Q    Okay.  But for the record so we can
23   know what we're talking about when we get to

Page 190

1    trial and we're looking at this photo, what
2    part of his truck was damaged; what are we
3    seeing that was damaged?
4    A    The taillight.
5    Q    When you say taillight, what color is
6    the taillight in this photograph marked
7    Plaintiff's Exhibit 8?
8    A    Yellow.
9    Q    Okay.  And is it kind of oblong or
10   kind of football shaped?
11   A    Yeah.  It's oblong on a rectangular
12   base.
13   Q    And it's in kind of a metal square or
14   rectangular box?
15   A    Yes.
16   Q    Okay.  And what, if anything, did you
17   notice was damaged about that taillamp after
18   you got out of the truck after the incident?
19   A    That the box was bent.
20   Q    Which direction?
21   A    Towards the cab of his truck.
22   Q    Was there any other damage that you
23   noticed, Mr. Massingill, when you got out of

Page 191

1    your truck and looked at the damage
2    immediately after the incident?
3    A    No.
4    Q    Okay.  Did you notice any damage to
5    your trailer from the collision between the
6    two?
7    A    No.
8    Q    Okay.  Did you ever have to have any
9    repairs done to that trailer, to your
10   knowledge?
11   A    No.
12   Q    You were able to drive it away?
13   A    Yes.
14   Q    And do you know whether Mr. Johnson
15   was able to drive his tractor-trailer away?
16   A    Yes.
17   Q    While you were out there on the scene
18   after the initial impact, did you have a
19   chance to talk with Mr. Johnson?
20       MR. BAER:  Object to the form.  Asked
21   and answered.
22       THE WITNESS:  Yes.
23   Q    (By Mr. Oliver) Did you ask him if he

Page 192

1    was okay?
2        MR. BAER:  Object to the form.
3        THE WITNESS:  I don't remember.
4    Q    (By Mr. Oliver) Did Mr. Johnson tell
5    you while y'all were out there that he was
6    injured or suffering from any kind of pain or
7    problems?
8        MR. BAER:  Object to the form.  He
9    just said he didn't recall anything else.  Go
10   ahead.
11       THE WITNESS:  No.
12   Q    (By Mr. Oliver) How long were y'all
13   out there together before he left?
14   A    I don't remember.  It was 30, 40
15   minutes.
16   Q    Was Mr. Johnson walking around outside
17   of his truck during that time?
18   A    Yes.
19   Q    Did you notice whether he got in and
20   out of his truck during that time?
21   A    I didn't notice.
22   Q    When you were talking to and observing
23   him during that time, did he appear to be in

Page 193

1  any kind of pain or having any kind of
2  physical problems?
3    A   No.
4    Q   Did he ever ask the officer if he
5  could go to the hospital that you heard?
6    A   Not that I heard, no.
7      MR. OLIVER:  I think that's all I've
8  got.  Thank you.
9        FURTHER EXAMINATION
10  BY MR. BAER:
11    Q   I just want to talk about the diagram
12  that your attorney just went over with you.
13  It's attached as Defendant's Exhibit 1.  The
14  diagram reflects that you were traveling in
15  the right lane of Republic Boulevard before
16  you made a left turn on Avenue W, correct?
17    A   Yes.
18    Q   Okay.  Tell me when you, as a
19  professional truck driver, believe that it's
20  okay and legally permitted to make a left turn
21  from the right lane.
22      MR. OLIVER:  Object to the form.
23    Q   (By Mr. Baer) Let me ask you this.

Page 194

1  Let me rephrase the question.  I want to
2  rephrase the question.  You're familiar with
3  the rules of the road, like driving?
4    A   Yes.
5    Q   Yeah.  Can't run a red light, right?
6    A   (Witness nods head.)
7    Q   Yield in front of a yield sign, right?
8    A   Yes.
9    Q   No right turn; do you know that --
10  have you seen those signs?
11    A   Yes.
12    Q   Okay.  You had a driver's license
13  before you had a commercial driver's license,
14  right?
15    A   Yes.
16    Q   Okay.  Tell me, based on your training
17  and experience as a professional truck driver,
18  when you believe it is legally permitted for a
19  professional truck driver driving a
20  tractor-trailer to make a left turn from the
21  right lane?
22    A   Like, when the lights turn green and
23  you can make that turn.

Page 195

1    Q   So you believe there is -- it is legal
2  and not a violation of any statutes or
3  ordnances for a professional truck driver to
4  make a left turn from the right lane?
5    A   Yes.
6    Q   Okay.
7    A   This is a -- are you talking the right
8  lane of the road, like one direction or are
9  you talking two lanes in one direction?  I'm
10  confused.
11    Q   If I understood your testimony
12  earlier, there was two lanes on Republic
13  traveling in the direction you were going; did
14  I misunderstand that?
15    A   Okay.  I see what you're saying now.
16    Q   Yeah.
17    A   No.  I was not -- this is a lane going
18  in, this is a lane going out.
19    Q   Okay.  I want you to take this green
20  pen and draw the direction of travel -- you're
21  saying the left -- well, just draw which way
22  traffic goes on Republic Boulevard.
23    A   (Witness complies.)

Page 196

1    Q   Okay.  So Republic Boulevard is two
2  lanes total, correct?
3    A   Right.
4    Q   One traveling the direction you were
5  going and one traveling the other direction?
6    A   Right.
7    Q   Okay.  I misunderstood your testimony
8  earlier, I apologize.
9    A   Okay.
10    Q   Now, I want you to take this green --
11  I'll get a purple pen.  Take this purple pen
12  and draw the tractor-trailer you believe was
13  on -- and the location of the tractor-trailer
14  you believe was on Avenue W at the time you
15  stopped or claim you stopped before you made a
16  left turn.
17    A   The one that I saw?
18    Q   Yeah.
19    A   He would have been somewhere up here
20  (indicating).
21    Q   Okay.
22    A   Sorry, I'm not an artist.
23    Q   When you claim you were at a stop



MARK MASSINGILL
JAMES JOHNSON vs ABF FREIGHT SYSTEM

September 11, 2019
197—200

Page 197

1  before you made a left turn onto -- or
2  completed the left turn onto Avenue W, did you
3  ever think that if you put your vehicle in
4  reverse that the driver behind you would know
5  that you wanted to back up and that he would
6  have backed up as well or did that not cross
7  your mind?
8      A   Didn't cross my mind.
9      Q   Okay.  I want to talk about the
10  photograph already marked as Plaintiff's
11  Exhibit 7.  Can you take this light blue
12  pen -- rather than work on a demonstrative,
13  let's talk about reality, okay?
14      I want you to take this light blue pen and
15  I want you to tell me the curb that you claim
16  that you had to go over in order to make the
17  left turn.
18      A   (Witness complies.)
19      Q   Okay.  You would agree with me that
20  there is a distance between your front tire
21  and the curb, correct?
22      MR. OLIVER:  As shown in?
23      Q   (By Mr. Baer) As shown in Plaintiff's

Page 198

1  Exhibit 7.
2      A    Yes.
3      Q    You would agree with me that there's a
4  distance, right.
5      A    Right.
6      Q    I want you to take this purple
7  highlighter and show the jury the distance you
8  see in this photograph between the front of
9  your vehicle and the curb.
10     A    (Witness complies.)
11     Q    How far did you back up after you
12  realized you had collided with the rear of
13  Mr. Johnson's trailer?
14     A    I don't know.
15     Q    Okay.  You don't know?
16     A    Five or ten feet.
17     Q    Okay.  And you believe you were able
18  to do that without striking the rear of his
19  trailer again, correct?
20     A    Correct.
21     Q    Okay.  I want you to take this pink
22  highlighter and show the jury the distance
23  between your vehicle and the light pole.

Page 199

1      A    This way (indicating)?
2      Q    Yes, sir.  Approximately, how much
3  room do you think what you just marked in pink
4  highlighter, how many feet do you think that
5  is?
6      A    I don't know.
7      Q    Okay.  I'm going to go out and measure
8  it.  I just want you to tell me what you
9  believe -- the clearance you were worried
10  about when you made the turn.
11     A    Okay.
12     Q    What's that space right there in pink?
13     MR. OLIVER:  Object to the form, asked
14  and answered.
15     MR. BAER:  No, he didn't answer.
16     Q    (By Mr. Baer) Go ahead.  Just tell me
17  how far is that between the light pole and
18  your vehicle.
19     A    I don't know.
20     Q    Several feet?
21     MR. OLIVER:  Object to the form.
22     Q    (By Mr. Baer) If you don't know, you
23  don't know.

Page 200

1      A    I don't know.
2      Q    I'll tell the story to the jury.  So
3  you had this much room which you marked right
4  there.
5      A    I had this much room and whatever that
6  pole behind it and the other stuff.
7      Q    Okay.  And the direction in which your
8  trailer -- strike that.
9      The direction in which your tractor is
10  pointed in Plaintiff's Exhibit 7 would be the
11  direction in which you backed up, correct?
12     A    Yes.
13     Q    Okay.  In other words, you cut the
14  wheel a certain way to be able to back up,
15  correct?  Or did you just leave the wheel the
16  way it was and hit the gas to back up?
17     A    I think I just backed up.
18     Q    Okay.  So the position of your trailer
19  in Plaintiff's Exhibit 7 would be the same
20  angle that it was in when you struck
21  Mr. Johnson's trailer?
22     A    I believe so, yes.
23     Q    Okay.  You would agree with me that



Page 201

1 there is a distance between the front right
2 tire of your tractor in this picture and the
3 curb?
4     A    Yes.
5     Q    Okay.  In other words, you cleared the
6 curb and you cleared the pole, right?
7         MR. OLIVER:  Object to the form.
8         THE WITNESS:  Right.
9     Q    (By Mr. Baer) Did you clear the curb
10 when you made the turn?  When you made the
11 left turn, did you clear the curb?
12         MR. OLIVER:  Object to the form.
13         THE WITNESS:  When you say clear the
14 curb, what do you mean?
15     Q    (By Mr. Baer) You didn't hit the curb,
16 did you?
17     A    When I made the left turn?
18     Q    Yeah.
19     A    I was up over the curb.
20     Q    Okay.  So you believe the angle in
21 which your tractor is depicted in Exhibit 7,
22 you believe that you would have rolled over
23 the curb and then ended up in this position,

Page 202

1 which is after you backed up?
2     A    Yes.  Yes.
3         MR. BAER:  Okay.  Okay.  That's all
4 I've got.  Thank you, sir.
5             FURTHER EXAMINATION
6 BY MR. OLIVER:
7     Q    Let me ask you one quick question.  I
8 don't think it's been asked.  Mr. Baer asked
9 you about cell phone.  Were you using a cell
10 phone at the time this incident occurred?
11     A    No.
12     Q    Were you on the cell phone at the time
13 the incident occurred?
14     A    No.
15     Q    Were you adjusting the radio or
16 otherwise manipulating your radio at the time?
17     A    No.
18     Q    Were you eating?
19     A    No.
20     Q    Were you looking at maps or GPS
21 devices or anything else to guide your way at
22 the time this incident occurred?
23     A    No.

Page 203

1         MR. OLIVER:  Okay.  All right.
2 That's all.
3         MR. BAER:  All right.
4         (The deposition of MARK MASSINGILL was
5         concluded at 1:45 p.m., September 11,
6         2019.)
7             --oOo--

Page 204

1             C E R T I F I C A T E
2 State of Alabama
3 Marshall County
4     I here by certify that the above and
5     foregoing deposition was taken down by me
6     in stenotype and the questions and answers
7     thereto were transcribed by means of
8     computer-aided transcription, and that the
9     foregoing represents a true and correct
10     transcript of the testimony given by said
11     witness upon said hearing .
12     I further certify that I am neither of
13     counsel, nor of kin to the parties to the
14     action, nor am I in any way interested in
15     the result of said cause named in said
16     caption.
17
18
19
20
21             /s/Kayla Wilson
                KAYLA WILSON
22              ACCR #634
                Commissioner for the
23              State of Alabama at Large



**EXHIBIT B**

**IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA**

| | | |
|---|---|---|
| **JAMES JOHNSON, JR., and** | ) | |
| **ERICKA JOHNSON,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | |
| | ) | **Civil Action No.: CV-2018-902401** |
| | ) | |
| **ABF FREIGHT SYSTEM, INC., and** | ) | |
| **MARK EUGENE MASSINGILL** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF JAMES JOHNSON'S RESPONSES TO DEFENDANT
ABF FREIGHT SYSTEM, INC.'S FIRST SET OF INTERROGATORIES**

**COMES NOW**, the Plaintiff, JAMES JOHNSON, by and through his undersigned counsel of record and files this his Responses to Defendant ABF Freight System, Inc.'s First Set of Interrogatories pursuant to Alabama Rules of Civil Procedure and responds as follows, to-wit:

**GENERAL OBJECTIONS**

The following General Objections apply to each and every one of the Interrogatories, Requests for Production of Documents, and Requests for Admission ("Discovery Requests") irrespective of whether the General Objections are expressly referred to in response to the specific request. The particular objections which are set forth herein following a response are intended to amplify the General Objections and neither limit the applicability of any of the General Objections nor waive any objections which may, in addition to those set forth in each Discovery Request, be applicable to each Discovery Request.

Any Objections and Responses to the Discovery Requests ("Responses") are based on information presently known to Plaintiff and are given without prejudice to Plaintiff's right to supplement and/or amend his Objections and Responses, or present additional evidence or contentions at a later date in accordance with the Alabama Rules of Civil Procedure, but without affirmatively undertaking any obligations to supplement their Responses.

Plaintiff objects to the Discovery Requests to the extent Defendant seeks privileged or confidential information that is protected by the attorney-client privilege, the work product doctrine, the joint or common defense privilege and/or otherwise immune from discovery.

Plaintiff objects to the Discovery Requests to the extent Defendants seek disclosure of confidential, sensitive and/or proprietary business information.

Plaintiff objects to the Discovery Requests to the extent Defendants seek information obtainable from documents and/or information in possession, custody or control of Defendant or which may be more readily available to Defendant from a more convenient, less burdensome and oppressive and/or less expensive source.

Plaintiff objects to the Discovery Requests to the extent Defendants seek information that is not in the possession, custody or control of Plaintiff or which otherwise exceeds the scope of permissible discovery as set forth in the Alabama Rules of Civil Procedure and/or applicable jurisprudence.

Plaintiff objects to the Discovery Requests to the extent they are unlimited in time on grounds the Discovery Request are overly broad, burdensome, harassing and seek information which is irrelevant to the subject matter of the captioned litigation and not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff objects to the Discovery Request to the extent Defendants seek information which is not within the scope of this action on grounds the Discovery Requests are overly broad, unduly burdensome, oppressive, and seeks information which is irrelevant to the subject matter of the captioned litigation and not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff objects to the Discovery Requests to the extent Defendants seek information relating to policies that are not at issue in the captioned litigation, on the grounds any such inquiry is overly broad, burdensome, oppressive, and irrelevant to the subject matter of the captioned litigation and not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff objects to the Discovery Requests to the extent Defendants seek information protected from disclosure under the Alabama Rules of Civil Procedure and applicable jurisprudence, or to the extent such inquiries may be construed to impose on Plaintiff any obligations beyond those encompassed by the Alabama Rules of Civil Procedure and applicable jurisprudence.

