FILED

2021 Mar-25  AM 11:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **James Johnson, Jr., et al.** | \* | |
| | \* | |
| **Plaintiffs** | \* | **Case No.: 2:18-cv-1835-MHH** |
| | \* | |
| **v.** | \* | |
| | \* | |
| **ABF Freight System, Inc., et al.** | \* | |
| | \* | |
| **Defendants** | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE/LIMIT NANCY MICHALSKI

### I.     Overview of This Motion

There are two issues before this Court.  The first is whether Nancy Michalski's medical bill audit and record review satisfy the *Daubert* reliability requirements. The second is whether Ms. Michalski—who was retained to conduct a medical bill audit and record review in this case—should be allowed to offer opinions on other topics—topics that she herself admits she is not qualified for and that she does not plan to testify about.

### A.    Nancy Michalski's opinions are not reliable.

Ms. Michalski should be excluded from testifying at trial because her opinions are not reliable.  For an expert to testify, the expert must offer opinions based on reliable application of valid inputs to sound methods.  Here, Defendants offer expert

opinion testimony from Ms. Michalski regarding the reasonableness of Mr. Johnson's medical bills.  Yet, Ms. Michalski bases her conclusions off:

1. <u>incomplete and inaccurate facts</u>—*e.g.*, relying on numbers from sources that do not provide any transparency; comparing hospital surgery centers with non-hospital private surgery centers when determining what she considers to be a reasonable price; relying on sources that, by their own admission, are not authoritative and should not be legally relied upon; and not calling any local facilities or healthcare providers to obtain their charge masters;
2. <u>flawed methodology</u>—*e.g.*, comparing apples to oranges by comparing hospital surgery centers to non-hospital surgery centers, without taking into account pricing differences; and
3. <u>result-oriented application</u>—*e.g.*, selectively using numbers that suit her purpose rather than taking all data points into account.

The first question before this Court is whether her testimony should be excluded based on the unreliable nature of her opinions.

### B.   Nancy Michalski is a nurse, healthcare manager, and consultant who assessed reasonableness of past medical bills; she is *not* a life care planner, forensic accountant, economist, or doctor.

For an expert to be qualified to offer opinions, her opinions must be <u>within her specific subject area</u>.   In this case, in Ms. Michalski's report and in her deposition, she stated she was retained to and did conduct a medical bill audit and record review in this case to opine on the "reasonable value of past medical services."[1]  She is a self-described certified nurse and legal consultant.[2]  She also admitted she is *not* a life care planner, a forensic accountant, or an economist.[3]  She

---

[1] Exhibit 1, Michalski Audit Analysis and Records Review, p. 2.
[2] Exhibit 2, Michalski Deposition, p. 31: 19–24.
[3] Exhibit 2, Michalski Deposition, pp. 13:22–14:9.

testified that she would not offer future care estimates or projections or medical causation opinions.[4]   The second question before this Court is whether Ms. Michalski—who testified that she is not a life care planner, forensic accountant, or economist and who testified that she was not qualified to offer medical causation opinions and would not be offering future care estimates—should be allowed to opine on those topics at trial.[5]

## II.    Facts

### A.    Nancy Michalski's opinions regarding reasonableness of medical bills rely on flawed and incomplete data, use a methodology which fails to mitigate this unreliable data, and are based on an outcome-oriented application.

#### 1. Nancy Michalski uses distinguishable data sets to reach her opinions.

Ms. Michalski used disparate data sets and flawed sources when reaching her conclusions.  The flaws with her data are two-fold.  First, she uses <u>disparate data sets</u>, using data from hospital facilities to assess pricing at non-hospital, privately-owned surgery centers—even though she admits that costs of the same procedures and services Mr. Johnson underwent varies by facility type.  Second, she heavily <u>relies on unreliable pricing guides</u>; these guides are unreliable both because they

---

[4] Exhibit 2, Michalski Deposition, pp. 25:18–25, 26:1–8.
[5] This Motion is limited to the issues of whether Nurse Michalski is (1) qualified to opine on life care planning, forensic accounting, economics, future cost estimates, or medical causation and (2) whether her opinions on reasonableness of past medical services are reliable. Her qualifications regarding *her medical bill audit and records review* are not addressed in this Motion.

indicate—and in some instances expressly state—they are without any binding, legal effect and because there is no transparency in where the guides pull their data from.