Plaintiff objects to the Discovery Requests to the extent Defendants seek information that is protected from discovery by the attorney-client privilege, the work product doctrine and/or any other applicable privilege.

Plaintiff objects to the Discovery Requests insofar as they are repetitive, redundant or overlapping as to subject matter.  As such, they are unduly burdensome, oppressive and/or harassing.

Plaintiff objects to the Discovery Requests to the extent they are overly broad.  As used herein, "overly broad" means the information requested is either irrelevant to the subject matter of the captioned litigation as a whole, or is outside the scope of discovery permitted by the Alabama Rules of Civil Procedure and applicable jurisprudence.

Plaintiff objects to the Discovery Requests to the extent they are burdensome and oppressive.  As used herein, "unduly burdensome" or "burdensome and oppressive" means that the information sought requires an unreasonable expenditure of time and resources and is of little or no benefit to the lawsuit, such that the value of its disclosure is far outweighed by the burden of disclosing it.

Plaintiff objects to the Discovery Requests to the extent they use words or phrases which render them vague and ambiguous.  As used herein, "vague" or "vague and ambiguous" means that a discovery request is drafted in a manner which does not with reasonable clarity convey what information is sought, so that Plaintiff is not able to ascertain with certainty the intended meaning of the Discovery Request.

Plaintiff's responses shall be made solely for this action.  Any responsive statement given by Plaintiff is subject to all objections regarding relevance, materiality, propriety, admissibility and all other objections on any other grounds that would require excluding the statement if offered at trial.  All such objections and grounds are hereby expressly reserved and may be interposed at the time of trial.

Plaintiff objects to the Discovery Requests to the extent he has not yet completed his investigation into the facts of this lawsuit, nor fully participated in discovery or prepared for trial and, therefore, reserves his right to amend, modify, or supplement his objections and any documents requested if he learns of new information and/or discovers additional documentation.

These General Objections are incorporated by reference into each Specific Objection and/or Response made herein or subsequently, as though fully set forth, regardless of whether any or all of these General Objections are repeated in any Specific Objection and/or Response.  Notwithstanding any Specific Objection or Response, Plaintiff does not waive any of the General Objections made herein.

"Subject to the foregoing objections," or substantial language used in the following objections, means that Plaintiff will not search for or provide information that is subject of his Specific or General objections unless otherwise stated in the response, and that any information provided in response to the information or documents provided in response to the Discovery Requests or additional areas of inquiry may not be construed as a waiver of any objection.

Plaintiff objects to each discovery request to the extent the request requires Plaintiff to make legal conclusions or to determine whether documents have a certain legal effect in order to determine which documents to produce. Plaintiff is not required to make those determinations.

Plaintiff objects to each discovery request to the extent the request presumes factual bases which are untrue or contain contentions of fact or law that are contested or are argumentative or

speculative. Plaintiff intends to respond in good faith to Defendant's requests, but such responses are made with the express understanding that they in no way constitute an admission, acquiescence or agreement as to the truth or validity of any of the statements contained in the discovery requests.

Without waiving any of the foregoing objections, and specifically subject thereto, Plaintiff further responds as follows:

## RESPONSES TO INTERROGATORIES

1.      Please identify your name, address, date of birth, social security number, and all names by which you have been known in the past.

## RESPONSE TO INTERROGATORY NO. 1:

James H. Johnson, Jr.; ██████████████, Marrero, LA ███████; ██████; XXX-XX-██.

2.      Please list all relatives living in the county in which this claim has been filed, including their full name, residence address, place of employment, and relationship.

## RESPONSE TO INTERROGATORY NO. 2:

None.

3.      Please identify each and every communication or transaction you have had with any Defendant or employee, representative, and/or agent of any Defendant, and identify each employee, representative, and/or agent of any Defendant with whom you have had each such communication or transaction, and for each communication or transaction state the date when the communication or transaction took place, as well as the substance of the communication or transaction.

## RESPONSE TO INTERROGATORY NO. 3:

None.

4.      Please set forth fully and completely your entire medical history as it may refer to any illness, injury, disease, condition or disability of his body, stating in your answer the nature and extent of all treatments given therefor, the date thereof, and the names and addresses of all doctors, hospitals, and/or any other medical facility involved.

**RESPONSE TO INTERROGATORY NO. 4:**

Plaintiff objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome as it is unlimited in time and scope. Subject to and without waiving the foregoing objections, Mr. Johnson had not suffered any injuries prior to the subject collision.

5.      Please list the name and address of any pharmacies ever used by you to fill prescription medications.

**RESPONSE TO INTERROGATORY NO. 5:**

Plaintiff objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome as it is unlimited in time and scope. Subject to and without waiving the foregoing objections, Mr. Johnson uses Walgreens Pharmacy.

6.      Please list the name, address, and telephone number for each of your employers that for the last ten (10) years.

**RESPONSE TO INTERROGATORY NO. 6:**

American Building Products
5600 Jefferson Hwy # 248, Harahan, LA 70123
(504) 734-9941; and

Energy Dispatch
601 Republic Circle, Birmingham, AL 35214
800-372-2568

7.      Please state the name, address, and telephone number for each person from whom you, or someone acting on your behalf, has taken a written or recorded statement regarding the matters made the basis of this litigation.

**RESPONSE TO INTERROGATORY NO. 7:**

Plaintiff is not in possession of any information responsive to this request.

8.      Please state the name, address and telephone number of each person known to have any knowledge of the facts or circumstances described in the Complaint.

**RESPONSE TO INTERROGATORY NO. 8:**



James Johnson, Jr.
███████████████ Marrero, LA ████
Only to be contacted through undersigned counsel;

Ericka Johnson
████████████████, Marrero, LA ████
Only to be contacted through undersigned counsel;

Mark Eugene Massingill
Unknown
Unknown.

9.      Please identify by name, address and telephone number each person known to Plaintiff to have seen, heard or known about the occurrence alleged in the Complaint, including the substance, within the best knowledge of Plaintiff, of all information or knowledge about the alleged occurrence known to each such witness.

**RESPONSE TO INTERROGATORY NO. 9:**

See Response to Interrogatory No.8.

10.     Please identify each and every witness, fact, document, or other source of evidence presently known that you have to support the contention that Defendant was driving at a speed that was excessive as stated in the Complaint.

**RESPONSE TO INTERROGATORY NO. 10:**

Plaintiff objects to this Interrogatory on the grounds that it seeks information which may be protected by the work-product doctrine and/or attorney-client privilege. Additionally, Plaintiff objects to this Interrogatory on the grounds that it is premature as discovery is still in its early stages. Subject to and without waiving the foregoing objections, Mr. Johnson will support the contention.

11.   Please describe in full detail how the subject accident occurred.

**RESPONSE TO INTERROGATORY NO. 11:**

Mr. Johnson was the driver of a tanker truck, loaded with fuel, that was stopped at a railroad crossing waiting for a train to pass. While Mr. Johnson was sitting in his vehicle, Defendant Massingill attempted to go around Mr. Johnson to position his vehicle in the lane to the left of Mr. Johnson. While attempting to go around Mr. Johnson's vehicle, Defendant Massingill turned his vehicle too short causing it to collide with the rear of Mr. Johnson's vehicle. After the collision, Defendant Massingill exited his vehicle and tried to put the equipment that was torn off of Mr. Johnson's truck, back in its place while Mr. Johnson called the police.

12.   Please describe completely and in full detail any and all injuries presently known suffered by you as a result of the subject accident.

**RESPONSE TO INTERROGATORY NO. 12:**

Mr. Johnson suffered injuries to his neck, back, and right leg, as well as psychological injuries as a result of the collision. Please see the attached medical records for more detail.

13.   With reference to the injuries, illnesses or disabilities referred to in the preceding interrogatory, please state:

a.     The name or names and address or addresses of the person or persons who treated, examined or operated on your decedent for such injuries, ailments or illnesses.

**<u>RESPONSE TO INTERROGATORY NO. 13:</u>**

Plaintiff objects to this Interrogatory on the grounds that it is vague and confusing as Plaintiff was unaware the collision resulted in a death, thus he is unaware of any treatment provided to a "decedent."

14.     Please identify each and every witness, fact, document, or other source of evidence presently known that you have to support the contention that Defendant negligently hired, retained, supervised and/or entrusted its commercial vehicle to its driver, Defendant Mark Massingill as stated in the Complaint.

**<u>RESPONSE TO INTERROGATORY NO. 14:</u>**

Plaintiff objects to this Interrogatory on the grounds that it seeks information which may be protected by the work-product doctrine and/or attorney-client privilege and seeks the mental impressions of undersigned counsel. Additionally, Plaintiff objects to this Interrogatory on the grounds that it is premature as discovery is still in its early stages.

15.     Please state fully and in complete detail all that Defendants did or failed to do which in any way caused, or contributed to cause, the alleged occurrence in the Complaint.

**<u>RESPONSE TO INTERROGATORY NO. 15:</u>**

Plaintiff objects to this Interrogatory on the grounds that it seeks information which may be protected by the work-product doctrine and/or attorney-client privilege and seeks the mental impressions of undersigned counsel. Additionally, Plaintiff objects to this Interrogatory on the grounds that it is premature as discovery is still in its early stages. Subject to and without waiving the foregoing objections, see Response to Interrogatory No. 11 and the attached police report.

16.    Please state and describe fully and in detail each and every act or omission presently known relating to fault, extent of negligence, and/or breach of the standard of care, on the part of each Defendant that you claim caused or contributed to cause the alleged occurrence in the Complaint.

**RESPONSE TO INTERROGATORY NO. 16:**

Plaintiff objects to this Interrogatory on the grounds that it seeks information which may be protected by the work-product doctrine and/or attorney-client privilege and seeks the mental impressions of undersigned counsel. Additionally, Plaintiff objects to this Interrogatory on the grounds that it is premature as discovery is still in its early stages. Subject to and without waiving the foregoing objections, see Response to Interrogatory No. 11 and the attached police report.

17.    Please identify each person you expect to call as an expert witness at trial and please indicate, as to each such person:

    a.    The subject matter on which the expert is expected to testify;

    b.    The substance of the facts and opinions to which each such person is expected to testify and a summary of the grounds for each opinion.

**RESPONSE TO INTERROGATORY NO. 17:**

Plaintiff objects to this Interrogatory on the grounds that it is premature as discovery is still in its early stages and thus Plaintiff does not yet know who will be called as a witness at trial, aside from his treating physicians. Subject to and without waiving the foregoing objections, Plaintiff will provide this information in accordance with the rules of the court and any scheduling orders entered in this matter.

18.    Please state the name, address and telephone number of each person you intend to call as a witness at the trial of this matter.

**RESPONSE TO INTERROGATORY NO. 18:**

Plaintiff objects to this Interrogatory on the grounds that it is premature as discovery is still in its early stages and thus Plaintiff does not yet know who will be called as a witness at trial, aside from his treating physicians. Subject to and without waiving the foregoing objections, Plaintiff will provide this information in accordance with the rules of the court and any scheduling orders entered in this matter.

19.     Please state whether you have received any payment or settlement from any other party or on behalf of any other party involved in the events made the basis of this lawsuit.  If you have received such payment or settlement, please identify the source, amount and date of payment.

**RESPONSE TO INTERROGATORY NO. 19:**

No.

20.     Do you have health insurance? If so, please identify the name of each such insurer, including contact information and the corresponding policy number.

**RESPONSE TO INTERROGATORY NO. 20:**

Mr. Johnson has Medicaid.

21.     Please state fully and in complete detail all that ABF Freight did or failed to do, which you are presently are of, that caused or contributed to cause the alleged occurrence.

**RESPONSE TO INTERROGATORY NO. 21:**

Plaintiff objects to this Interrogatory on the grounds that it seeks information which may be protected by the work-product doctrine and/or attorney-client privilege and seeks the mental impressions of undersigned counsel. Additionally, Plaintiff objects to this Interrogatory on the grounds that it is premature as discovery is still in its early stages. Subject to and without waiving the foregoing objections, see Response to Interrogatory No. 11.

22.     If you have overheard any conversations between the Defendant(s) or the Defendant(s)' employees with anyone concerning your incident, please list the substance of the conversation and the time and date of the conversation. Please also provide a list of names of those who were present.

**RESPONSE TO INTERROGATORY NO. 22:**

     No.

23.     Please list the names of any and all other lawyers or firms that may have any interest in the outcome of this case.

**RESPONSE TO INTERROGATORY NO. 23:**

     Plaintiff objects to this Interrogatory on the grounds that it is irrelevant to the subject litigation and unlikely to lead to the discovery of admissible information.

24.     Have you ever applied for Social Security Disability benefits?  If so, please state:

     (a)     the date of each such application;

     (b)     the location (city) of application;

     (c)     the status of the application; and

     (d)     identify any attorney(s) who represented the you in that matter.

**RESPONSE TO INTERROGATORY NO. 24:**

     Mr. Johnson applied for Social Security Disability in June of 2018 in New Orleans. He has not yet received a response.

25.     If James Johnson, Jr. has ever been involved as a plaintiff or defendant in any lawsuit, including a bankruptcy proceeding, domestic dispute, or any litigation of any type or nature, please state the name of the lawsuit, the jurisdiction in which the lawsuit was filed, and the lawyer who represented him in the lawsuit

**RESPONSE TO INTERROGATORY NO. 25:**

Plaintiff objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome as it is unlimited in time or scope. Additionally, Plaintiff objects to this Interrogatory on the grounds it is irrelevant to the subject litigation. Subject to and without waiving the foregoing objections, Mr. Johnson has not been involved in any prior litigation

Respectfully submitted, this the 5th day of October, 2018, A.D.

_____
JAMES JOHNSON

As to objections only:

_____
ERIC TIEBAUER, ASB# 2431-E68E
The Tiebauer Law Offices, LLC
P.O. Box 1421
Waynesboro, MS 39367
Phone: 601.735.5222
Fax: 601.735.5008
Email: tiebauer@att.net

STATE OF _____
COUNTY OF _____

BEFORE ME, the undersigned officer, who is duly authorized to administer oaths, personally appeared the undersigned affiant, who first being duly sworn on oath, deposes and says that the answers contained in the foregoing pleading are true and correct.

_____
JAMES JOHNSON

SWORN TO AND SUBSCRIBED BEFORE ME on this the _____ day of October, 2018, A.D.

_____
Notary Public

My Commission Expires: _____

**RESPONSE TO INTERROGATORY NO. 25:**

Plaintiff objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome as it is unlimited in time or scope. Additionally, Plaintiff objects to this Interrogatory on the grounds it is irrelevant to the subject litigation. Subject to and without waiving the foregoing objections, Mr. Johnson has not been involved in any prior litigation

Respectfully submitted, this the 5th day of October, 2018, A.D.