The most egregious example of how she uses disparate data sets is how she compares apples to oranges by using *hospital data* to assess the reasonableness of bills from a *non-hospital surgery center*.  She testified that in reaching her opinions in this case, she compared Crescent View's outpatient services to the amounts hospitals charged for these same services—amounts she obtained from a book that contains proprietary data (1) she cannot confirm are actually based on the charges and costs of the procedures, (2) she has not confirmed the accuracy of, (3) and flaws which she failed to control for (since she failed to even attempt to all other facilities to get the charge masters for local hospitals or private surgery centers.[6]  Instead, she grasps at straws and assumes the books are a valid basis for her opinions.  For example, in her Audit Analysis and Record Review, she compares prices from three Louisiana hospitals—East Jefferson General Hospital, Ochsner Medical Center, and West Jefferson Medical Center—to assess the reasonableness of outpatient services at a non-hospital, ambulatory surgery center.[7]

---

[6] Exhibit 2, Michalski Deposition, pp. 80:17:–81:1 ("Q: So in this case you're comparing Crescent View's outpatient services, which was the facility in which Mr. Johnson had his surgery, versus the billed amounts that a hospital such as the hospitals listed on Page 10 of your report would have billed for outpatient services such as its facility fee or billed amount for the same procedure that Mr. Johnson underwent, which is the fusion; correct? / A: Correct.").

[7] Exhibit 1, Michalski Audit Analysis and Records Review, pp. 10–11.

**2. Nancy Michalski bases her opinions on sources that compile price points—even though those sources concede their own unreliability, emphasize the importance of considering *all* relevant factors, and do not provide any transparency about where they pull their data from.**

The flawed sources issue involves her heavy reliance on pricing guides as gospel—even though those sources state that they are mere guidelines without any binding, legal effect and even though those sources obscure where they pull their data from.  Ms. Michalski admits that she relies on sources including the Physician's Fee Reference and OptumInsight (National Fee Analyzer).[8]  Yet, the language of these sources shows that they are unreliable for exactly the purposes Ms. Michalski uses them for.  For instance, the Physicians' Fee Reference states:

- "***Without limitation, there is no representation or warranty that [the Physicians' Fee Reference] will meet any legal or statutory requirements, including requirements for establishing usual, customary and reasonable fees***."[9]
- "The information in this product is an opinion (which may or may not prove to be accurate) and should not be the sole basis for making decisions about a medical practice or the marketplace in general." [10]
- This product is a basic guide to be used for general reference purposes only."[11]
- "Your decision making should consider ***all*** relevant factors." [12]
- "There is ***no assurance*** that coding or fee information [in the Physicians' Fee Reference] is ***complete, accurate, or free of errors or omission***." [13]

---

[8] Exhibit 1, Michalski Audit Analysis and Records Review, p. 8.
[9] Exhibit 3, Physicians' Fee Reference (2016), (2017), (2018), (2019) (emphasis added).
[10] Exhibit 3, Physicians' Fee Reference (2016), (2017), (2018), (2019).
[11] Exhibit 3, Physicians' Fee Reference (2016), (2017), (2018), (2019) (emphasis added).
[12] Exhibit 3, Physicians' Fee Reference (2016), (2018), (2019).
[13] Exhibit 3, Physicians' Fee Reference (2016), (2017), (2018), (2019) (emphasis added).

- "Until recently fee information and fee setting methodologies for in-network participating providers was considered proprietary information and not publicly available.  They remain so."[14]

It makes sense that these the Physicians' Fee Reference would not profess to be complete, accurate, or free of errors because **it pulls its data from a <u>voluntary survey it sends to providers—a survey that is not publicly available and that is completely lacking in transparency</u>**.[15]

> A: What I'm telling you is that these standard analytical files are capturing the data based on provider ID numbers on the bills, that that's what's in the analytical files.  The independent research is that they send out annual provider service to providers across the country, and that's what they compile.
>
> Q: And what is the margin of error for the surveys to be returned from medical providers?  Do you know?
>
> A: ***That is not information that is available.   They don't provide transparency*** into –
>
> Q: So you don't know what percentage of doctors actually turn in the survey that – who sends?  Who sends the survey?
>
> A: Wassermann.
>
> Q: Oh, so the author of the book?
>
> A: The publisher.
>
> Q: I'm sorry.  ***The publishers of the book sends surveys to doctors and gets the surveys back and bases the fee information on that information and public sources, which is the CMS, LDS standard analytical files; correct?***
>
> ***A: Correct.***
>
> Q: Is that correct?
>
> A: Yes.
>
> Q:  So we don't know what the publisher of the Physicians Fee Reference includes or requests in the survey, do we?