_____
JAMES JOHNSON

As to objections only:

_____
ERIC TIEBAUER, ASB# 2431-E68E
The Tiebauer Law Offices, LLC
P.O. Box 1421
Waynesboro, MS 39367
Phone: 601.735.5222
Fax: 601.735.5008
Email: tiebauer@att.net

STATE OF _____
COUNTY OF _____

BEFORE ME, the undersigned officer, who is duly authorized to administer oaths, personally appeared the undersigned affiant, who first being duly sworn on oath, deposes and says that the answers contained in the foregoing pleading are true and correct.

_____
JAMES JOHNSON

SWORN TO AND SUBSCRIBED BEFORE ME on this the 30 day of October, 2018, A.D.

_____
Notary Public JOSHUA A. STEIN
Notary Public
Bar No. 37885
State of Louisiana
Commission Issued for Life

My Commission Expires: _____

## **CERTIFICATE OF SERVICE**

I, Eric Tiebauer, do hereby certify that I have this day, caused to be served a copy of the above and foregoing on counsel for all parties by filing through Alafile system which has sent notification of such filing unto the following:

Hon. Thomas L. Oliver, II
Hon. Howard G. Perdue, III
Hon. Allison Carr
100 Vestavia Parkway
Birmingham, AL 35216
Email: toliver@carrallison.com
        tperdue@carrallison.com

**SO CERTIFIED**, this the 5th day of October, 2018, A.D.

                                        s/Eric Tiebauer
                                BY:   ERIC TIEBAUER, ASB# 2431-E68E

ERIC TIEBAUER, ASB# 2431-E68E
The Tiebauer Law Offices, LLC
P.O. Box 1421
Waynesboro, MS 39367
Phone: 601.735.5222
Fax: 601.735.5008
Email: tiebauer@att.net

**EXHIBIT C**

**IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA**

| | | |
|---|---|---|
| **JAMES JOHNSON, JR., and** | ) | |
| **ERICKA JOHNSON,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | |
| | ) | **Civil Action No.: CV-2018-902401** |
| | ) | |
| **ABF FREIGHT SYSTEM, INC., and** | ) | |
| **MARK EUGENE MASSINGILL** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF ERICKA JOHNSON'S RESPONSES TO DEFENDANT
ABF FREIGHT SYSTEM, INC.'S FIRST SET OF INTERROGATORIES**

    **COMES NOW,** the Plaintiff, ERICKA JOHNSON, by and through her undersigned counsel of record and files this her Responses to Defendant ABF Freight System Inc.'s First Set of Interrogatories pursuant to Alabama Rules of Civil Procedure and responds as follows, to-wit:

**GENERAL OBJECTIONS**

    The following General Objections apply to each and every one of the Interrogatories, Requests for Production of Documents, and Requests for Admission ("Discovery Requests") irrespective of whether the General Objections are expressly referred to in response to the specific request. The particular objections which are set forth herein following a response are intended to amplify the General Objections and neither limit the applicability of any of the General Objections nor waive any objections which may, in addition to those set forth in each Discovery Request, be applicable to each Discovery Request.

Any Objections and Responses to the Discovery Requests ("Responses") are based on information presently known to Plaintiff and are given without prejudice to Plaintiff's right to supplement and/or amend his Objections and Responses, or present additional evidence or contentions at a later date in accordance with the Alabama Rules of Civil Procedure, but without affirmatively undertaking any obligations to supplement their Responses.

Plaintiff objects to the Discovery Requests to the extent Defendant seeks privileged or confidential information that is protected by the attorney-client privilege, the work product doctrine, the joint or common defense privilege and/or otherwise immune from discovery.

Plaintiff objects to the Discovery Requests to the extent Defendants seek disclosure of confidential, sensitive and/or proprietary business information.

Plaintiff objects to the Discovery Requests to the extent Defendants seek information obtainable from documents and/or information in possession, custody or control of Defendant or which may be more readily available to Defendant from a more convenient, less burdensome and oppressive and/or less expensive source.

Plaintiff objects to the Discovery Requests to the extent Defendants seek information that is not in the possession, custody or control of Plaintiff or which otherwise exceeds the scope of permissible discovery as set forth in the Alabama Rules of Civil Procedure and/or applicable jurisprudence.

Plaintiff objects to the Discovery Requests to the extent they are unlimited in time on grounds the Discovery Request are overly broad, burdensome, harassing and seek information which is irrelevant to the subject matter of the captioned litigation and not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff objects to the Discovery Request to the extent Defendants seek information which is not within the scope of this action on grounds the Discovery Requests are overly broad, unduly burdensome, oppressive, and seeks information which is irrelevant to the subject matter of the captioned litigation and not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff objects to the Discovery Requests to the extent Defendants seek information relating to policies that are not at issue in the captioned litigation, on the grounds any such inquiry is overly broad, burdensome, oppressive, and irrelevant to the subject matter of the captioned litigation and not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff objects to the Discovery Requests to the extent Defendants seek information protected from disclosure under the Alabama Rules of Civil Procedure and applicable jurisprudence, or to the extent such inquiries may be construed to impose on Plaintiff any obligations beyond those encompassed by the Alabama Rules of Civil Procedure and applicable jurisprudence.

Plaintiff objects to the Discovery Requests to the extent Defendants seek information that is protected from discovery by the attorney-client privilege, the work product doctrine and/or any other applicable privilege.

Plaintiff objects to the Discovery Requests insofar as they are repetitive, redundant or overlapping as to subject matter.  As such, they are unduly burdensome, oppressive and/or harassing.

Plaintiff objects to the Discovery Requests to the extent they are overly broad.  As used herein, "overly broad" means the information requested is either irrelevant to the subject matter of the captioned litigation as a whole, or is outside the scope of discovery permitted by the Alabama Rules of Civil Procedure and applicable jurisprudence.

Plaintiff objects to the Discovery Requests to the extent they are burdensome and oppressive.  As used herein, "unduly burdensome" or "burdensome and oppressive" means that the information sought requires an unreasonable expenditure of time and resources and is of little or no benefit to the lawsuit, such that the value of its disclosure is far outweighed by the burden of disclosing it.

Plaintiff objects to the Discovery Requests to the extent they use words or phrases which render them vague and ambiguous.  As used herein, "vague" or "vague and ambiguous" means that a discovery request is drafted in a manner which does not with reasonable clarity convey what information is sought, so that Plaintiff is not able to ascertain with certainty the intended meaning of the Discovery Request.

Plaintiff's responses shall be made solely for this action.  Any responsive statement given by Plaintiff is subject to all objections regarding relevance, materiality, propriety, admissibility and all other objections on any other grounds that would require excluding the statement if offered at trial.  All such objections and grounds are hereby expressly reserved and may be interposed at the time of trial.

Plaintiff objects to the Discovery Requests to the extent he has not yet completed his investigation into the facts of this lawsuit, nor fully participated in discovery or prepared for trial and, therefore, reserves his right to amend, modify, or supplement his objections and any documents requested if he learns of new information and/or discovers additional documentation.

These General Objections are incorporated by reference into each Specific Objection and/or Response made herein or subsequently, as though fully set forth, regardless of whether any or all of these General Objections are repeated in any Specific Objection and/or Response.  Notwithstanding any Specific Objection or Response, Plaintiff does not waive any of the General Objections made herein.

"Subject to the foregoing objections," or substantial language used in the following objections, means that Plaintiff will not search for or provide information that is subject of his Specific or General objections unless otherwise stated in the response, and that any information provided in response to the information or documents provided in response to the Discovery Requests or additional areas of inquiry may not be construed as a waiver of any objection.

Plaintiff objects to each discovery request to the extent the request requires Plaintiff to make legal conclusions or to determine whether documents have a certain legal effect in order to determine which documents to produce. Plaintiff is not required to make those determinations.

Plaintiff objects to each discovery request to the extent the request presumes factual bases which are untrue or contain contentions of fact or law that are contested or are argumentative or

speculative. Plaintiff intends to respond in good faith to Defendant's requests, but such responses are made with the express understanding that they in no way constitute an admission, acquiescence or agreement as to the truth or validity of any of the statements contained in the discovery requests.

Without waiving any of the foregoing objections, and specifically subject thereto, Plaintiff further responds as follows:

## RESPONSES TO INTERROGATORIES

1.) Please identify your name, address, date of birth, social security number, and all names by which you have been known in the past.

## RESPONSE TO INTERROGATORY NO. 1:

Ericka Collins Johnson█████████████ Marrero, LA █████; █████████; XXX-XX-███. Mrs. Johnson was previously known as Ericka Monique Collins.

2.) Please list all relatives living in the county in which this claim has been filed, including their full name, residence address, place of employment, and relationship.

## RESPONSE TO INTERROGATORY NO. 2:

Plaintiff objects to this Interrogatory on the grounds that it is irrelevant and unlikely to lead to the discovery of admissible information. Subject to and without waiving the foregoing objections, Mrs. Johnson has an estranged sister, Kecia, who lives in Jefferson County.

3.) Please identify each and every communication or transaction you have had with any Defendant or employee, representative, and/or agent of any Defendant, and identify each employee, representative, and/or agent of any Defendant with whom you have had each such communication or transaction, and for each communication or transaction state the date when the communication or transaction took place, as well as the substance of the communication or transaction.

**RESPONSE TO INTERROGATORY NO. 3:**

 None.

4.) Please set forth fully and completely your entire medical history as it may refer to any illness, injury, disease, condition or disability of his body, stating in your answer the nature and extent of all treatments given therefor, the date thereof, and the names and addresses of all doctors, hospitals, and/or any other medical facility involved.

**RESPONSE TO INTERROGATORY NO. 4:**

 Plaintiff objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome as it is unlimited in time and scope. Additionally, Plaintiff objects to this Interrogatory on the grounds that it is irrelevant and unlikely to lead to the discovery of admissible information as Mrs. Johnson is not claiming bodily injury.

5.) Please list the name and address of any pharmacies ever used by you to fill prescription medications.

**RESPONSE TO INTERROGATORY NO. 5:**

 Plaintiff objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome as it is unlimited in time and scope. Additionally, Plaintiff objects to this Interrogatory on the grounds that it is irrelevant and unlikely to lead to the discovery of admissible information as Mrs. Johnson is not claiming bodily injury.

6.) Please list the name, address, and telephone number for each of your employers that for the last ten (10) years.

**RESPONSE TO INTERROGATORY NO. 6:**

 Plaintiff objects to this Interrogatory on the grounds that it is irrelevant and unlikely to lead to the discovery of admissible information as Mrs. Johnson is not claiming bodily injury.

7.)     Please state the name, address, and telephone number for each person from whom you, or

someone acting on your behalf, has taken a written or recorded statement regarding the

matters made the basis of this litigation.

**RESPONSE TO INTERROGATORY NO. 7:**

Plaintiff is not in possession of any information responsive to this request.

8.)     Please state the name, address and telephone number of each person known to have any

knowledge of the facts or circumstances described in the Complaint.

**RESPONSE TO INTERROGATORY NO. 8:**

Plaintiff objects to this Interrogatory on the grounds that it is overly broad and unduly

burdensome. Subject to and without waiving the foregoing objections, see below:

James Johnson, Jr.
███████████████ Marrero, LA █████
Only to be contacted through undersigned counsel;

Ericka Johnson
███████████████ Marrero, LA █████
Only to be contacted through undersigned counsel;

Mark Eugene Massingill
Unknown
Unknown.

9.)     Please identify by name, address and telephone number each person known to Plaintiff to

have seen, heard or known about the occurrence alleged in the Complaint, including the

substance, within the best knowledge of Plaintiff, of all information or knowledge about

the alleged occurrence known to each such witness.

**RESPONSE TO INTERROGATORY NO. 9:**

See Response to Interrogatory No.8.

10.)    Please identify each and every witness, fact, document, or other source of evidence presently known that you have to support the contention that Defendant was driving at a speed that was excessive as stated in the Complaint.

**RESPONSE TO INTERROGATORY NO. 10:**

Plaintiff objects to this Interrogatory on the grounds that it seeks information which may be protected by the work-product doctrine and/or attorney-client privilege. Additionally, Plaintiff objects to this Interrogatory on the grounds that it is premature as discovery is still in its early stages. Subject to and without waiving the foregoing objections, Mr. Johnson will support the contention.

11.)    Please describe in full detail how the subject accident occurred.

**RESPONSE TO INTERROGATORY NO. 11:**

Mrs. Johnson was not in the vehicle when the collision occurred.

12.)    Please describe completely and in full detail any and all injuries presently known suffered by you as a result of the subject accident.

**RESPONSE TO INTERROGATORY NO. 12:**

Plaintiff objects to this Interrogatory on the grounds that it is irrelevant and unlikely to lead to the discovery of admissible information as Mrs. Johnson is not claiming bodily injury. Subject to and without waiving the foregoing objections, Mrs. Johnson's family has suffered as a result of the collision. The collision has placed financial, social, and marital strains on Mrs. Johnson's family and has negatively impacted her relationship with her husband, Mr. Johnson. Additionally, she now has to do many of the task Mr. Johnson used to do but can no longer do after the collision.

13.)    With reference to the injuries, illnesses or disabilities referred to in the preceding interrogatory, please state:

        a.      The name or names and address or addresses of the person or persons who treated, examined or operated on your decedent for such injuries, ailments or illnesses.

**RESPONSE TO INTERROGATORY NO. 13:**

Plaintiff objects to this Interrogatory on the grounds that it is vague and confusing as Plaintiff was unaware the collision resulted in a death, thus he is unaware of any treatment provided to a "decedent."

14.)    Please identify each and every witness, fact, document, or other source of evidence presently known that you have to support the contention that Defendant negligently hired, retained, supervised and/or entrusted its commercial vehicle to its driver, Defendant Mark Massingill as stated in the Complaint.

**RESPONSE TO INTERROGATORY NO. 14:**

Plaintiff objects to this Interrogatory on the grounds that it seeks information which may be protected by the work-product doctrine and/or attorney-client privilege and seeks the mental impressions of undersigned counsel. Additionally, Plaintiff objects to this Interrogatory on the grounds that it is premature as discovery is still in its early stages.

15.)    Please state fully and in complete detail all that Defendants did or failed to do which in any way caused, or contributed to cause, the alleged occurrence in the Complaint.

**RESPONSE TO INTERROGATORY NO. 15:**

Plaintiff objects to this Interrogatory on the grounds that it seeks information which may be protected by the work-product doctrine and/or attorney-client privilege and seeks the

mental impressions of undersigned counsel. Additionally, Plaintiff objects to this Interrogatory on the grounds that it is premature as discovery is still in its early stages. Subject to and without waiving the foregoing objections, Mrs. Johnson was not in the vehicle at the time of the collision.

16.)   Please state and describe fully and in detail each and every act or omission presently known relating to fault, extent of negligence, and/or breach of the standard of care, on the part of each Defendant that you claim caused or contributed to cause the alleged occurrence in the Complaint.

**RESPONSE TO INTERROGATORY NO. 16:**

See Response to Interrogatory No. 15.

17.)   Please identify each person you expect to call as an expert witness at trial and please indicate, as to each such person:

a.      The subject matter on which the expert is expected to testify;

b.      The substance of the facts and opinions to which each such person is expected to testify and a summary of the grounds for each opinion.