---

[14] Exhibit 3, Physicians' Fee Reference (2016), (2017), (2018), (2019).
[15] Exhibit 2, Michalski Deposition, pp. 181:16:–182:22.

> A: **They don't provide transparency into the questions in the survey or the information they're obtaining.**
> Exhibit 2, Michalski Deposition, pp. 181:16:–182:22 (emphasis added).

Ms. Michalski tries to minimize these fatal flaws: "It is acknowledged that these databases contain disclaimer language for legal liability to guard against misuse and misappropriation, and they recommend that the information be correlated with other sources" and concludes that her opinions must be reliable because she "incorporates numerous sources."[16]   But as described in the following subsection addressing methodology, she neither accounts for all relevant factors nor controls for the missing factors in her methodology.  More shockingly, she did not pick up the phone and call local medical doctors, local surgery centers, or local hospitals to ask what they would charge (according to each charge master) for the exact same procedures Mr. Johnson underwent as a direct result of the accident.  This lack of transparency and unknown margin or rate of error makes the data she relies on inherently unreliable, which is problematic given *Daubert*'s emphasis on the known rate of error.  Finally, the Physician's Fee Reference admits that it uses **outdated** data—in the 2016 and 2017 editions, it was using CMS data from 2014, and in the 2018 and 2019 editions, it was using CMS data from 2016.  Unlike the transparency flaws— which Ms. Michalski at least addressing in passing, Ms. Michalski completely

---

[16] Exhibit 1, Michalski Audit Analysis and Records Review, p. 8.

ignores the outdated—and thus unreliable—data that one her of key sources (the Physicians' Fee Reference) uses.

She also relies heavily on Optum 360 National Fee Analyzer—a source which shares the flaws of the Physicians' Fee Reference and is further flawed because it deals with **reimbursement rates** instead of **charges**—making this an apples-to-oranges comparison.   For example, the Optum source she relies on:

- Includes an American Medical Association Notice that states: "Fee schedules, relative value units, conversion factors and/or related components are not assigned by the AMA, are not part of the CPT, and **the AMA is not recommending their use.**"
- Explains that "[t]he *Analyzer* provides in-depth information to help you evaluate the fee schedule you are currently using.  **Key sections of the book include:** [a] coding overview to provide users with a perspective on the code sets and how their use impacts reimbursement[, . . .] [a] comparison of commercial and Medicare policies and payments[, and] [p]ercentiles of national charge data as well as the national average Medicare fee**."
- Medicare amounts are subject to change throughout the year.  The Medicare averages published in this *Analyzer* are the most current available at the time of printing.  **Please check with CMS or your local contractor to obtain rates for a specific locality and date**."[17]
- Explains that "[it] makes no warranties, either express or implied, including warranties that this information is error free or accepted or approved by others."
- States that "[t]he data used in the *Analyzer* is based on data collected from health insurance payers by FAIR Health, Inc." (In other words, **_not_** medical doctors and privately owned surgery centers like Dr. Liechty and Crescent View Surgery Center).

Optum itself explains that it relies in part on Medicare payments and policies—data which is substantively different from other charge data and which artificially skews

---

[17] Exhibit 4, Optum Fee Analyzer, (2016), (2017), (2018), (2019) (emphasis added).

all the percentiles downward.  It also cautions that individuals using it as a source should do more digging to make sure locality rates and rates at a certain date are accurate—exactly the sort of additional digging Ms. Michalski chose not to do. These flaws highlight the unreliability of the data Ms. Michalski relies on.

> **B.** **Instead of tackling weaknesses in the data head-on—for example, by obtaining necessary, additional data herself from local providers—Nancy Michalski brushes aside the flaws in her data to reach her outcome-oriented opinions.**

Prior to becoming a consulting expert with Elevate, Ms. Michalski was the cofounder of Director Surgical Services and director of the medical billing department for Outpatient Surgery Medical Unit—a multi-specialty outpatient surgery center and medical clinic.[18]  As part of her job there, she was in charge of setting the fees for that outpatient surgery center.[19]  In doing so, she relied on three sources, specifically including "community-based research"[20]:

> Q: Okay.  And we'll touch on that later.  The third source that you use for setting the charges for the surgery center in California, which was the Outpatient Surgical Medical Unit, is what?