**RESPONSE TO INTERROGATORY NO. 17:**

Plaintiff objects to this Interrogatory on the grounds that it is premature as discovery is still in its early stages and thus Plaintiff does not yet know who will be called as a witness at trial. Subject to and without waiving the foregoing objections, Plaintiff will provide this information in accordance with the rules of the court and any scheduling orders entered in this matter.

18.)   Please state the name, address and telephone number of each person you intend to call as a witness at the trial of this matter.

**RESPONSE TO INTERROGATORY NO. 18:**

Plaintiff objects to this Interrogatory on the grounds that it is premature as discovery is still in its early stages and thus Plaintiff does not yet know who will be called as a witness at trial. Subject to and without waiving the foregoing objections, Plaintiff will provide this information in accordance with the rules of the court and any scheduling orders entered in this matter.

19.)   Please state whether you have received any payment or settlement from any other party or on behalf of any other party involved in the events made the basis of this lawsuit.  If you have received such payment or settlement, please identify the source, amount and date of payment.

**RESPONSE TO INTERROGATORY NO. 19:**

No.

20.)   Do you have health insurance? If so, please identify the name of each such insurer, including contact information and the corresponding policy number.

**RESPONSE TO INTERROGATORY NO. 20:**

Plaintiff objects to this Interrogatory on the grounds that it is irrelevant and unlikely to lead to the discovery of admissible information as Mrs. Johnson is not claiming bodily injury.

21.)   Please state fully and in complete detail all that ABF Freight did or failed to do, which you are presently are of, that caused or contributed to cause the alleged occurrence.

**RESPONSE TO INTERROGATORY NO. 21:**

See Response to Interrogatory No. 15.

22.)   If you have overheard any conversations between the Defendant(s) or the Defendant(s)' employees with anyone concerning your incident, please list the substance of the

conversation and the time and date of the conversation. Please also provide a list of names of those who were present.

**RESPONSE TO INTERROGATORY NO. 22:**

No.

23.)   Please list the names of any and all other lawyers or firms that may have any interest in the outcome of this case.

**RESPONSE TO INTERROGATORY NO. 23:**

Plaintiff objects to this Interrogatory on the grounds that it is irrelevant to the subject litigation and unlikely to lead to the discovery of admissible information.

24.)   Have you ever applied for Social Security Disability benefits?  If so, please state:

     (a)    the date of each such application;

     (b)    the location (city) of application;

     (c)    the status of the application; and

     (d)    identify any attorney(s) who represented the you in that matter.

**RESPONSE TO INTERROGATORY NO. 24:**

Plaintiff objects to this Interrogatory on the grounds that it is irrelevant and unlikely to lead to the discovery of admissible information as Mrs. Johnson is not claiming bodily injury.

25.   If Ericka Johnson has ever been involved as a plaintiff or defendant in any lawsuit, including a bankruptcy proceeding, domestic dispute, or any litigation of any type or nature, please state the name of the lawsuit, the jurisdiction in which the lawsuit was filed, and the lawyer who represented him in the lawsuit

**RESPONSE TO INTERROGATORY NO. 25:**

Plaintiff objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome as it is unlimited in time or scope. Additionally, Plaintiff objects to this Interrogatory on the grounds it is irrelevant to the subject litigation. Subject to and without waiving the foregoing objections, Mrs. Johnson has not been involved in any prior litigation.

Respectfully submitted, this the 5th day of October, 2018, A.D.

_____
ERICKA JOHNSON

As to objections only:

_____
ERIC TIEBAUER, ASB# 2431-E68E
The Tiebauer Law Offices, LLC
P.O. Box 1421
Waynesboro, MS 39367
Phone: 601.735.5222
Fax: 601.735.5008
Email: tiebauer@att.net

STATE OF _____
COUNTY OF _____

BEFORE ME, the undersigned officer, who is duly authorized to administer oaths, personally appeared the undersigned affiant, who first being duly sworn on oath, deposes and says that the answers contained in the foregoing pleading are true and correct.

_____
ERICKA JOHNSON

SWORN TO AND SUBSCRIBED BEFORE ME on this the ____ day of October, 2018, A.D.

_____
Notary Public

My Commission Expires: _____

Plaintiff objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome as it is unlimited in time or scope. Additionally, Plaintiff objects to this Interrogatory on the grounds it is irrelevant to the subject litigation. Subject to and without waiving the foregoing objections, Mrs. Johnson has not been involved in any prior litigation.

Respectfully submitted, this the 5th day of October, 2018, A.D.

_ERICKA JOHNSON_
ERICKA JOHNSON

As to objections only:

_____

ERIC TIEBAUER, ASB# 2431-E68E
The Tiebauer Law Offices, LLC
P.O. Box 1421
Waynesboro, MS 39367
Phone: 601.735.5222
Fax: 601.735.5008
Email: tiebauer@att.net

STATE OF _____
COUNTY OF _____

BEFORE ME, the undersigned officer, who is duly authorized to administer oaths, personally appeared the undersigned affiant, who first being duly sworn on oath, deposes and says that the answers contained in the foregoing pleading are true and correct.

_ERICKA JOHNSON_
ERICKA JOHNSON

SWORN TO AND SUBSCRIBED BEFORE ME on this the 30 day of October, 2018, A.D.

_____
Notary Public

**JOSHUA A. STEIN**
**Notary Public**
**Bar No. 37885**
**State of Louisiana**
**Commission Issued for Life**

My Commission Expires: _____

## <u>CERTIFICATE OF SERVICE</u>

I, Eric Tiebauer, do hereby certify that I have this day, caused to be served a copy of the above and foregoing on counsel for all parties by filing through Alafile system which has sent notification of such filing unto the following:

Hon. Thomas L. Oliver, II
Hon. Howard G. Perdue, III
Hon. Allison Carr
100 Vestavia Parkway
Birmingham, AL 35216
Email: toliver@carrallison.com
         tperdue@carrallison.com

**SO CERTIFIED**, this the 5th day of October, 2018, A.D.

s/Eric Tiebauer
BY:   ERIC TIEBAUER, ASB# 2431-E68E

ERIC TIEBAUER, ASB# 2431-E68E
The Tiebauer Law Offices, LLC
P.O. Box 1421
Waynesboro, MS 39367
Phone: 601.735.5222
Fax: 601.735.5008
Email: tiebauer@att.net

**EXHIBIT D**

# PSP Detailed Report

**Federal Motor Carrier Safety Administration**

No crash or inspection results found.

| Driver Information | | | |
|---|---|---|---|
| Last Name | First Name | License # | State |
| MASSINGILL | MARK | ▮▮▮▮▮▮▮ | GA |

## Crash Activity

**Crash Summary (Crashes listed represent a driver's involvement in FMCSA-reportable crashes, without any determination as to responsibility.)**

| # of Crashes: | 0 | # of Crashes with Fatalities: | 0 | # of Crashes with Injuries: | 0 | # of Towaways: | 0 |
|---|---|---|---|---|---|---|---|
| | | # of Fatalities: | 0 | # of Injuries: | 0 | # of Hazmat Releases: | 0 |

**Crash Details (Crashes listed represent a driver's involvement in FMCSA-reportable crashes, without any determination as to responsibility.)**

| | Date | DOT # | Carrier Name | Driver Name | Driver Lic | State | Driver DOB | Rpt St | Report Number | Location | # Fatalities | # Injuries |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |

## Inspection Activity

**Inspection Summary**

| Driver Summary | | Vehicle Summary | | Hazmat Summary | |
|---|---|---|---|---|---|
| Driver Inspections: | 0 | Vehicle Inspections: | 0 | Hazmat Inspections | 0 |
| Driver Out-of-service Inspections: | 0 | Vehicle Out-of-service Inspections: | 0 | Hazmat Out-of-service Inspections: | 0 |
| Driver Out-of-service Rate: | 0% | Vehicle Out-of-service Rate: | 0% | Hazmat Out-of-service Rate: | 0% |

**Inspection Details**

| Carrier Info | | | Driver Info | | | | | Inspection Info | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Date | DOT # | Carrier Name | Driver Name | Driver Lic | State | Driver DOB | Rpt St | Report Number | Hazmat Insp | Insp Level | # of Viol |
| | | | | | | | | | | | | |

**Violation Summary**

| Violation # | Description | # of Violations | # of Out-of-service Violations |
|---|---|---|---|
| | | | |

The summary counts and rates do not include violations that were a result of the crash.  The summary counts and rates for the co-driver only include violations that were charged to the co-driver.  Summary counts and rates for the primary driver do not include violations charged to the co-driver.

Report executed at: 6/8/2014 10:25:45 PM

MCMIS snapshot date: 05/30/2014

\* Violation charged to co-driver    \*\* Post crash violation

For an explanation of FMCSA-reportable crashes see  https://www.psp.fmcsa.dot.gov/psp/FAQ.aspx.

Page 1 of 1

**ABF FREIGHT SYSTEM 000093**

# EXHIBIT E

## MEDICAL EXAMINER'S CERTIFICATE

I certify that I have examined **Mark Massingill** in accordance
with the Federal Motor Carrier Safety Regulations (49 CFR
391.41-391.49) and with knowledge of the driving duties, find
this person is qualified, and, if applicable, only when:

**NOVA**
MEDICAL CENTERS

- [x] wearing corrective lenses
- [ ] wearing hearing aid
- [ ] accompanied by a waiver/exemption
- [ ] driving within an exempt intracity zone (49 CFR 391.62)
- [ ] accompanied by a Skill Performance Evaluation Certificate (SPE)
- [ ] Qualified by operation of 49CFR 391.64

The information I have provided regarding this physical examination is true and complete. A
complete examination form with any attachment embodies my findings completely and
correctly, and is on file in my office.

------ fold here ------

## MEDICAL EXAMINER'S CERTIFICATE

I certify that I have examined **Mark Massingill** in accordance with the Federal Motor Carrier
Safety Regulations (49 CFR 391.41-391.49) and with knowledge of the driving duties, find this person is qualified; and, if applicable, only when:

- [x] wearing corrective lenses
- [ ] wearing hearing aid
- [ ] accompanied by a _____ waiver/exemption
- [ ] driving within an exempt intracity zone (49 CFR 391.62)
- [ ] accompanied by a Skill Performance Evaluation Certificate (SPE)
- [ ] Qualified by operation of 49 CFR 391.64

The information I have provided regarding this physical examination is true and complete. A complete examination form with any attachment embodies my findings completely and correctly and is on file in my office.

| SIGNATURE OF MEDICAL EXAMINER | TELEPHONE | DATE |
|---|---|---|
| *Joanne E. Williams* MD | 423·800·7500 | 7/1/14 |

MEDICAL EXAMINER'S NAME (PRINT)
JOANNE E. WILLIAMS, MD

- [x] MD
- [ ] DO
- [ ] Physician Assistant
- [ ] Chiropractor
- [ ] Advanced Practice Nurse

| MEDICAL EXAMINER'S LICENSE OR CERTIFICATE NO. / ISSUING STATE | NATIONAL REGISTRY NO. |
|---|---|
| 49417  |  TN | 4426803584 |

ABF FREIGHT SYSTEM 000114

**EXHIBIT F**

# CERTIFICATE OF COMPLETION

I certify that on October 17, 2014

## *Mark Massingill*

successfully completed training requirements
set forth in the Federal Motor Carrier Safety
Regulations for entry-level driver training
in accordance with 49 CFR 380.503

In recognition thereof, this certificate is awarded for

## **160 Hours of Training**



# UAFS

UNIVERSITY OF ARKANSAS · FORT SMITH

Center for Business and
Professional Development

**PO Box 3649**
**Fort Smith, AR  72913-3649**

| October 17, 2014 | Roy Duncan |
|---|---|
| Issued On | Instructor |
| | Instructor Signature |

ABF FREIGHT SYSTEM 000037

**EXHIBIT G**



**RDT**





# Record of Road Test

Mark E. Massingill
_____
Driver Name

Stops before crossing sidewalk when coming out of
   driveway or alley.......................................................... ☐
Stops clear of pedestrian crosswalks............................ ☐

**PART 6 — OPERATING IN TRAFFIC PASSING AND TURNING**

**A. TURNING**

Gets in proper lane well in advance........................... ☐
Signals well in advance .............................................. ☐
Checks traffic conditions and turns only when
   way is clear ............................................................. ☐
Does not swing wide or cut short while turning ......... ☐

**B. TRAFFIC SIGNS AND SIGNALS**

Does not approach signal prepared to stop
   if necessary ............................................................. ☐
Violates traffic signal ................................................. ☐
Runs yellow light ....................................................... ☐
Starts up too fast or too slow on green ...................... ☐
Fails to notice or heed traffic signs .......................... ☐
Runs "Stop" signs....................................................... ☐

**C. INTERSECTIONS**

Adjusts speed to permit stopping if necessary ......... ☐
Checks for cross traffic regardless of traffic controls ☐
Yields right-of-way for safety .................................... ☐

**D. GRADE CROSSING**

Adjusts speed to conditions....................................... ☐
Makes safe stop, if required ...................................... ☐
Selects proper gear .................................................... ☐

**E. PASSING**

Passes with insufficient clear space ahead .............. ☐
Passes in unsafe location: hill, curve, intersection... ☐
Fails to signal change of lanes ................................. ☐
Fails to warn driver being passed............................. ☐
Pulls out and back — uncertain................................. ☐
Tailgates, waiting chance to pass.............................. ☐
Blocks traffic with slow pass..................................... ☐
Cuts in too short returning to right lane.................... ☐

**F. SPEED**

Speed consistent with basic ability ........................... ☐
Adjusts speed properly to road, weather,
   traffic conditions, legal limits ................................ ☐
Slows down for rough roads ...................................... ☐
Slows down in advance of curves,
   intersections, etc. ................................................... ☐
Maintains consistent speed ....................................... ☐

**G. COURTESY AND SAFETY**

Depends on others for safety...................................... ☐
Yields right-of-way for safety ..................................... ☐
Fails to go ahead when given safety
   by others .................................................................. ☐
Tends to crowd other drivers or force way
   through traffic .......................................................... ☐
Fails to allow faster traffic to pass............................ ☐
Fails to keep right and in own lane ........................... ☐
Uses horn unnecessarily ............................................ ☐
Displays other discourtesy or improper conduct ....... ☐

**PART 7 — MISCELLANEOUS**

**A. GENERAL DRIVING ABILITY AND HABITS**

Consistently alert and attentive.................................. ☐
Consistently aware of changing traffic conditions ..... ☐
Adjusts driving to meet changing conditions ............ ☐
Performs routine functions without taking
   eyes from road ........................................................ ☐
Checks instruments regularly while driving .............. ☐
Takes instructions and suggestions willingly ............ ☐
Adequate self-confidence in driving .......................... ☐
Nervous, apprehensive................................................ ☐
Easily angered............................................................ ☐
Complains too much.................................................... ☐
Personal appearance, manner, cleanliness .............. ☐
Physical stamina ........................................................ ☐

**B. HANDLING OF FREIGHT**

Checks freight properly............................................... ☐
Handles and loads freight properly ........................... ☐
Handles bills properly ................................................ ☐
Breaks down load as required .................................... ☐

**C. RULES AND REGULATIONS**

Knowledge of company rules ..................................... ☐
Knowledge of regulations: federal, state, local.......... ☐
Knowledge of special truck routes ............................ ☐

**D. USE OF SPECIAL EQUIPMENT (Specify)**

................................................................ ☐

................................................................ ☐

**REMARKS:**

_____
_____
_____
_____

**GENERAL PERFORMANCE:**    SATISFACTORY ☒

**QUALIFIED FOR:**  TRUCK ☐    TRACTOR-SEMITRAILER ☑

Signature of Examiner: _Van Brown_

NEEDS TRAINING ☐    UNSATISFACTORY ☐

OTHER: (Specify) Double 28'

Date: 10/17/2014

**Distribution: Scan as RTP - Road Test Packet (Field)**

ABF FREIGHT SYSTEM 000098

# EXHIBIT H

*Mark Eugene Massengill*

SIGNATURE OF DRIVER

DRIVER'S LICENSE NO.