---

[18] Exhibit 2, Michalski Deposition, pp. 56:15–57:13 ("Q: […] On your CV, from 1984 to 2001, explain to me what you did for work.  It says you were the cofounder of Director Surgical Services and director of medical billing department for Outpatient Surgery Medical Unit.  Is that accurate? / A: Yes. / Q: Okay.  What is Outpatient Surgical Medical Unit? / A: It was a multispecialty outpatient surgery center and medical clinic. / Q: Would you classify that as an ambulatory surgery center? / A: Yes. / Q: So it would be similar to Crescent View Surgery Center in this case; correct? / A: Yes, plus it had a clinic. / Q: I'm sorry? / A: Plus it had a clinic associated to it, as well. / ***Q: "But with respect to the surgery center itself, that would be analogous to Crescent View Surgery Center in this case; correct? / A: Yes.***") (emphasis added).

[19] Exhibit 2, Michalski Deposition, p. 60:10–13 ("Q: Okay.  Looking at your CV, it says that you established medical charges for the facility; is that correct? / A: Yes."), p. 60:21–23 ("Q: Okay. So you set the fees for the Outpatient Surgery Center, correct? / A: Yes.").

[20] Exhibit 2, Michalski Deposition. p. 63:8–18.

*A: Then I just conducted community-based research.*
Q: Okay. And what did the community-based research entail? Explain
that to the jury.
*A: Yeah, I contacted colleagues within the community and found out
what they were charging for the same services*.  Exhibit 2, Michalski
Deposition, p. 63:8–18 (emphasis added).

At that time, there was only one other surgery center in Anaheim, California

(the only other surgery center west of the Mississippi), and as part of her community-

based research, she obtained that facility's pricing; furthermore, she did not rely on

that single data point, but she also contacted local hospitals and doctors to find out

their surgery center prices.[21]   When asked why she chose to omit statistics from

privately-owned surgery centers in the Greater New Orleans area when forming her

opinions in this case—as she had done before when she was working for a surgery

center—instead, she stated that "that data is not available."[22]   But soon thereafter,

she stated that the reason she did not call any privately-owned ambulatory surgery

centers was because that was "not part of [her] methodology."[23]   Then, she about-

---

[21] Exhibit 2, Michalski Deposition, p. 65:7–19 ("Q: And that [community-based research] entailed
contacting colleagues at other surgery centers to see what they were charging, correct? / A: I was
actually contacting other – contacting our local hospitals and doctors to find that out, because we
were the second surgery center west of the Mississippi. / Q: Okay. / A: And at that time there were
no other – there was one other surgery center in Anaheim, California, and I did, in fact, get their
pricing because they were the only other surgery center at the time.").

[22] Exhibit 2, Michalski Deposition, p. 81:4–13 ("Q: Okay. What is the reason why you did not use
statistics from privately-owned surgery centers in the Greater New Orleans area in coming up with
your statistics with respect to APC code or APC 5115, which the Level V musculoskeletal
procedures? / A: Because there is no – that data is not available.  There is no data source of judge
privately-held surgery centers.  That does not exist.  This is the data that exists.").

[23] Exhibit 2, Michalski Deposition, pp. 81:21–82:6 ("Q: So you did not call any of the privately-
owned ambulatory surgery centers in the Greater New Orleans area to get the amount that they
would have billed and charged Mr. Johnson to use its facility for the surgery that he underwent;

faced *again*—and said that one reason she thought that information would be unreliable was because "it's very difficult to get that information" and that it would be a small sample size compared to national directories and that she thought it would be unusual for facilities to give her this information.[24]  Based on her distinguishable, incomplete data sets and her methodology (which does not try to mitigate these issues)—Ms. Michalski's opinions on the reasonableness of the past medical bills is not reliable.