STATE GA

INTRASTATE ONLY ☐ Yes ☑ No   CDL ☐ Yes ☑ No

ADDRESS OF DRIVER

GA 30128

07 - 01 - 2015

**ABF** Freight

---

SIGNATURE OF MEDICAL EXAMINER   TELEPHONE 423-800-7500   DATE 7/1/2014

MEDICAL EXAMINER'S NAME (PRINT)

Joanne Williams, MD

☑ MD   ☐ Chiropractor
☐ DO   ☐ Advanced Practice Nurse
☐ Physician Assistant   ☐ Other

MEDICAL EXAMINER'S LICENSE OR CERTIFICATE NO./ISSUING STATE 49417 / TN   NATIONAL REGISTRY NO. 4426803584

SIGNATURE OF DRIVER   INTRASTATE ONLY | CDL   DRIVER'S LICENSE NO. | STATE GA

☐ Yes   ☐ Yes
☑ No    ☑ No

ADDRESS OF DRIVER (STREET/CITY/STATE/ZIP)   Lafayette, GA

MEDICAL CERTIFICATE EXPIRATION: 7/1/2015

ABF FREIGHT SYSTEM 000115

**EXHIBIT I**

Form MCSA-5875

Form MCSA-5875                                                    OMB No. 2126-0006  Expiration Date: __08/31/2018__

| Last Name: **Massingill**   First Name: **Mark**   DOB █████   Exam Date: **06/23/2016** |

## MEDICAL EXAMINER DETERMINATION (Federal)

*Use this section for examinations performed in accordance with the Federal Motor Carrier Safety Regulations (49 CFR 391.41-391.49):*

○ Does not meet standards *(specify reason)*:

○ Meets standards in 49 CFR 391.41; qualifies for 2-year certificate:

◉ Meets standards, but periodic monitoring required *(specify reason)*: **Previous high blood pressure; , Health History**

Driver qualified for:  ○ 3 months  ○ 6 months  ◉ 1 year  ○ Other:

☑ Wearing corrective lenses  ☐ Wearing hearing aid  ☐ Accompanied by a waiver/exemption  (specify type)
☐ Accompanied by a Skill Performance Evaluation (SPE) certificate  ☐ Qualified by operation of 49 CFR 391.64
☐ Driving within an exempt intracity zone (see 49 CFR 391.62)

○ Determination pending *(specify reason)*:

☐ Return to medical exam office for follow-up on *(must be 45 days or less)*:
☐ Medical Examination Report amended *(specify reason)*:
*(if amended)* Medical Examiner Signature: _____ Date:

○ Incomplete examination *(specify reason)*:

| If the driver meets the standards outlined in 49 CFR 391.41, then complete a Medical Examiner's Certificate as stated in 49 CFR 391.43(h), as appropriate. |

I have performed this evaluation for certification. I have personally reviewed all available records and recorded information pertaining to this evaluation, and attest that to the best of my knowledge, I believe it to be true and correct.

Medical Examiner Signature: _____

Medical Examiner Name *(please print or type)*: __Daniel Callan, D.O.__
Address: __5779 Brainerd Rd.__  City: __Chattanooga__  State: __TN__  Zip Code: __37411__
Medical Examiner's Telephone Number: __423-800-7500__  Date Certificate Signed: __06/23/2016__
Examiner's State License, Certificate, or Registration Number: __1905__  Issuing State: __TN__
☐ MD ☑ DO ☐ Physician Assistant ☐ Chiropractor ☐ Advanced Practice Nurse
☐ Other Practitioner (specify)_____
National Registry Number: __9481938399__

| Medical Examiner's Certificate Expiration Date: **06/23/2017** |

Page 4

ABF FREIGHT SYSTEM 000136

**EXHIBIT J**

Taken on **AUGUST 14, 2019**

Deposition of **ERICKA JOHNSON**

Deposition of
**ERICKA JOHNSON**

In the Matter of
**JAMES JOHNSON, JR., ET AL**
vs.
**ABF FREIGHT SYSTEM, INC.,
ET AL**

*CONDENSED*

Taken on
**AUGUST 14, 2019**



**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JAMES JOHNSON, JR. and      NO.2:18-cv-01835-MHH
ERICKA JOHNSON,
     Plaintiffs

VERSUS

ABF FREIGHT SYSTEM, INC., and
MARK EUGENE MASSINGILL

* * * * * * * * * * * * * * * * * * * * * * * * * *

     The video deposition of ERICKA JOHNSON, taken in connection with the captioned cause, pursuant to the following stipulations before MARY LEJEUNE-KEPHART, Certified Court Reporter, at the office of Baer Law, LLC, 3000 Kingman Street, Suite 200, Metairie, Louisiana 70006 on the 14th day of August 2019, beginning at 11:20 a.m.

**2**

```
 1  APPEARANCES:
 2  FOR THE PLAINTIFF: JAMES JOHNSON, JR., and
    ERICKA JOHNSON
 3      MR. JASON BAER, ESQ.
        BAER LAW, LLC
 4      3000 KINGMAN STREET, SUITE 200
        METAIRIE, LOUISIANA 70006
 5      jbaer@baerlawllc.com
 6
    FOR THE DEFENDANTS:  ABF FREIGHT SYSTEM, INC., and
 7  MARK EUGENE MASSINGILL
        MR. THOMAS L. OLIVER, II
 8      CARR ALLISON
        100 VESTAVIA PARKWAY
 9      BIRMINGHAM, ALABAMA 35216
        toliver@carrallison.com
10
11  ALSO PRESENT:
        MS. SHELLEY POUSSON
12      VIDEOGRAPHER FOR GODEPO
13
14

15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1         STIPULATION
 2      It is hereby stipulated by and among counsel for
 3  plaintiff and counsel for defense that the
 4  deposition of
 5         ERICKA JOHNSON,
 6  be taken before MARY LEJEUNE-KEPHART, Certified
 7  Court Reporter, by counsel for the defense for all
 8  purposes, pursuant to notice and to the provisions
 9  of the appropriate statutes of the Federal Rules of
10  Civil Procedure.
11      The parties hereto waive all formalities in
12  connection with the taking of said deposition,
13  including the reading and signing thereof, except
14  the swearing of the witness and the reduction of the
15  questions and answers to typewriting.
16      Per Article 1443(D) of the Louisiana Code of
17  Civil Procedure, counsel for all parties reserve all
18  objections until trial or other use of the
19  deposition.
20              * * *
21
22
23
24
25
```