## III.   Law & Analysis

Under Federal Rule of Evidence 702, for expert testimony to be admissible, it must satisfy three tests.  First, the expert must be <u>qualified</u> to testify competently regarding the matters he intends to address. Fed. R. Civ. Pro. 702; *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1309 (11th Cir. 1999).  The testimony must also be <u>reliable</u> under *Daubert* and <u>helpful</u> to the trier of fact.  Fed. R. Civ. Pro. 702; *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).  While there is inevitably some overlap among these three basic requirements (qualification, reliability, and

---

correct? / A: No.  That is not part of my methodology, to call other facilities.  That would be inherently unreliable, and I would not be able to validate that, even if I could get the information, which is highly unusual for providers to give pricing over the phone.").

[24] Exhibit 2, Michalski Deposition, pp. 82:7–19 ("Q: Why do you say that calling privately-owned surgery centers in the Greater New Orleans area that are similar to Crescent View would be unreliable? / A: Because, first of all, it's very difficult to get that information.  There would be no way to validate it.  It would be a very small sample size.  This is tens and thousands of data points in the American Hospital Directory.  They have a hugely robust database of this fact-based data upon which to rely rather than calling around to facilities and not being able to validate that the information I was given is accurate.").

helpfulness), they are distinct concepts and courts should not conflate them. *Frazier*, 387 F.3d at 1260 (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.,* 326 F.3d 1333, 1341 (11th Cir. 2003)). The trial court has broad discretion in the admission or exclusion of expert evidence, including the qualification of an offered expert, and its decision is reviewed under the manifest error standard. *Salem v. United States Lines*, 370 U.S. 31 (1962); *Eastern Airlines, Inc. v. American Cyanamid Co.*, 321 F.2d 683 (5th Cir. 1963).

### A. Ms. Michalski's opinions on the reasonableness of the medical bills are not reliable because of her incomplete and flawed data and outcome-oriented methodology.

The proponent of an expert opinion bears the burden of proof that the opinion is reliable. *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005); *Frazier*, 387 F.3d 1244, 1282, fn. 27 (11th Cir. 2004). The trial court has broad discretion in the exclusion of expert evidence, including the qualification of an offered expert, and its decision is reviewed under the manifest error standard. *Salem v. United States Lines*, 370 U.S. 31 (1962); *Eastern Airlines, Inc. v. American Cyanamid Co.*, 321 F.2d 683 (5th Cir., 1963). The district judge has "the task of ensuring that an expert's testimony . . . rests on a reliable foundation. . . ." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014) (citing *Daubert,* 509 U.S. at 597, 113 S. Ct. at 2799).

When assessing whether an opinion is reliable under *Daubert*, courts should assess the expert testimony using four factors:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community. *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1305 (11th Cir. 2014).

These factors are not "a definitive checklist or test"—another is improper extrapolation of data—and such considerations are "applied in case-specific evidentiary circumstances," *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 593, 113 S.Ct. 2786, 2796, (1993); *United States v. Brown,* 415 F.3d 1257, 1296, 1305 (11th Cir. 2005); *Chapman*, 766 F.3d at 1305; *Alison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (1999).

When analyzing reliability under *Daubert*, "*the focus 'must be solely on principles and methodology, not on the conclusions that they generate.'*" *Chapman*, 766 F.3d at 1305 (citing *Daubert,* 509 U.S. at 594–95, 113 S.Ct. at 2797 (emphasis added)); *see also McDowell v. Brown,* 392 F.3d 1283, 1298 (11th Cir.2004) (a trial judge should meticulously focus on the expert's principles and methodology).

To the extent opinion evidence is connected to existing data only by the *ipse dixit* of the expert, a trial judge can conclude that there is "simply too great an analytical gap between the data and the opinion offered." *Chapman*, 766 F.3d at

1305.  As the Honorable Judge Haikala has correctly cited with approval, a district judge "has 'the task of ensuring that an expert's testimony both rests on a reliable foundation . . .'" *Ruiz v. Wintzell Huntsville, L.L.C.*, 2017 WL 4305004, at *5 (N.D. Ala. 2017) (citing *Chapman*, 766 F.3d at 1306 (11th Cir. 2014)).

In *Ruiz*, this Court considered whether a biologist who specialized in food safety, microbiology, commercially-important shellfish pathogens, and seafood distribution chains was qualified to testify about the supply-chain source of tainted shellfish. *Id.* at 5–6.  In that case, this Court held that the expert was qualified.  *Id.* In *Ruiz*, this Court also correctly analyzed whether the expert's analysis was sufficiently reliable pursuant to *Daubert*. *Id.*  That expert relied on the harvest tags in conjunction with the restaurant's sales records and one of two shellfish supplier's business records.  *Id.*  The Court concluded that these inputs were valid and reliable basis for the expert's opinion because there was not "too great an analytical gap" between the data and the proffered opinion.