**4**

```
 1              INDEX
 2  EXAMINATION BY MR. OLIVER. . . . . . . . . . . . . .6
 3
 4  OBJECTIONS:
 5  NO OBJECTIONS
 6
 7  EXHIBITS:
 8  NO EXHIBITS PRESENTED
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1 (Pages 1 to 4)

**5**

1    ERICKA JOHNSON,
2  after having been duly sworn, was examined and did
3  testify as follows:
4      VIDEOGRAPHER:
5          My name is Shelley Pousson of Veritext.
6      The date today is August 14th, 2019, and the
7      time is approximately 11:20 a.m.  This
8      deposition is being held in Metairie,
9      Louisiana.  The caption of this case is
10     James Johnson, Jr. and Ericka Johnson versus
11     ABF Freight System, Incorporated and Mark
12     Eugene Massingill in the U.S. District Court
13     for the Northern District of Alabama,
14     Southern Division.  The name of the witness
15     is Ericka Johnson.  At this time will
16     attorneys please identify themselves for the
17     record.
18     MR. BAER:
19         Jason Baer on behalf of James and
20     Ericka Johnson.
21     MR. OLIVER:
22         Tom Oliver, on behalf of Mark Eugene
23     Massingill and Arkansas Best.
24     VIDEOGRAPHER:
25         Will the Court Reporter please swear in

**6**

1      the witness?
2          (Witness Sworn In)
3  EXAMINATION BY MR. OLIVER:
4  Q    Would you state your full name for me?
5  A    Ericka Collins Johnson.
6  Q    Miss Johnson, I'm Tom Oliver.  I represent the
7      defendants in this matter.  Have you ever given
8      testimony before like we're doing here today?
9  A    No.
10 Q    Have you ever testified in court?
11 A    No.
12 Q    All right.  Do you understand everything you say
13     here today is under oath?
14 A    Yes.
15 Q    All right.  I'm going to be asking you a series
16     of questions about this case and your
17     background, but if I ever ask a question you
18     don't understand, just stop me and tell me, I
19     need you to rephrase that so you can understand
20     it, all right?
21 A    Okay.
22 Q    Now, the reason for that is when we get through,
23     we'll have a transcript from our court reporter
24     and a video from our videographer, and we want
25     to make sure that you understood the question,

**7**

1      and then told me the truth when you answered it,
2      all right?
3  A    Okay.
4  Q    All right.  If you need to take a break at any
5      time too, you just let me know and we'll stop
6      and take a break, okay?
7  A    Okay.
8  Q    All right.  What -- what's your current address?
9  A    ████████████ in Gretna, Louisiana ███
10 Q    And who lives there with you?
11 A    Myself and my two children, my daughter and my
12     son.
13 Q    And tell me their names and ages.
14 A    ████████████████████████████████████████
15     ████████████████████████████████████████
16 Q    And who's the father of ████████
17 A    James Johnson.
18 Q    And who's the father of ████
19 A    James Johnson.
20 Q    Are you and Mr. Johnson married currently?
21 A    Yes.
22 Q    Are y'all living together?
23 A    No, we're separated.
24 Q    How long have you been separated?
25 A    It's been about eleven months now.

**8**

1  Q    What was the reason for y'all's separation?
2  A    We just decided that it wouldn't work.  Just had
3      issues with him, you know, after his surgery,
4      and everything just added to it.  So we just
5      decided, you know, amongst each other that it
6      just wasn't going to work.
7  Q    And you said it started after his surgery?
8  A    Yes.
9  Q    Did y'all have any problems prior to his
10     surgery?
11 A    No.
12 Q    When were you guys first married?
13 A    That was in 2008, April 19th.
14 Q    And where did y'all get married?
15 A    At the courthouse.
16 Q    Which -- which one?
17 A    It was Jefferson Parish.  Jefferson Parish
18     courthouse.
19 Q    And have you been separated from Mr. Johnson any
20     other time since 2008?
21 A    No.
22 Q    You ever threatened to leave him any time
23     before, or since 2008?
24 A    No.
25 Q    Has he ever threatened to leave you before --

2 (Pages 5 to 8)

**9**

1      since 2008?
2  A   No.
3  Q   Have you been married to anyone else, other than
4      Mr. Johnson?
5  A   No.
6  Q   Do you have any other children, other than
7      London or Logan?
8  A   No.
9  Q   Is Collins your maiden name?
10 A   Yes.
11 Q   And where did you grow up?
12 A   I grew up in Algiers.  Algiers, Louisiana.
13 Q   Now I'm not from down here.  Tell me where that
14     is.
15 A   On the -- well, it's on the west bank.  This is
16     the east bank.  It's on the west bank, across
17     the Mississippi bridge.
18 Q   Were you born over there?
19 A   Yes, I was born in Gretna, which is not exactly
20     the same area, but it's on the west bank.  I was
21     born in Gretna.
22 Q   And did you go to school over there?
23 A   Yes, I went to school in Algiers.
24 Q   And what was the highest grade you finished over
25     there?

**10**

1  A   Twelfth.
2  Q   You graduated high school?
3  A   Yes.
4  Q   Which high school?
5  A   Oliver Perry Walker High School.
6  Q   Do you remember what year it was you graduated?
7  A   2002.
8  Q   Did you go on to college or any kind of school
9      after that?
10 A   I went to Louisiana Technical College, Sidney
11     Collier Campus in New Orleans.
12 Q   What did you study there?
13 A   Nursing, practical nursing.
14 Q   Did you get a -- a LPN degree?
15 A   Yes.
16 Q   When was that?
17 A   In 2007, June of 2007.
18 Q   Did you go full time between getting out of high
19     school and getting your degree?
20 A   Did I -- I'm sorry, can you rephrase?
21 Q   Did you attend -- did you attend college full
22     time?
23 A   Yes.  Yes, I did.
24 Q   It took five years to get that degree?
25 A   No.  No, I went to school for, it wasn't even a

**11**

1      year, I went to school in Alabama actually, but
2      I dropped out.
3  Q   Where did you go?
4  A   University of Alabama at Birmingham.
5  Q   Did you go to UAB before or after LA Tech?
6  A   Before.
7  Q   Was that right after high school?
8  A   Yes, it was right after school.
9  Q   What were you studying there?
10 A   Nursing.
11 Q   And you dropped out after a year?
12 A   Yeah, it was about a year.
13 Q   Did you finish two semesters there?
14 A   I don't quite remember.
15 Q   What was your reason for dropping out?
16 A   Homesick, and I was also working a full time job
17     then, so --
18 Q   Where were you working?
19 A   UAB Hospital.
20 Q   What were you doing?
21 A   Tech, like nursing assistant.
22 Q   How did you pick UAB as a college?
23 A   I heard about it, just word of mouth and that
24     they had a good nursing program.
25 Q   So that would have been probably the fall of

**12**

1      2002 into 2003 that you were at UAB?
2  A   Yes.
3  Q   All right.  Did you go back to UAB
4  A   No.
5  Q   -- for the spring semester?
6  A   No, I never went back.  I left and I never came
7      back.
8  Q   All right, let me -- let me make sure we
9      understand each other.
10 A   Uh-huh.
11 Q   You would have enrolled and started in the fall,
12     I assume?
13 A   Yes.
14 Q   Of 2002?
15 A   Uh-huh.
16 Q   And then did you finish your first semester
17     there?
18 A   I think I did finish the first semester.
19 Q   All right.
20 A   But I didn't -- when I left I didn't go back.
21 Q   You came home for Christmas, I suspect?
22 A   I can't really recall.  It's been so long, I
23     don't remember exactly what time frame it was.
24 Q   Well, what I'm trying -- I'm trying to
25     understand is, did you basically finish your

3 (Pages 9 to 12)

**13**

1  first semester, come home, and then just didn't
2  go back?
3  A  Yeah, I just didn't went back.  Huh-uh.
4  Q  Okay.  And then when was it that you then
5  enrolled at LA Tech?
6  A  That was sometime after, maybe a couple of
7  months after.  I don't remember the exact date.
8  Q  Sometime in 2003?
9  A  Uh-huh.
10  Q  And if you'll say yes or no --
11  A  Yes, I'm sorry.
12  Q  -- it'll be easier for her to take down.
13  A  Sorry, yes.
14  Q  And did you go full time at Louisiana Tech up
15  until the time you got your degree?
16  A  Yes.
17  Q  And you got your degree in LPN in 2007?
18  A  Yes.
19  Q  Did you work anywhere during those four years?
20  A  No.
21  Q  Did you go to work after you got your LPN
22  degree?
23  A  Yes.
24  Q  Before we talk about your work, did you go to
25  school, or have you had any additional schooling

**14**

1  since leaving Louisiana Tech in 2007?
2  A  No.
3  Q  Once you got your degree in 2007, where did you
4  first go to work?
5  A  The name at the time was St. Charles Healthcare
6  in New Orleans.
7  Q  And what kind of setting was that, a hospital?
8  A  Nursing home.
9  Q  What did you do there?
10  A  LPN.
11  Q  How long were you at the St. Charles Healthcare
12  facility?
13  A  A year.
14  Q  And why did you leave that job?
15  A  I just wasn't satisfied with the hours.
16  Q  Did you give them a notice that you were
17  leaving?
18  A  Yes, I did.
19  Q  They didn't fire you?
20  A  No.
21  Q  Where did you go next?
22  A  Let's see, the place name was Carrington.  It's
23  called Carrington Place of New Orleans.
24  Q  What kind of facility is that?
25  A  It's a nursing home.

**15**

1  Q  How long were you there?
2  A  About -- about two years.
3  Q  Did LPN work there?
4  A  Yes, same thing.
5  Q  And why did you leave them?
6  A  I had another job opportunity, a better job
7  opportunity.
8  Q  Where was that at?
9  A  United Medical Rehab Hospital in Gretna,
10  Louisiana.
11  Q  You weren't fired from Carrington though?
12  A  No.
13  Q  Okay.  How long were you with United Medical
14  Rehab Hospital?
15  A  About a year and a half to two years.
16  Q  Where were you working when you got married to
17  Mr. Johnson?
18  A  I was -- I was at either -- I was at Carrington.
19  I was at Carrington Place of New Orleans.
20  Q  How long had you known him before you got
21  married?
22  A  About a year and a half.
23  Q  How did y'all meet?
24  A  Through a family member.
25  Q  What family member is that?

**16**

1  A  Actually it's just family.  I just knew his
2  family for a long time, so it's really no one in
3  particular.
4  Q  Did y'all grow up together?
5  A  No.
6  Q  Did y'all date for that year and a half before
7  you got married?
8  A  Yes.
9  Q  Ever break off from dating before you got
10  married?
11  A  No.
12  Q  Married in 2008, when did you first have London?
13  A  I had her in 2008 as well.
14  Q  Were you pregnant when y'all got married?
15  A  Yes.
16  Q  Was that the reason y'all got married?
17  A  No.
18  Q  And after you had her I assume you continued
19  working?
20  A  Yes, I did.
21  Q  Worked at United Rehab for, you told me a year
22  to two years?
23  A  Yes.
24  Q  What did you do there?
25  A  LPN.

**17**

1  Q   And why did you leave them?
2  A   I don't remember why I left that job at that
3      time.
4  Q   Did you get fired?
5  A   No, I've never been fired off a job.
6  Q   Where did you go next?
7  A   I went to -- I went back to St. Charles
8      Healthcare in New Orleans.
9  Q   How long did you stay with them during that
10     time?
11 A   I know it was at least -- at least a year.  I
12     don't remember exactly.
13 Q   Doing LPN work?
14 A   Yes.
15 Q   Do you remember why you left them?
16 A   No.
17 Q   Did you quit and give a notice?
18 A   Yes.
19 Q   Where did you work next?
20 A   I was at United Medical after I had her.  United
21     Medical Rehab in Gretna.  I was there.
22 Q   This is after you had Logan?
23 A   Yes.
24 Q   All right.  Was she already born when you
25     started at United Medical?

**18**

1  A   Yes, she was.
2  Q   Were you doing LPN work again there?
3  A   Yes.
4  Q   And how long did you stay with them then, or are
5      you still with them?
6  A   No, I'm not still with them.
7  Q   Okay.  How long were you with them the second
8      time?
9  A   Probably about a year.
10 Q   And what was your reason for leaving them that
11     time?
12 A   I don't remember.
13 Q   Where did you go after that?
14 A   West Jefferson Healthcare in Harvey, Louisiana.
15 Q   Where is Harvey?
16 A   Harvey is also on the west bank.  It's also on
17     the west bank.
18 Q   And how long did you work there?
19 A   I'm still with them now.
20 Q   Were you still living with Mr. Johnson when you
21     started at West Jefferson?
22 A   Yes.
23 Q   What do you do for West Jefferson?
24 A   LPN.
25 Q   And do you report to an RN?

**19**

1  A   Yes, I have my RN supervisor.
2  Q   Who is that?
3  A   Right now, his name is Tom.  I can't remember
4      his last name.  He's new.
5  Q   Who did you report to before Tom?
6  A   Veronica.  Her last name is Thompson.
7  Q   She still work there?
8  A   Yeah, she's there.
9  Q   She is?
10 A   Uh-huh.
11 Q   All right.  What's her role now?
12 A   Now she's just a floor nurse.
13 Q   How long would you say you were with West
14     Jefferson before you separated with Mr. Johnson?
15 A   I'm not sure.
16 Q   Did you have any problems at work that
17     contributed to y'all splitting up?
18 A   No, I didn't have problems at work.
19 Q   Did you ever confide in any co-workers about the
20     problems you were having with Mr. Johnson before
21     y'all split up?
22 A   No.
23 Q   Did you have any friends or family you confided
24     in about problems you were having with Mr.
25     Johnson before y'all separated?

**20**

1  A   No.
2  Q   Didn't talk to any family or friends about it?
3  A   No.
4  Q   Did you have to seek any kind of counseling of
5      any kind before y'all separated?
6  A   No, I didn't go to a counselor.
7  Q   Do you know if Mr. Johnson did?
8  A   Did he go to counseling?
9  Q   Yes.
10 A   Not that I'm aware of, no.
11 Q   Have you had any kind of counseling since the
12     separation?
13 A   No.
14 Q   Has he?
15 A   No, I don't think so.
16 Q   Could you describe for me how your marriage was
17     prior to the separation?
18 A   We were fine.  We both were working.  Well, of
19     course he -- after he had his accident he wasn't
20     working, but I was still working.  We were fine,
21     you know.  We were happy.  My children were
22     happy.
23 Q   He continued to work for a little while after
24     this accident, correct?
25 A   Uh-huh.  Yes.

**5 (Pages 17 to 20)**

**21**

1  Q   Was everything okay while he was back to work
2      after the accident?
3  A   No, cause he was still having pain.  At that
4      time he just wasn't sure what was going on.
5  Q   But as far as your marriage, how --
6  A   My marriage was fine.
7  Q   Good.  And was it good up till the time he had
8      that surgery.
9  A   Yeah, it was -- it was okay up until the time he
10     had the surgery.
11 Q   And if you can for us, describe what -- what
12     happened after the surgery.
13 A   Attitude, mood swings.  Just seemed to cast his
14     emotions out on everybody else around him.
15 Q   When you say his attitude changed, how did it
16     change?
17 A   He had mood swings.  He was angry.
18 Q   Was he angry at you or the kids or what?
19 A   I don't think it was necessarily us, it just was
20     the frustration of going through the surgery and
21     not being able to work.
22 Q   Did his not being able to work put a financial
23     strain on y'all?
24 A   Yes, it did.
25 Q   Did that cause issues in the marriage?

**22**

1  A   Yes, it did.
2  Q   Were you the sole generator of income of the
3      family once he stopped working?
4  A   Yes.
5  Q   Did that cause y'all to have trouble paying
6      bills?
7  A   Yes, we did.
8  Q   Did that cause trouble in the marriage?
9  A   Yes.
10 Q   Anything else that you can list for me, since
11     this is my only time to talk to you, things that
12     caused trouble with your marriage after his
13     surgery.
14 A   Yeah, outside of the anger and the mood swings,
15     you know -- you know, we had to, you know, admit
16     him into the hospital.
17 Q   I'm sorry?
18 A   Admit him into the hospital.
19 Q   For what?
20 A   He was having outbursts.  He, you know, said
21     that he was gonna hurt his self [sic], so we had
22     him admitted into the hospital.  He ended up
23     going to isolation at a psych facility.
24 Q   Where was that, if you recall?
25 A   West Jeff Hospital.  It's on the west bank in

**23**

1      Marrero, Louisiana.
2  Q   You were -- when did that occur?
3  A   That was last year.  It was around the holidays,
4      either November or December around Christmas.
5  Q   Tell me about that.  How did that come about?
6  A   Just -- it could have been -- it's something
7      somewhere in the conversation, and he just, you
8      know, went into a outrage.
9  Q   He was what now?
10 A   It was just as simple as a conversation, and he
11     just, you know -- he would just, any little
12     thing.  You know, he would just get agitated,
13     you know, and he went into that and you know, we
14     had him -- you know, had him admitted and
15     evaluated.
16 Q   Did he voluntarily go to be checked out?
17 A   Yes.
18 Q   Or did you have to force him to be --
19 A   No, we didn't have to force him.  He voluntarily
20     went.
21 Q   Was he admitted?
22 A   Yes, he was.
23 Q   How long?
24 A   It may have been two weeks.
25 Q   Was he released back home after that?

**24**

1  A   Yes.
2  Q   Did he come back home?
3  A   Yes.
4  Q   And how long did y'all stay together after that?
5  A   We separated in either August or September.
6  Q   The following year?
7  A   Yes.
8  Q   All right.  Did y'all have any issues between
9      the time he came home from West Jefferson
10     Hospital, up until the separation?
11 A   No, it's just that we just wasn't -- wasn't
12     getting along.
13 Q   Was there another man or woman involved in
14     either relationship?
15 A   No.
16 Q   Did y'all do any kind of trial separation where
17     one left the other before the -- you finally
18     moved out and separated?
19 A   Can you rephrase it?
20 Q   Yep.  You said the separation occurred in August
21     or September, right?
22 A   Yes.
23 Q   Between the time he got out of the hospital, the
24     -- call the November/December time frame before
25     and that August/September, did y'all separate

**25**

```
1      any during those --
2  A   In between?
3  Q   -- eight or nine months?
4  A   No.
5  Q   Okay.  So you were still together, still living
6      under the same roof?
7  A   No, we're not together.
8  Q   Back then you were?
9  A   Then, yes.
10 Q   Yeah, during that nine month period --
11 A   After he got out of the hospital?
12 Q   Yes.
13 A   Yes.
14 Q   Okay.  Did he ever have to go back in the
15     hospital, the psych hospital for any reason
16     during that time?
17 A   No, he didn't go back.
18 Q   Did you recommend that he do that?
19 A   No.
20 Q   Did the marriage change in any other way between
21     the time he got out of the psych hospital and
22     the time you separated?
23 A   No.
24 Q   Kids were still there?
25 A   Yes.
```

**26**

```
1  Q   Every -- everybody was together?
2  A   Yes.
3  Q   In the same household?
4  A   No, when we separated, we separated.  I left,
5      you know, with my children.
6  Q   But up till that time y'all were --
7  A   Up to the time we were together.
8  Q   -- all lived together as a family unit?
9  A   Yes.
10 Q   Was there anything else about your marriage or
11     your family situation changed during that time?
12 A   No, other than the, you know, the issue of him
13     not working and -- no.
14 Q   What was he doing during that time when he
15     wasn't working?
16 A   He couldn't do anything because of his back.
17 Q   Tell me how that was different from what he had
18     been able to do before.
19 A   Well, after the surgery he couldn't -- he
20     couldn't bend over.  He couldn't sit for long
21     periods of time.
22 Q   Were there any kind of things around the house
23     or in the family that he no longer could do that
24     he used to do?
25 A   Yeah, he used to move things around.  He
```

**27**

```
1      couldn't do any -- any of that.  Yard work he
2      couldn't do.
3  Q   Who did your yard work?
4  A   There was a guy that came and cut the grass.
5  Q   Who was that?
6  A   I don't remember his name.
7  Q   Did you have to pay him, or did he do it
8      voluntarily?
9  A   No, he didn't pay him.  His mom paid him.
10 Q   Any other things that he no longer did around
11     the house or with the family?
12 A   Other than the yard work, moving things around.
13     He was always active, working out.  He couldn't
14     do any of that.  And that's -- that's about it.
15 Q   Were you still doing the same things you had
16     done in the household?
17 A   Yes.
18 Q   Did you have to do anything extra after his
19     surgery?
20 A   Well, I had -- got a second job.  I work two
21     jobs.
22 Q   Where was that at?
23 A   I am still at West Jeff Healthcare, and the
24     second job is Chateau des Notre Dame in New
25     Orleans.
```

**28**