Here, Defendants are the proponents of Ms. Michalski's expert opinions, so Defendants bear the burden of proving her testimony is reliable.  They have not and cannot satisfy their burden.  As a threshold matter, Ms. Michalski reaches her opinions by improperly extrapolating data from one type of source (for example, hospital sources) and applying that data to distinguishable sources (for example, non-hospital, out-patient surgery centers—which again was the exact methodology

she used to set the pricing at a surgery center in practice, before she started changing her methodology to benefit her litigation-driven opinions as she did here).  This type of extrapolation is improper under *Daubert* and requires exclusion of her opinions.

Ms. Michalski's data is further flawed because she bases her opinions on unreliable data not fit for the purposes she uses it for.  For instance, the Physicians' Fee Reference cautions that there is <u>no assurance</u> that the coding or fee information contained in it is complete, accurate, or free of errors or omissions.   This is because—as the publisher admits—it bases its data on surveys it sends to cherrypicked providers that accept health insurance and Medicare alone and has no control over response rate.

Although Ms. Michalski tries to dismiss this language as a mere "legal disclaimer," her own testimony implicitly concedes that this source is incomplete, since she acknowledges that local, ***non-hospital surgery centers are not contained in her sources***—which means that the Physicians' Fee Reference (as one of her sources), is in fact incomplete.  For example, in the audit accompanying her report, she stated that she reached her opinions regarding Crescent View Surgery Center's charges based "on the APC (Ambulatory Payment Classification) value for outpatient services, the anesthesia fee calculation of base units plus time units multiplied by a conversion factor, and NCCI (National Correct Coding Initiative)

Edits."[25]  Based on this and the fact that the Physicians' Fee Reference is based in large part on voluntary surveys, her sources lack reliability.  These surveys are not transparency and the margin of error for them is unknown.  Ms. Michalski admits that there the data comes from voluntary surveys and that there is no information on the margin of error for the surveys being returned from the medical providers.  This is problematic since known margin of error is a key factor in a *Daubert* analysis. Ms. Michalski relies on sources—like the Physicians' Fee Reference—that have not been shown to be reliable.

She also disregards the statement that all relevant factors should be considered, because she neither includes data points from non-hospital surgery centers (another, relevant factor) nor does she include anything in her methodology to account for this omission.  (She did not, for example, include a rate of error based on this omission).  Instead, she—through her *ipse dixit*—simply insists that she could not include those data points for contradictory reasons.

First, she states that information is "not available" and "does not exist." Her own actions when *she* was in charge of setting fees belie this statement.  In her own personal experience, when she was tasked with setting the rates for a non-hospital surgery center, she picked up the phone and called other facilities to help understand regional, reasonable costs.  Here, she chose not to do so.  When asked why she did

---

[25] Exhibit 5, Michalski Audit, p. 6.

not make any calls, she stated that phone calls were not part of her methodology and claimed (without supporting sources) that that data would be unreliable.[26]  Her *ipse dixit* here is not enough to show that her methodology and sources were reliable—especially when she *did* consider this type of data reliable enough for her to obtain it when she was the one setting prices.  Additionally, she suggests that calling around to other, more analogous providers would be a dead-end since she deems it unlikely they would share this information.  But again, when she actually tried this method in a past job, she *was* able to obtain prices from the most analogous health care center.  Here, she did not even try to obtain this information by independently reaching out to similar providers or centers—doing so would have shown the reliability of the medical bills in this matter.

It is also interesting that Ms. Michalski suddenly professes to care about reliability to explain away her refusal to call analogous facilities, but that she has no qualms in relying on data that suits her purposes from the Physicians' Fee Reference—a source that disclaims its own reliability, that is based on voluntary surveys, and that is completely lacking in transparency.