```
1  Q   What is that?
2  A   It's a -- it's under Catholic charities.  It's
3      assisted living and a nursing home.
4  Q   When did you start that second job?
5  A   I started that job about six months ago.
6  Q   So this was after you had separated?
7  A   Yeah.  Yes.
8  Q   And why did you take that second job?
9  A   So that I can -- bills, rent.  Take care of
10     myself and my kids.
11 Q   Are you having to pay, now that you're
12     separated, are you having to pay anything on Mr.
13     Johnson's behalf?
14 A   No.
15 Q   And did you have to work a second job between
16     the time of his surgery and the time of the
17     separation?
18 A   No.
19 Q   Anything else as far as your marriage or family
20     change after the surgery, but up to the
21     separation that you hadn't told me about?
22 A   No.
23     MR. BAER:
24         Tom, are you talking about including
25     her kids, or just her?
```

**7 (Pages 25 to 28)**

**29**

1  MR. OLIVER:
2  Her or the family, either one.
3  A  Okay. As far as the kids are concerned, they're
4  solely with me, so they don't see him as much as
5  they would if he was in the household.
6  BY MR. OLIVER:
7  Q  Have y'all entered into any type of custody
8  arrangement?
9  A  No.
10  Q  How often do you talk to Mr. Johnson since
11  you've separated?
12  A  Every so often.
13  Q  Give me an idea what you're thinking of.
14  A  Maybe once every two weeks.
15  Q  And how often do you see him?
16  A  Maybe once or twice a month.
17  Q  And when you talk to him, what is that typically
18  about?
19  A  It's mostly about the kids, him seeing the kids.
20  Q  Does he have regular visitation or time with
21  them?
22  A  Yes.
23  Q  When does he see them?
24  A  Normally it's -- he has to really go around my
25  work schedule, so normally I'd say maybe once a

**30**

1  week, but it's -- it defers (sic) in days. Not
2  necessarily on the weekend, but it may be during
3  the week when I'm off.
4  Q  So does he always see them when you're off?
5  A  Yes, most -- most of the time.
6  Q  And why is that?
7  A  Because I would be the one bringing them and --
8  bringing them to him. Sometimes he gets them.
9  He comes and picks them up. It just depends.
10  Q  Do you allow him to see them unsupervised?
11  A  Yes.
12  Q  Okay. No concern there?
13  A  No.
14  Q  Does he provide any financial support for them?
15  A  As much as he can, yes.
16  Q  And how much would you say that is?
17  A  It may be something like school shoes or along
18  those lines.
19  Q  Does he pay you any kind of weekly or monthly
20  benefit?
21  A  No.
22  Q  And do you pay him any kind of weekly or monthly
23  benefit?
24  A  No.
25  Q  Is there any kind of child support order or

**31**

1  anything like that?
2  A  No. No.
3  Q  Y'all are just living apart by agreement?
4  A  Yes.
5  Q  Okay. Was there any change in your marriage or
6  relationship with Mr. Johnson before the
7  surgery, but after the accident?
8  A  No.
9  Q  Was there any change in y'all's relationship
10  after the accident between you and Mr. Johnson?
11  A  Yes.
12  Q  Can you tell me about that.
13  A  The -- I mean, what I told you about the
14  attitude and the mood swings that he was having.
15  Q  Other than his attitude, mood swings, his
16  emotions, did it change anything physically
17  between the two of you?
18  A  Yes.
19  Q  Can you tell me about that.
20  A  It just wasn't happening period, at all.
21  Q  And when you say it wasn't happening, what --
22  what are you talking about there?
23  A  Sexual relations.
24  Q  And when did that problem start? Was it after
25  the surgery?

**32**

1  A  After the surgery, yes.
2  Q  I don't mind to pry.
3  A  It's fine.
4  Q  It's sensitive, but can you tell me about --
5  give me some comparison of how it was before to
6  how it was after the surgery.
7  A  We didn't have any limitations before. After,
8  it was very limited.
9  Q  Can you quantify that, give me an idea of what
10  you're talking about there?
11  A  The actual acts, it just didn't happen.
12  Q  At all?
13  A  No.
14  Q  Is that -- is that -- are we agreeing with each
15  other, or --
16  A  No, we're agreeing.
17  Q  Okay.
18  A  It didn't happen at all.
19  Q  After the surgery?
20  A  After the surgery.
21  Q  No sexual relations whatsoever?
22  A  No.
23  Q  Did that contribute to the breakup?
24  A  Yes, that probably was part of it, along with us
25  just not getting along.

**8 (Pages 29 to 32)**

**33**

1 Q   Was that a problem for you or for him, or for
2   both?
3 A   Both.
4 Q   Were there any other reasons y'all weren't
5   having sexual relations after the surgery?
6 A   No.
7 Q   Did y'all have to seek any kind of counseling or
8   help about that?
9 A   We never went to counseling, no.
10 Q   Seek the help of any kind of pastor or anyone
11   like that?
12 A   No.
13 Q   Did y'all go to church back before the accident
14   happened?
15 A   No, we didn't.
16 Q   Are you currently seeing anyone else?
17 A   No.
18 Q   A man or woman?
19 A   No.
20 Q   Have you tried to reconcile with Mr. Johnson in
21   any way since y'all's separation?
22 A   No.
23 Q   Has he tried to reconcile with you?
24 A   He have insinuated, but no.
25 Q   And what do you mean by that?

**34**

1 A   He may have asked, you know, just say we needed
2   to talk or whatever, but I just disregarded it.
3 Q   And why is that?
4 A   It's been -- that was like months ago, early on.
5   Yeah.
6 Q   You have any desire to reconcile with him at
7   this point?
8 A   Not at this point, no.
9 Q   All right, I think that's all I've got.  Thank
10   you very much.
11   MR. BAER:
12     I don't have any questions.
13   VIDEOGRAPHER:
14     This concludes the deposition.  We're
15   off the record at 12:00.
16   MADAME COURT REPORTER:
17     Mr. Baer, do you want a copy?
18   MR. BAER:
19     Yes, e-copy.
20     DEPOSITION CONCLUDED AT 12:00 P.M.
21
22
23
24
25

**35**

1     REPORTER'S PAGE
2
3     I, MARY LEJEUNE-KEPHART, Certified Court
4 Reporter in and for the State of Louisiana, the
5 officer, as defined in Rule 28 of the Federal Rules
6 of Civil Procedure and/or the Article 1434(B) of the
7 Louisiana Code of Civil Procedure, before whom this
8 proceeding was taken, do hereby state on the Record:
9     That due to the spontaneous nature of the
10 interaction and discourse of the proceeding, double-
11 dashes (--) have been used to indicate pauses,
12 changes of thought and/or talk overs; that such is
13 the universally accepted method for a court
14 reporter's transcription of a proceeding; that
15 double-dashes (--) do not indicate that words or
16 phrases have been left out of the transcript;
17     And that the spelling of any words and/or names
18 which could not be verified through reference
19 resources have been denoted with the parenthetical
20 phrase "(spelled phonetically)."
21
22
23
24   Certified Court Reporter
25

**36**

1     CERTIFICATE
2
3     This certification is valid only for a
4 transcript accompanied by my original signature and
5 original required seal on this certificate.
6     I, MARY LEJEUNE-KEPHART, Certified Court
7 Reporter in and for the State of Louisiana, as the
8 officer before whom this testimony was taken, do
9 hereby certify that ERICKA JOHNSON., after having
10 been duly sworn by me upon authority of R.S.
11 37:2554, did testify on the 14TH day of AUGUST 2019,
12 at METAIRIE, Louisiana, as hereinbefore set forth in
13 the foregoing 35 pages; that this testimony was
14 reported by me in the voice-mask reporting method,
15 was prepared and transcribed by me or under my
16 personal direction and supervision, and is true and
17 correct to the best of my ability and understanding;
18 that the transcript has been prepared in compliance
19 with the transcript format guidelines required by
20 statute and rules of the board; that I am informed
21 about the complete arrangement, financial or
22 otherwise, with the person or entity making
23 arrangements for deposition services; that I have
24 acted in compliance with the prohibition on
25 contractual relationships, as defined by Louisiana

37

1   Code of Civil Procedure Article 1434 and rules of
2   the board; that I have no actual knowledge of any
3   prohibited employment or contractual relationship,
4   direct or indirect, between a court reporting firm
5   and any party litigant in this matter, nor is there
6   any such relationship between myself and a party
7   litigant in this matter; that I am not related to
8   counsel or to any of the parties hereto, I am in no
9   manner associated with counsel for any of the
10  interested parties to this litigation, and I am in
11  no way concerned with the outcome thereof.
12      This 14th day of AUGUST 2019, Metairie,
13  Louisiana.
14
15
16
17
18
19
20      Certified Court Reporter
21
22
23
24
25

**A**

a.m 1:22 5:7
ABF 1:11 2:6 5:11
ability 36:17
able 21:21,22
  26:18
accepted 35:13
accident 20:19,24
  21:2 31:7,10
  33:13
accompanied
  36:4
acted 36:24
active 27:13
acts 32:11
actual 32:11 37:2
added 8:4
additional 13:25
address 7:8
admit 22:15,18
admitted 22:22
  23:14,21
ages 7:13
agitated 23:12
ago 28:5 34:4
agreeing 32:14,16
agreement 31:3
Alabama 1:2 2:9
  5:13 11:1,4
Algiers 9:12,12,23
ALLISON 2:8
allow 30:10
and/or 35:6,12,17
anger 22:14
angry 21:17,18
answered 7:1
answers 3:15
apart 31:3
APPEARANCES
  2:1
appropriate 3:9
approximately
  5:7
April 8:13
area 9:20
Arkansas 5:23
arrangement 29:8
  36:21
arrangements
  36:23
Article 3:16 35:6

37:1
asked 34:1
asking 6:15
assistant 11:21
assisted 28:3
associated 37:9
assume 12:12
  16:18
attend 10:21,21
attitude 21:13,15
  31:14,15
attorneys 5:16
August 1:21 5:6
  24:5,20 36:11
  37:12
August/Septem...
  24:25
authority 36:10
aware 20:10

**B**

back 12:3,6,7,20
  13:2,3 17:7 21:1
  23:25 24:2 25:8
  25:14,17 26:16
  33:13
background 6:17
Baer 1:19 2:3,3
  5:18,19 28:23
  34:11,17,18
bank 9:15,16,16
  9:20 18:16,17
  22:25
basically 12:25
beginning 1:22
behalf 5:19,22
  28:13
bend 26:20
benefit 30:20,23
best 5:23 36:17
better 15:6
bills 22:6 28:9
Birmingham 2:9
  11:4
board 36:20 37:2
born 9:18,19,21
  17:24
break 7:4,6 16:9
breakup 32:23
bridge 9:17
bringing 30:7,8

**C**

call 24:24
called 14:23
Campus 10:11
caption 5:9
captioned 1:17
care 28:9
CARR 2:8
Carrington 14:22
  14:23 15:11,18
  15:19
case 5:9 6:16
cast 21:13
Catholic 28:2
cause 1:17 21:3
  21:25 22:5,8
caused 22:12
certificate 36:1,5
certification 36:3
Certified 1:19 3:6
  35:3,24 36:6
  37:20
certify 36:9
change 21:16
  25:20 28:20
  31:5,9,16
changed 21:15
  26:11
changes 35:12
charities 28:2
Charles 14:5,11
  17:7
Chateau 27:24
checked 23:16
child 30:25
children 7:11 9:6
  20:21 26:5
Christmas 12:21
  23:4
church 33:13
Civil 3:10,17 35:6
  35:7 37:1
co-workers 19:19
Code 3:16 35:7
  37:1
college 10:8,10,21
  11:22
Collier 10:11
Collins 6:5 9:9
come 13:1 23:5
  24:2

comes 30:9
comparison 32:5
complete 36:21
compliance 36:18
  36:24
concern 30:12
concerned 29:3
  37:11
CONCLUDED
  34:20
concludes 34:14
confide 19:19
confided 19:23
connection 1:17
  3:12
continued 16:18
  20:23
contractual 36:25
  37:3
contribute 32:23
contributed 19:17
conversation 23:7
  23:10
copy 34:17
correct 20:24
  36:17
counsel 3:2,3,7,17
  37:8,9
counseling 20:4,8
  20:11 33:7,9
counselor 20:6
couple 13:6
course 20:19
court 1:1,19 3:7
  5:12,25 6:10,23
  7:9 34:16 35:3
  35:13,24 36:6
  37:4,20
courthouse 8:15
  8:18
current 7:8
currently 7:20
  33:16
custody 29:7
cut 27:4

**D**

Dame 27:24
dashes 35:11
date 5:6 13:7 16:6
dating 16:9
daughter 7:11

day 1:21 36:11
  37:12
days 30:1
December 23:4
decided 8:2,5
defendants 2:6
  6:7
defense 3:3,7
defers 30:1
defined 35:5
  36:25
degree 10:14,19
  10:24 13:15,17
  13:22 14:3
denoted 35:19
depends 30:9
deposition 1:16
  3:4,12,19 5:8
  34:14,20 36:23
des 27:24
describe 20:16
  21:11
desire 34:6
different 26:17
direct 37:4
direction 36:16
discourse 35:10
disregarded 34:2
District 1:1,2 5:12
  5:13
Division 1:3 5:14
doing 6:8 11:20
  17:13 18:2
  26:14 27:15
double- 35:10
double-dashes
  35:15
dropped 11:2,11