Ms. Michalski's own personal experience and testimony show that comparing charges at hospital surgery centers and outpatient surgery centers (like Crescent

---

[26] Exhibit 2, Michalski Deposition, p. 81:21–82:6 ("Q: So you did not call any of the privately-owned ambulatory surgery centers in the Greater New Orleans area

View in this case) is like comparing apples and oranges.  Based on her own personal experience when she was the one figuring out what a facility like Crescent View should charge, she did not stop at relying on hospital charges; instead, she dug deeper and found the geographically closest facility of the same type (another non-hospital surgery center) and factored their charges into her price-setting analysis.  Yet, in this case, she did not—even though she testified that charges at hospitals are usually different from the charges at other surgery centers like Crescent View in this case (although she claimed, without *any* supporting authority, that hospitals would typically have higher costs than a hospital).[27]

Second, she implicitly concedes that the data *does* exist, but she shifts gears and argues that the data is unreliable.  This analysis—which does not even appear in the four corners of her report—is based purely on her *ipse dixit* from her deposition testimony.  Ms. Michalski's unwillingness or inability to address this lack of the most analogous data fundamentally taints her opinions, making them completely unreliable.  Finally, Ms. Michalski uses the data from the Physicians' Fee Reference for exactly the types of purposes it is not fit for.  The Physicians' Fee Reference is very clear that it makes no guarantees that it could meet any legal requirements—

---

[27] Exhibit 2, Michalski Deposition, pp. 66:12–19 ("Q: Thank you for the clarification.  So generally speaking, the costs for a surgery such as the one Mr. Johnson underwent at a privately-owned surgery center are lower than the costs that would be incurred if the same procedure was performed at a hospital? Yes or no? / A: Correct.").

"***including requirements for establishing usual, customary and reasonable fees***"—

exactly the reason Ms. Michalski uses it for.

This is not the first time a court has faced Ms. Michalski's flawed data sources.

In *Bradner v. Golconda Holdings, LLC et al*., a Mississippi court correctly

scrutinized this disclaimer language, and concluded that this type of language

indicated a lack of reliability, limiting Ms. Michalski for relying on this type of

unreliable data.[28]    In that case, the Court conducted a *Daubert* analysis and

concluded that Ms. Michalski relied on sources that:

> "…are guides for companies to use to decide what to do in their own
> business, not to decide what is reasonable.  These reasons alone lead
> this court to believe that such information is not something that an
> expert could reasonably rely upon in reaching valid opinions because
> the documents themselves indicate that they may or may not be
> accurate."[29]

Because of this, the Court excluded Ms. Michalski from offering opinions "based on

the referenced guides, including the Physicians' Fee Reference … and OptumInsight

(National Fee Analyzer)."[30]  Yet, Ms. Michalski turned around and used these same,

unreliable sources in this case.

---

[28] Exhibit 6, *Bradner v. Golcanda Holdings, LLC, et al.*, Case No: 17-0435 (Hancock County, Miss. 2020).
[29] Exhibit 6, *Bradner*, Case No: 17-0435, p. 3.
[30] Exhibit 6, *Bradner*, Case No: 17-0435, p. 3.

**B. Ms. Michalski is not qualified to offer opinions on life care planning, forensic accounting, economics, or medical causation and is not prepared to offer testimony on future medical bills.**

"The proponent of the testimony must show that the expert is **qualified** to testify competently regarding the matters he intends to address." *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (emphasis added); *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). Thus, the proponent of an expert opinion bears the burden of proof that the expert is qualified to testify competently regarding the matters he intends to testify on. *McClaim v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005) (citing *Frazier*, 387 F.3d 1244, 1282, fn. 27 (11th Cir. 2004)).

There is a key distinction between abstract qualifications and qualifications on a specific topic: "Often the qualification prong is not about if the proffered expert is qualified in the abstract, but instead it is about whether he is qualified to render an opinion on a *specific topic*." *Ifediba*, 2019 WL 3082662, at *2. For example, in *Ruiz*, this Court considered whether a biologist who specialized in food safety, microbiology, commercially-important shellfish pathogens, and seafood distribution chains was qualified to testify about the supply-chain source of tainted shellfish. *Id.* at 5–6. In that case, this Court held that the expert was qualified based on the specific nature of his experience and the specific opinions he was offering. *Id.*

Other district courts also make this distinction. For example, in *Ifediba*, the district court held that a medical expert was qualified to testify regarding whether

opioid-prescribing practices were for a legitimate medical purpose when his qualifications included:

- graduating from medical school,
- completing a surgery residency,
- completing an addiction medicine fellowship,
- having years of experience as a clinical practitioner in pain management and addiction, and
- having a board-certification in addiction medicine. *Ifediba*, 2019 WL 3082662, at *3 (N.D. Ala. July 15, 2019).