dropping 11:15
due 35:9
duly 5:2 36:10

**E**

e-copy 34:19
early 34:4
easier 13:12
east 9:16
eight 25:3
either 15:18 23:4
  24:5,14 29:2
eleven 7:25
emotions 21:14

31:16
employment 37:3
ended 22:22
enrolled 12:11
  13:5
entered 29:7
entity 36:22
Ericka 1:6,16 2:2
  3:5 5:1,10,15,20
  6:5 36:9
ESQ 2:3
Eugene 1:12 2:7
  5:12,22
evaluated 23:15
everybody 21:14
  26:1
exact 13:7
exactly 9:19 12:23
  17:12
EXAMINATION
  4:2 6:3
examined 5:2
EXHIBITS 4:7,8
extra 27:18

_____
F
facility 14:12,24
  22:23
fall 11:25 12:11
family 15:24,25
  16:1,2 19:23
  20:2 22:3 26:8
  26:11,23 27:11
  28:19 29:2
far 21:5 28:19
  29:3
father 7:16,18
Federal 3:9 35:5
finally 24:17
financial 21:22
  30:14 36:21
fine 20:18,20 21:6
  32:3
finish 11:13 12:16
  12:18,25
finished 9:24
fire 14:19
fired 15:11 17:4,5
firm 37:4
first 8:12 12:16,18
  13:1 14:4 16:12
five 10:24

floor 19:12
following 1:18
  24:6
follows 5:3
force 23:18,19
foregoing 36:13
formalities 3:11
format 36:19
forth 36:12
four 13:19
frame 12:23
  24:24
Freight 1:11 2:6
  5:11
friends 19:23 20:2
frustration 21:20
full 6:4 10:18,21
  11:16 13:14

_____
G
Gary 7:9
generator 22:2
getting 10:18,19
  24:12 32:25
give 14:16 17:17
  29:13 32:5,9
given 6:7
go 9:22 10:8,18
  11:3,5 12:3,20
  13:2,14,21,24
  14:4,21 17:6
  18:13 20:6,8
  23:16 25:14,17
  29:24 33:13
GODEPO 2:12
going 6:15 8:6
  21:4,20 22:23
gonna 22:21
good 11:24 21:7,7
grade 9:24
graduated 10:2,6
grass 27:4
Gretna 7:9 9:19
  9:21 15:9 17:21
grew 9:12
grow 9:11 16:4
guidelines 36:19
guy 21:7
guys 8:12

_____
H
half 15:15,22 16:6

happen 32:11,18
happened 21:12
  33:14
happening 31:20
  31:21
happy 20:21,22
Harvey 18:14,15
  18:16
Healthcare 14:5
  14:11 17:8
  18:14 27:23
heard 11:23
held 5:8
help 33:8,10
hereinbefore
  36:12
hereto 3:11 37:8
high 10:2,4,5,18
  11:7
highest 9:24
holidays 23:3
home 12:21 13:1
  14:8,25 23:25
  24:2,9 28:3
Homesick 11:16
hospital 11:19
  14:7 15:9,14
  22:16,18,22,25
  24:10,23 25:11
  25:15,15,21
hours 14:15
house 26:22 27:11
household 26:3
  27:16 29:5
Huh-uh 13:3
hurt 22:21

_____
I
idea 29:13 32:9
identify 5:16
II 2:7
including 3:13
  28:24
income 22:2
Incorporated
  5:11
INDEX 4:1
indicate 35:11,15
indirect 37:4
informed 36:20
insinuated 33:24
interaction 35:10

interested 37:10
involved 24:13
isolation 22:23
issue 26:12
issues 8:3 21:25
  24:8
it'll 13:12

_____
J
James 1:5 2:2
  5:10,19 7:17,19
Jason 2:3 5:19
jbaer@baerlaw...
  2:5
Jeff 22:25 27:23
Jefferson 8:17,17
  18:14,21,23
  19:14 24:9
job 11:16 14:14
  15:6,6 17:2,5
  27:20,24 28:4,5
  28:8,15
jobs 27:21
Johnson 1:5,6,16
  2:2,2 3:5 5:1,10
  5:10,15,20 6:5,6
  7:14,14,17,19
  7:20 8:19 9:4
  15:17 18:20
  19:14,20,25
  20:7 29:10 31:6
  31:10 33:20
  36:9
Johnson's 28:13
Jr 1:5 2:2 5:10
June 10:17

_____
K
kids 21:18 25:24
  28:10,25 29:3
  29:19,19
kind 10:8 14:7,24
  20:4,5,11 24:16
  26:22 30:19,22
  30:25 33:7,10
Kingman 1:20 2:4
knew 16:1
know 7:5 8:3,5
  17:11 20:7,21
  22:15,15,15,20
  23:8,11,12,13
  23:13,14 26:5

26:12 34:1
knowledge 37:2
known 15:20

_____
L
L 2:7 3:1
LA 11:5 13:5
Law 1:19 2:3
leave 8:22,25
  14:14 15:5 17:1
leaving 14:1,17
  18:10
left 12:6,20 17:2
  17:15 24:17
  26:4 35:16
LEJEUNE-KE...
  1:18 3:6 35:3
  36:6
Let's 14:22
limitations 32:7
limited 32:8
lines 30:18
list 22:10
litigant 37:5,7
litigation 37:10
little 20:23 23:11
lived 26:8
lives 7:10
living 7:22 18:20
  25:5 28:3 31:3
LLC 1:20 2:3
Logan 7:14,18 9:7
  17:22
London 7:14,16
  9:7 16:12
long 7:24 12:22
  14:11 15:1,13
  15:20 16:2 17:9
  18:4,7,18 19:13
  23:23 24:4
  26:20
longer 26:23
  27:10
Louisiana 1:21
  2:4 3:16 5:9 7:9
  9:12 10:10
  13:14 14:1
  15:10 18:14
  23:1 35:4,7 36:7
  36:12,25 37:13
LPN 10:14 13:17
  13:21 14:10

15:3 16:25
17:13 18:2,24

**M**

**MADAME** 34:16
**maiden** 9:9
**making** 36:22
**man** 24:13 33:18
**manner** 37:9
**Mark** 1:12 2:7
5:11,22
**Marrero** 23:1
**marriage** 20:16
21:5,6,25 22:8
22:12 25:20
26:10 28:19
31:5
**married** 7:20 8:12
8:14 9:3 15:16
15:21 16:7,10
16:12,14,16
**MARY** 1:18 3:6
35:3 36:6
**Massingill** 1:12
2:7 5:12,23
**matter** 6:7 37:5,7
**mean** 31:13 33:25
**Medical** 15:9,13
17:20,21,25
**meet** 15:23
**member** 15:24,25
**Metairie** 1:20 2:4
5:8 36:12 37:12
**method** 35:13
36:14
**mind** 32:2
**Mississippi** 9:17
**mom** 27:9
**month** 25:10
29:16
**monthly** 30:19,22
**months** 7:25 13:7
25:3 28:5 34:4
**mood** 21:13,17
22:14 31:14,15
**mouth** 11:23
**move** 26:25
**moved** 24:18
**moving** 27:12

**N**

**N** 3:1

**name** 5:5,14 6:4
9:9 14:5,22 19:3
19:4,6 27:6
**names** 7:13 35:17
**nature** 35:9
**necessarily** 21:19
30:2
**need** 6:19 7:4
**needed** 34:1
**never** 12:6,6 17:5
33:9
**new** 10:11 14:6,23
15:19 17:8 19:4
27:24
**nine** 25:3,10
**NO.2:18-cv-018...**
1:5
**normally** 29:24
29:25
**Northern** 1:2 5:13
**notice** 3:8 14:16
17:17
**Notre** 27:24
**November** 23:4
**November/Dece...**
24:24
**nurse** 19:12
**nursing** 10:13,13
11:10,21,24
14:8,25 28:3

**O**

**O** 3:1
**oath** 6:13
**objections** 3:18
4:4,5
**occur** 23:2
**occurred** 24:20
**office** 1:19
**officer** 35:5 36:8
**okay** 6:21 7:3,6,7
13:4 15:13 18:7
21:1,9 25:5,14
29:3 30:12 31:5
32:17
**old** 7:14,15
**Oliver** 2:7 4:2
5:21,22 6:3,6
10:5 29:1,6
**once** 14:3 22:3
29:14,16,25
**opportunity** 15:6

15:7
**order** 30:25
**original** 36:4,5
**Orleans** 10:11
14:6,23 15:19
17:8 27:25
**outbursts** 22:20
**outcome** 37:11
**outrage** 23:8
**outside** 22:14
**overs** 35:12

**P**

**P** 3:1
**P.M** 34:20
**PAGE** 35:1
**pages** 36:13
**paid** 27:9
**pain** 21:3
**parenthetical**
35:19
**Parish** 8:17,17
**PARKWAY** 2:8
**part** 32:24
**particular** 16:3
**parties** 3:11,17
37:8,10
**party** 37:5,6
**pastor** 33:10
**pauses** 35:11
**pay** 27:7,9 28:11
28:12 30:19,22
**paying** 22:5
**period** 25:10
31:20
**periods** 26:21
**Perry** 10:5
**person** 36:22
**personal** 36:16
**phonetically**
35:20
**phrase** 35:20
**phrases** 35:16
**physically** 31:16
**pick** 11:22
**picks** 30:9
**place** 14:22,23
15:19
**plaintiff** 2:2 3:3
**Plaintiffs** 1:7
**please** 5:16,25
**point** 34:7,8

**Pousson** 2:11 5:5
**practical** 10:13
**pregnant** 16:14
**prepared** 36:15
36:18
**PRESENT** 2:11
**PRESENTED** 4:8
**prior** 8:9 20:17
**probably** 11:25
18:9 32:24
**problem** 31:24
33:1
**problems** 8:9
19:16,18,20,24
**Procedure** 3:10
3:17 35:6,7 37:1
**proceeding** 35:8
35:10,14
**program** 11:24
**prohibited** 37:3
**prohibition** 36:24
**provide** 30:14
**provisions** 3:8
**pry** 32:2
**psych** 22:23 25:15
25:21
**purposes** 3:8
**pursuant** 1:17 3:8
**put** 21:22

**Q**

**quantify** 32:9
**question** 6:17,25
**questions** 3:15
6:16 34:12
**quit** 17:17
**quite** 11:14

**R**

**R.S** 36:10
**reading** 3:13
**really** 12:22 16:2
29:24
**reason** 6:22 8:1
11:15 16:16
18:10 25:15
**reasons** 33:4
**recall** 12:22 22:24
**recommend** 25:18
**reconcile** 33:20,23
34:6
**record** 5:17 34:15

35:8
**reduction** 3:14
**reference** 35:18
**regular** 29:20
**Rehab** 15:9,14
16:21 17:21
**related** 37:7
**relations** 31:23
32:21 33:5
**relationship**
24:14 31:6,9
37:3,6
**relationships**
36:25
**released** 23:25
**remember** 10:6
11:14 12:23
13:7 17:2,12,15
18:12 19:3 27:6
**rent** 28:9
**rephrase** 6:19
10:20 24:19
**report** 18:25 19:5
**reported** 36:14
**reporter** 1:19 3:7
5:25 6:23 34:16
35:4,24 36:7
37:20
**reporter's** 35:1,14
**reporting** 36:14
37:4
**represent** 6:6
**required** 36:5,19
**reserve** 3:17
**resources** 35:19
**right** 6:12,15,20
7:2,4,8 11:7,8
12:3,8,19 17:24
19:3,11 24:8,21
34:9
**RN** 18:25 19:1
**role** 19:11
**roof** 25:6
**Rule** 35:5
**rules** 3:9 35:5
36:20 37:1

**S**

**S** 3:1
**satisfied** 14:15
**schedule** 29:25
**school** 9:22,23

10:2,4,5,8,19,25
11:1,7,8 13:25
30:17
schooling 13:25
seal 36:5
second 18:7 27:20
27:24 28:4,8,15
see 14:22 29:4,15
29:23 30:4,10
seeing 29:19
33:16
seek 20:4 33:7,10
self 22:21
semester 12:5,16
12:18 13:1
semesters 11:13
sensitive 32:4
separate 24:25
separated 7:23,24
8:19 19:14,25
20:5 24:5,18
25:22 26:4,4
28:6,12 29:11
separation 8:1
20:12,17 24:10
24:16,20 28:17
28:21 33:21
September 24:5
24:21
series 6:15
services 36:23
set 36:12
setting 14:7
sexual 31:23
32:21 33:5
Shelley 2:11 5:5
shoes 30:17
sic 22:21 30:1
Sidney 10:10
signature 36:4
signing 3:13
simple 23:10
sit 26:20
situation 26:11
six 28:5
sole 22:2
solely 29:4
son 7:12
sorry 10:20 13:11
13:13 22:17
Southern 1:3 5:14
spelled 35:20

spelling 35:17
split 19:21
splitting 19:17
spontaneous 35:9
spring 12:5
St 14:5,11 17:7
start 28:4 31:24
started 8:7 12:11
17:25 18:21
28:5
state 6:4 35:4,8
36:7
STATES 1:1
statute 36:20
statutes 3:9
stay 17:9 18:4
24:4
stipulated 3:2
stipulations 1:18
stop 6:18 7:5
stopped 22:3
strain 21:23
Street 1:20 2:4
study 10:12
studying 11:9
Suite 1:20 2:4
supervision 36:16
supervisor 19:1
support 30:14,25
sure 6:25 12:8
19:15 21:4
surgery 8:3,7,10
21:8,10,12,20
22:13 26:19
27:19 28:16,20
31:7,25 32:1,6
32:19,20 33:5
suspect 12:21
swear 5:25
swearing 3:14
swings 21:13,17
22:14 31:14,15
sworn 5:2 6:2
36:10
System 1:11 2:6
5:11

T
T 3:1,1
take 7:4,6 13:12
28:8,9
taken 1:16 3:6

35:8 36:8
talk 13:24 20:2
22:11 29:10,17
34:2 35:12
talking 28:24
31:22 32:10
Tech 11:5,21 13:5
13:14 14:1
Technical 10:10
tell 6:18 7:13 9:13
23:5 26:17
31:12,19 32:4
ten 7:14
testified 6:10
testify 5:3 36:11
testimony 6:8
36:8,13
Thank 34:9
thereof 3:13
37:11
thing 15:4 23:12
things 22:11
26:22,25 27:10
27:12,15
think 12:18 20:15
21:19 34:9
thinking 29:13
THOMAS 2:7
Thompson 19:6
thought 35:12
threatened 8:22
8:25
till 21:7 26:6
time 5:7,15 7:5
8:20,22 10:18
10:22 11:16
12:23 13:14,15
14:5 16:2 17:3
17:10 18:8,11
21:4,7,9 22:11
24:9,23,24
25:16,21,22
26:6,7,11,14,21
28:16,16 29:20
30:5
today 5:6 6:8,13
told 7:1 16:21
28:21 31:13
toliver@carrall...
2:9
Tom 5:22 6:6 19:3
19:5 28:24

transcribed 36:15
transcript 6:23
35:16 36:4,18
36:19
transcription
35:14
trial 3:18 24:16
tried 33:20,23
trouble 22:5,8,12
true 36:16
truth 7:1
trying 12:24,24
Twelfth 10:1
twice 29:16
two 7:11,15 11:13
15:2,15 16:22
23:24 27:20
29:14 31:17
type 29:7
typewriting 3:15
typically 29:17

U
U 3:1
U.S 5:12
UAB 11:5,19,22
12:1,3
Uh-huh 12:10,15
13:9 19:10
20:25
understand 6:12
6:18,19 12:9,25
understanding
36:17
understood 6:25
unit 26:8
United 1:1 15:9
15:13 16:21
17:20,20,25
universally 35:13
University 11:4
unsupervised
30:10
use 3:18

V
valid 36:3
verified 35:18
Veritext 5:5
Veronica 19:6
versus 1:9 5:10
VESTAVIA 2:8

video 1:16 6:24
videographer
2:12 5:4,24 6:24
34:13
visitation 29:20
voice-mask 36:14
voluntarily 23:16
23:19 27:8

W
waive 3:11
Walker 10:5
want 6:24 34:17
wasn't 8:6 10:25
14:15 20:19
21:4 24:11,11
26:15 31:20,21
way 25:20 33:21
37:11
we'll 6:23 7:5
we're 6:8 7:23
25:7 32:16
34:14
week 30:1,3
weekend 30:2
weekly 30:19,22
weeks 23:24 29:14
went 9:23 10:10
10:25 11:1 12:6
13:3 17:7,7 23:8
23:13,20 33:9
weren't 15:11
33:4
west 9:15,16,20
18:14,16,17,21
18:23 19:13
22:25,25 24:9
27:23
whatsoever 32:21
witness 3:14 5:14
6:1,2
woman 24:13
33:18
word 11:23
words 35:15,17
work 8:2,6 13:19
13:21,24 14:4
15:3 17:13,19
18:2,18 19:7,16
19:18 20:23
21:1,21,22 27:1
27:3,12,20

28:15 29:25
**Worked** 16:21
**working** 11:16,18
   15:16 16:19
   20:18,20,20
   22:3 26:13,15
   27:13
**wouldn't** 8:2

---
**X**
---

---
**Y**
---
**y'all** 7:22 8:9,14
   15:23 16:4,6,14
   16:16 19:17,21
   19:25 20:5
   21:23 22:5 24:4
   24:8,16,25 26:6
   29:7 31:3 33:4,7
   33:13
**y'all's** 8:1 31:9
   33:21
**yard** 27:1,3,12
**Yeah** 11:12 13:3
   19:8 21:9 22:14
   25:10 26:25
   28:7 34:5
**year** 10:6 11:1,11
   11:12 14:13
   15:15,22 16:6
   16:21 17:11
   18:9 23:3 24:6
**years** 7:14,15
   10:24 13:19
   15:2,15 16:22
**Yep** 24:20

---
**Z**
---

---
**0**
---

---
**1**
---
**100** 2:8
**11:20** 1:22 5:7
**12:00** 34:15,20
**1434** 37:1
**1434(B)** 35:6
**1443(D)** 3:16
**14th** 1:21 5:6
   36:11 37:12
**1640** 7:9
**19th** 8:13

---
**2**
---
**200** 1:20 2:4
**2002** 10:7 12:1,14
**2003** 12:1 13:8
**2007** 10:17,17
   13:17 14:1,3
**2008** 8:13,20,23
   9:1 16:12,13
**2019** 1:21 5:6
   36:11 37:12
**28** 35:5

---
**3**
---
**3000** 1:20 2:4
**35** 36:13
**35216** 2:9
**37:2554** 36:11

---
**4**
---

---
**5**
---

---
**6**
---
**6** 4:2

---
**7**
---
**70006** 1:21 2:4
**70056** 7:9