By contrast, courts reject the idea of a blanket qualification for all professionals in a field to testify about every subset of that field. *See, e.g.*, *Alexander v. Smith & Nephew, P.L.C.*, 98 F. Supp. 2d 1276, 1281–82 (N.D. Okla. 2000) (rejecting the proposition that a physician can testify about anything medically-related). Just as not every medical doctor is automatically qualified to give an opinion on every medical issue, not every healthcare professional is qualified to give medical opinions much less life care planning, forensic accounting, or economic opinions. Here, Ms. Michalski, in her own words, testified that she is a nurse (*not* a doctor) and legal consultant with billing and coding experience, but she admitted that she is *not* a life care planner, a forensic accountant, or an economist. She also admitted that medical opinions are outside the scope of her qualifications.

This Court should not allow Ms. Michalski to offer any opinions on these topics or topics she testified that she was not offering opinions on. Because Ms. Michalski herself admits that she is not qualified as a life care planner (the type

of expert who accounts for the cost of future medical care that is more likely than not medically necessary per the treating doctor—here Dr. Liechty), a forensic accountant, or an economist, she should not be permitted to offer any opinions on those subject areas at trial.  Likewise, because she admitted that medical opinions are outside the scope of her purported expertise, she should not be permitted to offer medical opinions or medical causation opinions at trial.  Finally, because she testified that she would only be offering opinions on reasonableness of ***past*** medical bills and since that is all that is included in her report, she should not be allowed to offer any testimony about the reasonableness of *future* medical bills at trial.

Since she was disclosed as expert who would be conducting a medical bill audit and record review in this case and since she admitted she would not be testifying regarding these other topics—which are outside the scope of her qualifications *and* are not included in her report, this Court should not allow Ms. Michalski to offer any testimony on those topics.  For these reasons, Plaintiff ask this Court to hold that Ms. Michalski is not qualified to offer opinions on the following topics: life care planning, forensic accounting, economics, future care estimates or projections, and medical causation.

## IV.  Conclusion

Ms. Michalski—by her own admission—is not qualified to offer opinions on life care planning, forensic accounting, economics, future care estimates or

projections, or medical causation, so she should not be permitted to testify about these topics at trial. As such, this Court should not permit her to testify about these topics.  Similarly, she testified that she would not be offering opinions about future medical bills, so she should not be permitted to offer any opinions about the reasonableness of future medical bills at trial.  As to Ms. Michalski's opinions about the reasonableness of Mr. Johnson's past medical bills, those opinions are unreliable because they are based on incomplete and unreliable data and because the methodology ignores sources that could contradict her outcome-oriented opinions. Because Ms. Michalski is not qualified to offer testimony on numerous topics, and because the opinions she does plan to offer are unreliable, this Court should completely exclude Ms. Michalski from testifying at trial.

*SIGNATURE BLOCK ON FOLLOWING PAGE*

23

Respectfully Submitted,

**THE TIEBAUER LAW OFFICES, LLC**
*/s/  Eric Tiebauer*
**ERIC TIEBAUER**, ASB# 2431-E68E
P.O. Box 1421
4363 Highway 45 North
Waynesboro, MS 39367
Telephone:   (601) 735-5222
Facsimile:   (601) 735-5008
Email:            tiebauer@att.net
*Counsel for Plaintiffs*

<u>*and*</u>

**BAER LAW, LLC**
**JASON M. BAER**, Bar No. 31609
       *Admitted Pro Hac Vice*
3000 Kingman St., Ste 200
Metairie, LA 70006
Telephone: (504) 372-0111
Facsimile: (504) 372-0151
Email:        jbaer@baerlawllc.com

<u>*and*</u>

**THE KING FIRM, LLC**
**JASON F. GILES**, La. Bar #29211
       *Admitted Pro Hac Vice*
2912 Canal Street
New Orleans, LA 70119
Phone 504-909-5464
Fax 800-901-6470

## CERTIFICATE OF SERVICE

I certify that a copy of the above and foregoing pleading has been served upon counsel for all parties via CM/ECF Filer System, on this 25th day of March, 2021.

*/s/  Eric Tiebauer*
ASB# 2431-E68E